## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

**HOUSING RIGHTS INITIATIVE**
27 W. 60th Street
P.O. Box 20490
New York, NY 10023

and

**NEUHTAH OPIOTENNIONE**
5351 Haynes Street NE
Washington, DC 20019,
on behalf of herself and all others similarly-situated

*Plaintiffs,*

**v.**

**BOZZUTO MANAGEMENT COMPANY**
6406 Ivy Lane
Suite 700
Greenbelt, MD 20770

Service At:
CT Corporation System
1015 15th Street NW
Suite 1000
Washington, DC 20005

**GREYSTAR MANAGEMENT SERVICES L.P.**
465 Meeting Street, Suite 500
Charleston, SC 29403

Service At:
CT Corporation System
1015 15th Street NW
Suite 1000
Washington, DC 20005

**KETTLER MANAGEMENT INC.**
8255 Greensboro Drive
Suite 200
McLean, VA 22102

Service At:
National Registered Agents Inc.
1015 15th Street NW

Case No. 20-cv-1956

Class Action Complaint

Jury Trial Demanded

Suite 1000
Washington, DC 20005

**WOOD RESIDENTIAL SERVICES, LLC**
11 North Washington Street
Suite 320
Rockville, MD 20850

Service At:
CSC-Lawyers Incorporating Service Company
7 St. Paul Street
Suite 820
Baltimore, MD 21202

**FAIRFIELD RESIDENTIAL COMPANY LLC**
5510 Morehouse Drive
Suite 200
San Diego, California 92121

Service At:
Corporation Service Company
251 Little Falls Drive
Wilmington, DE 19808

**JBG SMITH MANAGEMENT SERVICES, LLC**
4747 Bethesda Avenue
Suite 200
Bethesda, Maryland 20814

Service At:
The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

**PINNACLE CAMPUS LIVING LLC**
5055 Keller Springs Road
Suite 400
Addison, Texas 75001

Service At:
Corporation Service Company
251 Little Falls Drive
Wilmington, DE 19808

**TOWER CONSTRUCTION GROUP, LLC (i/p/a
THE TOWER COMPANIES)**
2000 Tower Oaks Boulevard
Ninth Floor
Rockville, MD 20852

Service At:
Luann S. Sinclair, Esq.
2000 Tower Oaks Boulevard
Ninth Floor
Rockville, MD 20852

**VANTAGE MANAGEMENT, INC.**
9711 Washingtonian Boulevard, Suite 200
Gaithersburg, MD 20878

Service At:
The Corporation Trust, Inc.
2405 York Road
Suite 201
Lutherville Timonium, MD 21093

**BERKSHIRE COMMUNITIES, LLC**
One Beacon Street
Suite 2400
Boston, MA 02108

Service At:
Corporation Service Company
251 Little Falls Drive
Wilmington, DE 19808

*Defendants.*

The plaintiffs—a prospective tenant and a non-profit organization dedicated to promoting lawful housing practices—bring this class-action lawsuit against ten property-management companies that routinely and deliberately excluded older people from receiving advertisements on Facebook for dozens of apartment complexes in the D.C. metropolitan area, in violation of District of Columbia and Montgomery County civil rights and consumer protection laws.

## INTRODUCTION

This is the first fair-housing lawsuit brought against residential property management companies that engaged in digital discrimination in housing advertising—namely, the use of digital, online tools to eliminate a group of people from receiving a company's housing advertising and recruiting.  As with the historical practices of redlining and racial steering that led to the passage of fair-housing laws, the defendants' conduct here was overt. They knowingly decided not to advertise their rental properties to older people when they recruited prospective tenants via Facebook because they wanted to steer away older people from their properties and attract younger tenants. When each of the defendants published their housing ads on Facebook, it deemed anyone older than 50 too old to receive the ads. And, making matters worse, they expressly told recipients that they wanted to reach only younger people.

Like traditional forms of housing discrimination, the digital housing discrimination at issue here is systemic. This lawsuit is not about one or two small players who inadvertently misused digital tools. Instead, it involves several leaders in the industry—marquee names like Bozzuto, Greystar, and Kettler—that manage hundreds of thousands of apartments nationally and that knowingly paid substantial sums of money to Facebook to categorically withhold their ads from older people. Acting in unison, these leading residential property management companies distorted and skewed the D.C. metropolitan housing market with age discrimination and made it much harder for older residents to learn about, apply for, and secure suitable rental housing. And surprisingly, the defendants engaged in this harmful discrimination long after Facebook itself was sued for enabling, facilitating, and profiting from the same type of digital discrimination in housing.

For example, Bozzuto is one of the nation's leading apartment developers and managers. It manages over 75,000 apartments in eleven states and D.C., and is headquartered in Greenbelt. When it was leasing a new apartment complex in Silver Spring called "Central," Bozzuto placed ads

on Facebook that were sent only to people between the ages of 22 and 40. Bozzuto thus made a conscious choice to deny its ads to anyone older than 40. And Bozzuto informed the viewers of its advertising that Central wanted to "reach people ages 22 to 40 who live near Silver Spring, Maryland."



All of the defendants sent ageist ads like these—ads that were deliberately withheld from older persons. The complaint and Exhibit A offer more examples of these discriminatory ads.

In addition to expressly excluding older people from receiving their ads, the defendants engage in another similar form of age discrimination: When the defendants advertise their apartments on Facebook, they rely on Facebook's ad-delivery algorithm, which determines which Facebook users will receive the ads based on the individual's age, among other traits. As a result, even when older people are not completely excluded from getting the defendants' ads, they are routinely denied the defendant's housing advertisements because of their age and they are often less likely than younger persons to receive those ads.

As described in this complaint, the plaintiffs allege that the digital discrimination here violates fair-housing laws, including District of Columbia and Montgomery County laws that prohibit age discrimination in housing. But the plaintiffs do not stand alone in making this claim. In fact, both

the U.S. Department of Justice and the U.S. Department of Housing & Urban Development (HUD) have adopted the view that such digital housing discrimination is unlawful and have taken legal actions to curb it. So has the U.S. Equal Employment Opportunity Commission, with respect to age- and sex-restricted job ads on Facebook. And HUD's regulations and federal court decisions have long made clear that fair-housing law bars landlords and other housing companies from denying housing ads to people based on a protected status or class. Although the federal Fair Housing Act does not bar age bias, the laws of the District of Columbia and Montgomery County do ban age bias and they contain prohibitions on discriminatory advertising that are nearly identical to the Fair Housing Act.

The plaintiffs seek a declaration that the defendants' digital discrimination is unlawful, an injunction to stop these harmful practices in the future—by prohibiting the defendants from using age to deny their housing ads to older people and barring them from placing housing ads on Facebook so long as Facebook's ad delivery algorithm relies on age to determine which users receive housing ads. The plaintiffs also seek monetary damages for the harm that the defendants have caused and other forms of relief for the named plaintiffs and a class of thousands of other older persons who have been denied housing information and opportunities.

Unless and until these industry leaders are held accountable for their digital discrimination and are forced to stop ageist advertising, the housing industry may believe that it can act with impunity and in reckless disregard for tenants' fair-housing rights. They may believe that it is appropriate and lawful to micro-target prospective tenants or home purchasers based on age, race, national origin, sex, religion, familial status, and other protected traits. But that is not the law. While the Internet may have made it easier and more efficient to commit fair-housing violations, our civil rights laws still apply. And our federal courts still possess the same remedial powers to enforce the civil rights laws online as they do offline.

## JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d)(2) as the matter in controversy is a class action that exceeds the value of $5,000,000, exclusive of interests and costs, and members of the proposed class are citizens of different states than at least one defendant.

2.      This Court has personal jurisdiction over all of the defendants, as they all sent and specifically targeted their age-restricted housing advertisements on Facebook towards people who reside, are located, or are present in the state of Maryland, they all recruited persons who reside, are located, were present, or were searching for housing in the state of Maryland and other nearby jurisdictions such as the District of Columbia, including by sending age-restricted housing advertisements on Facebook to such persons and by engaging in other activities to solicit applications for housing, and all defendants manage rental properties in the state of Maryland.

3.      Upon information and belief, all of the defendants sent age-restricted housing advertisements to Facebook users who reside, or were located or present, in the state of Maryland and the District of Columbia in order to recruit and solicit such persons to apply for housing at those defendants' properties.  Defendants sent age-restricted housing advertisements to Facebook users who reside or were located or present in the state of Maryland in order to recruit and solicit such persons to apply for housing at those defendants' properties in the state of Maryland.  Moreover, upon information and belief, the age-restricted housing advertisements that the defendants sent to younger persons, to the exclusion of older persons, resulted in younger persons from the state of Maryland and the District of Columbia applying for housing managed by the defendants in the state of Maryland.  Upon information and belief, the defendants' advertisements were not targeted to a national audience of Facebook users (*i.e.*, entire United States), but instead specifically targeted Facebook users in both Maryland and the District of Columbia.

4.       In addition, there is general jurisdiction over defendants Bozzuto, JBG Smith, Tower, and Vantage, because they have their corporate headquarters in this District and have substantial business operations in this District.

5.       Venue is appropriate under 28 U.S.C. § 1391(b)(2), as a substantial part of the events or omissions that gave rise to the claims occurred, and a substantial portion of the properties that are the subject of the action, are situated in this District. Among other things, each of the defendants sent and specifically targeted its age-restricted housing advertisements towards and recruited persons who reside in or are located in the State of Maryland, as well as persons in other nearby jurisdictions such as the District of Columbia.

## PARTIES

6.       Plaintiff Neuhtah Opiotennione is a 55-year-old woman who lives in Washington, D.C. Within the last two years and even earlier, Ms. Opiotennione was regularly searching for rental housing in the D.C. metropolitan area, including the District of Columbia and Montgomery County, Maryland. She worked for the D.C. Public School system and had a housing budget of at least $2,500 per month. She has regularly used Facebook over the last two years and earlier and was interested in receiving information via Facebook about housing opportunities so that she could seek, apply for, and secure housing opportunities. During that time frame, she was present in both the District of Columbia and Montgomery County, including when she used Facebook. Upon information and belief, during her search for housing Plaintiff Opiotennione was completely denied the opportunity to receive the defendants' age-restricted housing ads that were denied to persons older than 50 years old.  Had she received those housing ads, Plaintiff Opiotennione would have clicked on the ads, reviewed the information on the defendants' web sites, and applied for housing at the defendants' properties.

7.      Plaintiff Housing Rights Initiative (HRI) is a non-profit organization dedicated to promoting lawful real estate practices, including promotion of the rights of tenants and other housing-related consumers, and providing information and assistance to tenants and individuals seeking housing in the New York City and Washington, D.C. metropolitan areas.

8.      Defendant Bozzuto Management Company (Bozzuto) is a property management company, with its principal office located at 6406 Ivy Lande, Suite 700, in Greenbelt, Maryland. Defendant Bozzuto engages in property management in numerous states.  Defendant Bozzuto manages residential rental properties in Maryland, including in Montgomery County and the District of Columbia.

9.      Defendant Greystar Management Services L.P. (Greystar) is a multi-state company, with its principal office located in Charleston, South Carolina. Defendant Greystar engages in property management services in numerous states. Defendant Greystar manages residential rental properties in Maryland, including in Montgomery County and the District of Columbia.

10.      Defendant Kettler Management Incorporated (Kettler) is a property management company that works in the mid-Atlantic region. Defendant Kettler's principal office is located at 8255 Greensboro Drive, Suite 200, McLean, Virginia 22102.  Defendant Kettler manages residential rental properties in multiple states. Defendant Kettler manages residential rental properties in Maryland, including in Montgomery County and the District of Columbia.

11.      Defendant Wood Residential Services, LLC (Wood) is a property management company whose principal office is located at 3715 Northside Parkway, Suite 4-600, Atlanta, GA 30327. Defendant Wood manages residential rental properties in several states.  Defendant Wood manages residential rental properties in Maryland, including in Montgomery County and the District of Columbia.

12.     Defendant Fairfield Residential LLC (Fairfield) is a property management company with its corporate office located at 5510 Morehouse Drive, Suite 200, in San Diego, California. Defendant Fairfield engages in property management in numerous states.  Defendant Fairfield manages residential rental properties in Maryland, including in Montgomery County.

13.     Defendant JBG Smith Management Services, LLC (JBG Smith) is a company that owns, operates and invests in mixed-use properties in the Washington, D.C. metropolitan area, with its corporate office located at 4747 Bethesda Avenue, Suite 200, Bethesda, Maryland.  Defendant JBG Smith manages residential rental properties in Maryland, including in Montgomery County and the District of Columbia.

14.     Defendant Pinnacle Campus Living LLC (Pinnacle) is a property management company with its corporate office located at 5055 Keller Springs Road, Suite 400, Addison, Texas. Defendant Pinnacle engages in property management in numerous states. Defendant Pinnacle manages residential rental properties in Maryland and the District of Columbia.

15.     Defendant Tower Construction Group, LLC, i/p/a The Tower Companies, (Tower) is a real estate development and management company with its corporate office located at 2000 Tower Oaks Boulevard, Ninth Floor, in Rockville, Maryland. Defendant Tower engages in property management in the Washington, D.C. area.  Defendant Tower manages residential rental properties in Maryland, including in Montgomery County.

16.     Defendant Vantage Management, Inc. (Vantage) is a property management company located at 9711 Washingtonian Boulevard, Suite 200 in Gaithersburg, Maryland. Defendant Vantage manages residential real estate properties in Maryland, including in Montgomery County.

17.     Defendant Berkshire Communities, LLC is a property management company located at One Beacon Street, Suite 2400 in Boston, Massachusetts. Defendant Berkshire manages residential real estate properties in Maryland and the District of Columbia.

## FACTUAL ALLEGATIONS

### *Facebook's advertising platform has permitted advertisers to target or exclude people from receiving housing ads based on age*

18.     Facebook is the most popular social media platform in the world. According to Facebook's 2018 Annual Report, Facebook had an average of 1.52 billion daily active users for December 2018, and 2.32 billion monthly active users as of December 31, 2018.  Facebook Inc. Form 10k for Fiscal Year Ending December 31, 2018, U.S. Sec. & Exchange Commission, https://www.sec.gov/Archives/edgar/data/1326801/000132680119000009/fb-12312018x10k.htm.

19.     According to the same report, "Facebook enables people to connect, share, discover, and communicate with each other on mobile devices and personal computers. There are a number of different ways to engage with people on Facebook, the most important of which is News Feed which displays an algorithmically-ranked series of stories and advertisements individualized for each person." *Id.*

20.     A Facebook user's "News Feed" is the page on Facebook where users see their friends' posts, as well as "Sponsored Ads" that advertisers pay Facebook to post on user's News Feeds. Upon information and belief, about one out of every five posts that Facebook users see on their News Feeds are "Sponsored Ads" (*i.e.*, paid ads that advertisers purchase from Facebook to advertise to Facebook users).

21.     Facebook earns billions of dollars a year by placing "Sponsored Ads" on Facebook users' News Feeds on behalf of advertisers, including property management companies. In 2018, Facebook earned $55.85 billion in revenue, substantially all of which was generated from selling advertising placements to marketers.  *Id.*

22.     From its inception, Facebook has been a powerful tool for advertisers because it allows advertisers to target very specific populations with their ads. Facebook collects an enormous

amount of information about the people who use Facebook, including demographics information like age and gender. In turn, Facebook gives its advertisers the power to use that information to determine which Facebook users will be included or will be excluded in the population that will receive their ads (*i.e.*, the audience selection).

23.     Facebook and the advertisers who publish ads on Facebook know the age of each Facebook user because Facebook requires users to tell Facebook their birth dates as a condition of joining Facebook and continuing to use Facebook's services.

24.     After Facebook users join Facebook, the age-related information they are required to provide Facebook is used by Facebook to segregate, classify, and categorize users based on age. The primary purpose of this segregation, classification, and categorization of users based on age is to make it easy for and to encourage advertisers to target their advertisements to Facebook users based on their age.

25.     On information and belief, when advertisers have published paid advertisements on Facebook, Facebook has helped the advertisers to create the ads and has provided databases of information on Facebook users to advertisers, including property management companies, so that those advertisers can know which individuals are looking for housing, know various types of information about these individuals, such as their age, and exclude certain groups of people from their ad campaigns; Facebook has coordinated with the advertisers to develop the recruitment, marketing, and/or advertising strategies to determine which people will and will not receive their ads; Facebook has delivered the ads to the Facebook users based on the directions or specifications of the advertisers, including in many cases delivering housing advertisements to prospective tenants; Facebook has collected payments for these advertising and recruitment services from the advertisers; Facebook has informed the advertisers of the performance of the ad campaigns with numerous types of data and analytics; and Facebook has retained copies of the ads and data related to them. In taking

these and other actions, Facebook has served as an agent of the advertisers, including the defendants in this action.

26.     Creating a Facebook ad involves several basic steps.

27.     First, the advertiser selects the population of Facebook users who will receive the ad, known as "audience selection." There are three mandatory filters that the advertiser is required to select in setting the audience selection:  (1) location; (2) age; and (3) gender.  The advertiser must either keep the default setting (the entire United States, 18 to 65+, and male and female) or narrow the scope of the population (for example, only female users who live in Maryland and are ages 18 to 40).

28.     Facebook requires the advertiser to select the location of the Facebook users who will receive the ad.  The default setting is the entire United States, but Facebook encourages advertisers to narrow the geographic scope of their ads.

29.     Facebook requires the advertiser to select the age of the Facebook users who will receive the ad. Facebook knows the age of its users because Facebook requires users to identify their birthdates in their individual Facebook profiles when they join Facebook. The default setting for ads is 18 to 65+, which means that anyone who is 18-years-old or older could receive the ad.  But Facebook has strongly encouraged advertisers to narrow the age range of the individuals who will receive their ads to make them more effective. Because the default age setting is 18 to 65+, any advertiser that selects a narrower and younger age range (such as ages 18 to 40) is consciously, knowingly, purposefully, and intentionally choosing to target younger persons and thereby exclude older persons who will not receive the ad.

30.     Facebook then requires the advertiser to select whether the ad should be sent to male users, female users, or users of all genders.

31.     After identifying its audience selection, the advertiser creates the image and text of the ad and directs where the ad will link to when it is clicked on by a Facebook user.

32.     Next, the advertiser purchases the ad, paying Facebook money to show a certain number of "impressions" of the ad to Facebook users in the selected population or obtain a certain number of "clicks" on the ad. (An impression occurs every time a person is displayed an ad on his or her News Feed or elsewhere on Facebook.  A click occurs every time a person clicks on an ad that is displayed on Facebook).

33.     Finally, Facebook sends the advertiser's ads to the Facebook users within the audience selection that the advertiser identified. This is known as "ad delivery."

34.     When the number of persons in the audience selection is greater than the number of impressions purchased by the advertiser, then only a portion of the persons in the audience selection will receive the ad.  But any person who is not in the audience selection will have no chance of receiving the ad.

35.     Facebook uses an algorithm and machine learning to determine which persons within a particular audience selection will receive a particular advertisement.  All advertisers rely on that algorithm when distributing their advertisements via Facebook, including housing advertisements.

36.     On information and belief, when making decisions about which users will receive the advertisement, including housing advertisements, Facebook's algorithm and machine learning directly rely upon the age of  Facebook users to make such decisions; routinely, this means that a disproportionate number of housing advertisements are sent to younger persons than older persons as opposed to an equal distribution across ages of persons in the relevant audience selection, and it means that specific people like the plaintiff are not shown housing ads because of their age.

37.     On information and belief, when advertisers, including defendants, rely upon Facebook's algorithm and machine learning that disproportionately direct housing ads to younger

14

persons at the exclusion of older persons because of their age, they are engaging in disparate treatment and/or publishing advertisements that indicate a preference or discrimination based on age. This phenomenon compounds and exacerbates the age discrimination that defendants are already engaged in when they manually and expressly select a younger population to send their housing ads to via Facebook's ad platform.

38.     When Facebook displays an ad on a Facebook user's News Feed or other page on behalf of an advertiser, in a portion of the advertisement called "Why am I seeing this ad" both Facebook and the company who purchased the ad inform the Facebook user why the person has been selected to receive that particular advertisement.  For example, if the advertiser directed Facebook to apply an audience selection of men who are 18 to 40 years old within 15 miles of a certain location in Montgomery County, Maryland, the "Why am I seeing this ad" portion of the advertisement tells the Facebook user that the person has received the ad because the advertiser wants to reach men 18-40 who live in or are near Silver Spring, Maryland, or who live in or are near the District of Columbia.

39.     As described below, Facebook's ad platform identifies the ages of Facebook users and has encouraged and permitted defendants and other property management companies to exclude older persons from receiving their advertisements for residential rental properties in the District of Columbia metropolitan area, including in Montgomery County, Maryland and the District of Columbia.

40.     However, since late 2019, pursuant to a March 2019 settlement between Facebook and civil rights groups, Facebook has operated a special portal for the creation of housing advertisements in which advertisers cannot limit the audience selection based on age.  Nevertheless, it is still possible to publish age-restricted housing advertisements on Facebook if an advertiser does not identify an advertisement as housing-related and if Facebook's "classifiers" do not flag the

advertisement as housing-related.  The settlement does not affect Facebook's operation of its algorithm and machine learning with respect to ad delivery.

### *The defendants have published housing ads on Facebook that exclude older prospective tenants from receiving information about their properties and that contain discriminatory content*

41.    On information and belief, the defendants have routinely used Facebook to advertise to and recruit prospective tenants for the properties that they manage and rent to tenants in the District of Columbia metropolitan area, including in Montgomery County, Maryland and/or the District of Columbia. In doing so defendants have routinely used Facebook's ad platform to exclude older individuals from receiving their housing advertisements based on their age.

42.    The defendants excluded older individuals from receiving their housing advertisements by directing Facebook to apply an audience selection for the ads that relied on an age range that excluded older persons, and also by relying on Facebook's ad delivery algorithm that, on information and belief, uses age to determine which Facebook users within an audience selection will receive advertiser's advertisements and that often disproportionately sends ads to younger persons to the exclusion of older persons.

43.    On information and belief, by routinely using Facebook's ad platform to exclude older individuals from receiving their housing advertisements, the defendants and other property management companies have directed Facebook, their agent, to exclude a large portion of older prospective tenants from hearing about housing opportunities that are routinely advertised to similarly situated younger prospective tenants who are in the relevant age ranges they have selected for their ads.

44.    The defendants' pattern or practice of age discrimination in housing advertising—in which they routinely excluded older persons from receiving their housing ads on Facebook due to their age and/or relying on Facebook's age-biased ad delivery algorithm to further exclude older

persons from receiving their housing ads (hereinafter "pattern or practice of age discrimination")—has occurred and/or is occurring in the District of Columbia metropolitan area, including Montgomery County, Maryland and the District of Columbia. This pattern or practice has occurred *both* by publishing defendants' age-restricted housing advertisements to Facebook users located in the District of Columbia metropolitan area, including Montgomery County, Maryland and the District of Columbia, and having those age-restricted housing advertisements relate to properties located in the District of Columbia metropolitan area, including Montgomery County, Maryland and the District of Columbia.

45.     In addition to excluding older persons, defendants engaged in age discrimination in their housing advertising on Facebook by including discriminatory statements in those advertisements. In each of defendants' age-restricted advertisements, defendants informed the Facebook users who did receive the ads that they were selected to receive the ads because the specific defendant advertiser wanted to reach persons within a certain age range that excludes older persons.

46.     These age-based statements in the defendants' advertisements are calculated and intended by defendants and their agent Facebook to encourage individuals in a younger age range to apply for housing at defendants' properties. These ads are calculated and intended to discourage older individuals outside of the desired age range from applying for housing at defendants' properties. In fact, research shows that people who click on the "Why am I seeing this" portion of paid advertisements on Facebook are more likely to engage with an advertisement when they are told that they are seeing the ad because of information that they have provided to Facebook, such as a person's age. Accordingly, these ads encourage only certain younger individuals to pursue these housing opportunities.

47.     On information and belief, Bozzuto purchased, authorized, published, and/or caused to be published age-restricted housing advertisements on Facebook relating to rentals at a

number of properties, including but not limited to the following properties, and in doing so published such age-restricted housing advertisements to persons in the District of Columbia metropolitan area, including Montgomery County and the District of Columbia.

- The Modern at Art Place, 400 Galloway Street NE, Washington, DC 20011;

- The Banks, 900 7th Street SW, Washington, DC 20024;

- Novel South Capitol, 2 I Street SE, Washington DC 20003;

- Central, 8455 Fenton Street, Silver Spring, MD 20910;

- Fenwick Apartments, 8616 2nd Avenue, Silver Spring, MD 20910;

- Flats at Bethesda, 7170 Woodmont Avenue, Bethesda, MD 20815;

- Lindley Apartments, 8405 Chevy Chase Lake Terrace, Chevy Chase, MD;

- Mallory Square, 15251 Siesta Key Way, Rockville, MD 20850;

- The Vine, 10945 Price Manor Way, Laurel, MD 20723;

- Aspire Apollo, 4451 Telfair Boulevard, Camp Springs, MD 20746;

- The Aperture, 11410 Reston Station Boulevard, Reston, VA 20190;

- Instrata Pentagon City, 901 15th Street South, Arlington, VA 22202;

- The Maxwell, 4200 North Carlin Springs Road, Arlington, VA 22203;

- Pike 3400, 2400 Columbia Pike, Arlington, VA 22204; and

- The View at Liberty Center, 4000 Wilson Boulevard, Arlington, VA 22203.

48.     Bozzuto's fair housing statement posted on its website provides that "[w]e will provide housing without discrimination or limitation because of race, color, religion, sex, handicap, familial status, national origin or any other classification protected by federal, state or local law, including age, sexual orientation, gender identity, source of income and other categories. You have the right

to expect equal professional service and the opportunity to consider housing options without discriminatory limitations in choice, location, pricing or any other factor."

49.     On information and belief, Greystar purchased, authorized, published, and/or caused to be published age-restricted housing advertisements on Facebook relating to rentals at a number of properties, including but not limited to the following properties, and in doing so published such age-restricted housing advertisements to persons in the District of Columbia metropolitan area, including Montgomery County and the District of Columbia.

- Aventine at Fort Totten, 5210 3rd Street NE, Washington DC 20011;

- The Residences at Pike and Rose, 11803 Grand Park Avenue, North Bethesda, MD, 20852;

- Heritage at Silver Spring, 8021 Georgia Avenue, Silver Spring, MD 20910;

- Paragon at Columbia Overlook, 8151 Robinson-Jefferson Drive, Elkridge, MD 21705;

- Adaire Apartments, 1521 Boyd Pointe Way, Tysons, VA 22182; and

- EXO Apartments, 1897 Oracle Way, Reston VA 20190.

50.     Greystar's fair housing statement posted on its website provides that "Greystar is committed to compliance with all federal, state, and local fair housing laws.  Greystar will not discriminate against any person because of race, color, religion, national origin, sex, familial status, disability, or any other specific classes protected by applicable laws."

51.     On information and belief, Kettler purchased, authorized, published, and/or caused to be published age-restricted housing advertisements on Facebook relating to rentals at a number of properties, including but not limited to the following properties, and in doing so published such age-restricted housing advertisements to persons in the District of Columbia metropolitan area, including Montgomery County and the District of Columbia.

- Dock 79, 79 Potomac Avenue SE, Washington DC 20003.

- Maple View Flats, 2228 Martin Luther King Jr. Avenue SE, Washington, DC 20020;

- The George Apartments, 11141 Georgia Avenue, Wheaton, MD 20902;

- Solaire, 7088 Woodmont Avenue, Bethesda, Maryland 20815; and

- Acadia at Metropolitan Park, 575 12th Road South, Arlington, VA 22202.

52.     On information and belief, Wood purchased, authorized, published, and/or caused to be published age-restricted housing advertisements on Facebook relating to rentals at a number of properties, including but not limited to the following properties, and in doing so published such age-restricted housing advertisements to persons in the District of Columbia metropolitan area, including Montgomery County and the District of Columbia.

- The Belgard, 33 N Street NE, Washington DC 20002; and

- Alloy by Alta, 4700 Berwyn House Road, College Park, Maryland 20740.

53.     On information and belief, Fairfield purchased, authorized, published, and/or caused to be published age-restricted housing advertisements on Facebook relating to rentals at its D.C. metropolitan area (including Montgomery County) properties, and in doing so published such age-restricted housing advertisements to persons in the District of Columbia metropolitan area, including Montgomery County and the District of Columbia. Fairfield's properties in the D.C. metropolitan area, which would be displayed to a Facebook user who clicked on Fairfield's age-restricted housing advertisements on Facebook, include the following properties:

- Fenwick Apartments, 8616 Second Avenue, Silver Spring, MD 20910;

- The Barrington Apartments, 1970 Rosemary Hills Drive, Silver Spring, MD 20910;

- 7001 Arlington at Bethesda Apartments, 7001 Arlington Road, Bethesda, MD 20814;

- Oakfield Apartment Homes, 2217 Georgian Way, Wheaton, MD 20902; and

- The Montgomery Apartments, 6425 Rock Forest Drive, Bethesda, MD 20817.

54.     Fairfield's fair housing statement available on its website provides that "[w]e support Equal Housing Opportunity and encourage users of our site to follow appropriate guidelines to comply with the Fair Housing Act, as well as any applicable state and local regulations. All renters are hereby informed that all property rental offers are available on an equal opportunity basis."

55.     On information and belief, JBG Smith purchased, authorized, published, and/or caused to be published age-restricted housing advertisements on Facebook relating to rentals at a number of properties, including but not limited to the following properties, and in doing so published such age-restricted housing advertisements to persons in the District of Columbia metropolitan area, including Montgomery County and the District of Columbia.

- 1221 VAN, 1221 Van Street SE, Washington, DC 20003;

- Atlantic Plumbing, 2112 8th Street NW, Washington, DC 20001;

- Notch 8, 2900 Main Line Blvd, Alexandria, VA 22301;

- The Terano Apartments, 5720 Fishers Lane, Rockville, MD 20852;

- The Alaire Apartments, 5720 Fishers Lane, Rockville, MD 20852; and

- The Bartlett Apartments, 520 12th Street S, Arlington, VA 22202.

56.     JBG's fair housing statement on its website provides that "JBG SMITH is committed to providing equal housing opportunities for all persons, including all races, religions, ethnic groups, those with disabilities and others in protected classes."

57.     On information and belief, Pinnacle purchased, authorized, published, and/or caused to be published age-restricted housing advertisements on Facebook relating to rentals at a number of properties, including but not limited to the following property, and in doing so published

such age-restricted housing advertisements to persons in the District of Columbia metropolitan area, including Montgomery County and the District of Columbia.

- Varsity on K, 950 24th Street NW, Washington, DC 20037.

Pinnacle also has a property in Maryland, Terrapin Row, located at 4300 Hartwick Rd., College Park, MD 20740.

58.     Pinnacle's fair housing statement on its website provides that "Pinnacle is committed to compliance with all federal, state, and local fair housing laws. Pinnacle will not discriminate against any person because of race, color, religion, national origin, sex, familial status, disability, or any other specific classes protected by applicable laws."

59.     On information and belief, Tower purchased, authorized, published, and/or caused to be published age-restricted housing advertisements on Facebook relating to rentals at a number of properties, including but not limited to the following properties, and in doing so published such age-restricted housing advertisements to persons in the District of Columbia metropolitan area, including Montgomery County and the District of Columbia.

- The Pearl, 180 High Park Lane, Silver Spring, MD 20910; and

- The Blairs, 1401 Blair Mill Road, Silver Spring, MD 20910.

60.     On information and belief, Vantage purchased, authorized, published, and/or caused to be published age-restricted housing advertisements on Facebook relating to rentals at a number of properties, including but not limited to the following property, and in doing so published such age-restricted housing advertisements to persons in the District of Columbia metropolitan area, including Montgomery County and the District of Columbia:

- Gallery Bethesda II, 4850 Rugby Avenue, Bethesda, MD 20814

61.     On information and belief, Berkshire purchased, authorized, published, and/or caused to be published age-restricted housing advertisements on Facebook relating to rentals at a number of properties, including but not limited to the following property, and in doing so published such age-restricted housing advertisements to persons in the District of Columbia metropolitan area, including Montgomery County and the District of Columbia:

- Berkshire 15 Apartments, 2011 15th Street NW, Washington, DC 20009

Berkshire also has properties in Annapolis, MD, and Camp Springs, MD.

62.     Each of the Defendants displays the Equal Housing Opportunity logo on their websites. The defendants' use of the Equal Housing Opportunity logo on their websites and the fair housing statements included on many of the defendants' websites, were and are designed to inform consumers that the company's actions comply with applicable fair housing laws.

63.     Exemplars of the age-restricted housing advertisements that defendants sent to Facebook users are set forth in Exhibit A. On information and belief, the exemplars in Exhibit A are merely a portion of the age-restricted housing advertisements that each defendant each sent to Facebook users in the District of Columbia metropolitan area, including Montgomery County, Maryland and the District of Columbia.

64.     The following images are examples of age-restricted housing ads that the defendants purchased from Facebook and published to Facebook users in the District of Columbia metropolitan area, including Montgomery County, Maryland and the District of Columbia.

65.     **Bozzuto** published the following housing advertisement for the Banks property in the District of Columbia only to "people ages 28 to 45 who live near Silver Spring, Maryland."



66.    **Fairfield Residential** published the following housing advertisement to attract people to view and apply to rent from numerous properties in the D.C. metropolitan area and sent the advertisement only to "people ages 21 to 45 who live or were recently near Silver Spring, Maryland."



67.    **Greystar** published the following housing advertisement for the Residences at Pike & Rose property in North Bethesda, Maryland only to "people ages 21 to 48 who live or were recently near Silver Spring, Maryland."



68.   **JBG Smith** published the following housing advertisement for the Atlantic Plumbing property in the District of Columbia only to "people ages 22 to 50 who were recently near Silver Spring, Maryland."



69. **Kettler** published the following housing advertisement for the Solaire Bethesda property in Bethesda, Maryland only to "people ages 21 to 50 who live or were recently near Silver Spring, Maryland."



70. **Pinnacle** published the following housing advertisement for the Varsity on K property in the District of Columbia only to "people ages 20 to 45 who live near Silver Spring, Maryland."




71. **Tower** published the following housing advertisement for the Blairs property in Silver Spring, Maryland only to "people ages 25 to 44 who live or were recently near Silver Spring, Maryland."

 

72. **Wood** published the following housing advertisement for the Alloy by Alta property in College Park, Maryland only to "people ages 18 to 50 who live or were recently near Silver Spring, Maryland."

 

73. **Vantage** published the following housing advertisement for the Gallery Bethesda property in Bethesda, Maryland only to "people ages 25 to 50 who live near Silver Spring, Maryland."

 

74. **Berkshire** published the following housing advertisement for the Berkshire 15 property in Washington, DC only to "people ages 18 to 50 who live near Silver Spring, Maryland."

 

*The defendants have engaged in unlawful housing discrimination*

75. On information and belief, defendants' advertising on Facebook has been a central feature of defendants' and other property management companies' pattern or practice of selectively

marketing, advertising, and branding rental properties in a discriminatory manner that excludes older individuals and that informs persons that such management companies are interested in recruiting younger persons and not interested in recruiting older persons to rent from them.

76. Though Facebook has made it possible to limit which Facebook users will see an ad based on the age of the user (including housing ads), the District of Columbia, Montgomery County, and other local jurisdictions' laws prohibit age discrimination in advertising and the provision of housing, including advertising that excludes people from receiving advertisements based on a protected status, including age, and advertising whose content or images indicate a preference or discrimination based on a protected status, including age.

77. Rather than complying with laws that prohibit age discrimination in housing, defendants and other property management companies have perpetuated and facilitated age discrimination in housing and have denied and diminished housing opportunities for older individuals, by virtue of their discriminatory advertising and recruiting younger prospective tenants via Facebook. In fact, all of the defendants routinely created, purchased, and published housing advertising campaigns that expressly excluded older persons from receiving those advertisements and that made age-based statements about the persons defendants wanted to reach and recruit for their properties.

78. When defendants have selected a ceiling on the age of people who receive their advertisements, older individuals have been automatically excluded from receiving the advertisements and they have had no chance of receiving such ads. The sole reason why older individuals like Plaintiff Opiotennione have been excluded from receiving the housing advertisements at issue is defendants' intentional and animus-based decisions to prevent older individuals from receiving their housing advertisements. On information and belief, even older persons whose ages did not automatically exclude them from receiving defendants' advertisements

have nonetheless been less likely to receive such advertisements from defendants than younger persons due to Facebook's ad delivery algorithm that defendants have relied on.

79.     On information and belief, when defendants and other advertisers rely on Facebook's ad delivery algorithm and machine learning to determine which users will actually receive housing advertisements via its platform, defendants and other advertisers know or should know that the ad delivery platform on which they are relying will use the age of prospective tenants to exclude them from receiving their housing ads. Thus, defendants are fully responsible for intentionally using a discriminatory tool that excludes older individuals from housing advertisement opportunities. (This remains true even after Facebook has implemented the terms of its March 2019 settlement, which did not affect the operation of Facebook's ad delivery algorithm).

80.     On information and belief, each defendant each used Facebook's ad platform to exclude persons above certain ages from receiving its advertisements that were sent in the District of Columbia metropolitan area, and each defendant knew and/or should have known that by selecting such ranges in its advertisements Facebook would include, as a portion of the advertisements, a statement that the property management company "wants to reach people" between certain ages.

81.     As a result, the defendants' housing advertisements on Facebook have excluded older individuals from receiving the advertisements and have stated in the content of the advertisements that these properties "want[] to reach" prospective tenants between certain ages.

82.     On information and belief, the defendants purchased, directed, approved of, authorized, and sent age-restricted housing advertisements on Facebook.  These advertisements advertised rental properties that were located in the District of Columbia metropolitan area and provided information to Facebook users who received the ads about the properties located in the District of Columbia metropolitan area.

83.     On information and belief, the defendants expressly sent housing advertisements via Facebook that excluded older individuals from receiving the ads, and thus targeted younger individuals to receive their housing advertisements, but defendants did not similarly target older individuals with housing advertisements to offset the harm of excluding older individuals from receiving their housing advertisements via Facebook.

84.     On information and belief, when the defendants have caused housing ads to be published and distributed, defendants have also utilized Facebook's ad delivery algorithm that determines which Facebook users within a population selected by the advertiser will receive the ads; that algorithm makes such determinations based upon age in a manner that routinely send the ads disproportionately to younger individuals rather than older individuals.

85.     Upon information and belief, by using Facebook's ad-delivery algorithm, defendants have compounded the discrimination that defendants caused by expressly excluding persons above a certain age from receiving their ads.  For example, if a housing advertisement was only sent to persons 22- to 55-years old, no one older than 55-years-old would have received the ad. But it was likely that the ad delivery algorithm would still result in persons in their 20s or 30s being more likely than persons in their late 40s or early 50s to receive the ads. Defendants are responsible for using and relying on Facebook's ad delivery algorithm to make decisions about which people will receive its housing advertisements. On information and belief, defendants knew or should have known that Facebook's ad delivery algorithm was using age to determine which persons would receive their housing advertisements and that doing so would disproportionately exclude older persons from receiving their housing advertisements.

86.     The defendants have engaged in discriminatory advertising and discrimination in the initiation of real property transactions by excluding older individuals from the population of

individuals to whom defendants have directed their housing advertisements and information on Facebook's advertising platform.

87.     The defendants' ads were specifically targeted to reach persons who reside and/or are located in the District of Columbia and Montgomery County, Maryland.

88.     The exceptions outlined in Montgomery County Code § 27-14 and D.C. Code § 2-1402.24 do not apply to these and other properties of defendants.

### Ms. Opiotennione and the class members have been injured by the defendants' discriminatory practices

89.     Plaintiff Opiotennione regularly uses Facebook, was seeking housing opportunities in the District of Columbia and the surrounding counties, had a housing budget of at least $2,500, which was sufficient for an apartment at the properties managed by defendants and advertised on Facebook, and has routinely been denied defendants' housing advertisements that similarly situated younger individuals received. If she had received such ads from defendants, Ms. Opiotennione would have clicked on those housing ads in order to learn more about the opportunities, pursue such opportunities, and obtain them. Because Ms. Opiotennione did not receive such ads from defendants, she did not learn about specific housing opportunities at those properties and she was thus deterred from applying to rent at these properties and was delayed in finding available housing. On information and belief, Ms. Opiotennione was otherwise qualified for, genuinely interested in learning more about and renting apartments at the properties that defendants advertised on Facebook, as well as other properties that defendants managed. Ms. Opiotennione has been denied housing advertisements and information that similarly situated younger individuals have received from defendants. Ms. Opiotennione struggled for many months to find available and suitable housing, and defendants' discriminatory actions contributed to Ms. Opiotennione's hardship and increased the time it took for her to secure housing.

90.     Ms. Opiotennione seeks to represent herself and all other similarly situated Facebook users who have actively searched for housing and/or changed residences in the District of Columbia metropolitan area, and who have routinely used Facebook and have been or are being excluded from receiving a housing-related advertisement from defendants because defendants placed an upper age limit on the population of Facebook users who were eligible to receive a housing-related advertisement that excluded such persons, at any time from the earliest date actionable under the limitations period applicable to the given claim until the date of judgment. One or more age-restricted advertisement of each defendant was published within the two years preceding the filing of this complaint.

91.     The defendants' pattern or practice challenged in this case has harmed older individuals, like Plaintiff Opiotennione and individuals for whom HRI advocates and engages with in education and outreach campaigns, who have been systemically excluded from hearing about housing opportunities in the District of Columbia metropolitan area.

92.     On information and belief, the defendants continue to rely on Facebook's age-based delivery algorithm to deliver their housing ads on Facebook, thereby excluding Plaintiff, other older individuals, and individuals for whom HRI advocates and engages with in education and outreach campaigns, from receiving their housing advertisements.

93.     On information and belief, the pattern or practice challenged in this case has caused significant harm to older individuals who have been systematically excluded from hearing about housing opportunities in the District of Columbia metropolitan area. Like Ms. Opiotennione, there are numerous older individuals seeking housing in the District of Columbia metropolitan area who are active users of Facebook and who have been denied opportunities by defendants.

94.     The defendants have routinely sent paid Facebook advertisements to encourage prospective tenants to pursue renting an apartment at their properties. The rental market in the

District of Columbia metropolitan area typically requires acting quickly to secure an available vacancy, and not receiving these advertisements will mean that a person will not hear about, pursue, or obtain the available rental property on a timely basis or at all.

95.     On information and belief, the defendants created, purchased, and published these housing ads via Facebook because they knew that a significant portion of prospective tenants will only learn about the relevant apartment – and will only apply to become a tenant – if they receive a paid ad that is directed to their Facebook News Feed.

96.     Excluding older individuals from receiving housing ads makes it less likely that older individuals will hear about housing opportunities and, in turn, apply for vacant rental properties. When older individuals do not receive a housing ad, they often will not know about the specific housing opportunities or they will be more likely to apply at a later time than younger individuals who received the housing ad, and thus the older individuals will lose out on the housing opportunity. Accordingly, defendants' age discrimination has made it much harder for older persons to compete for housing at their properties in the D.C. metropolitan area.

97.     Furthermore, by making it harder for older persons to find and obtain housing, defendants caused Ms. Opiotennione and other members of the proposed Class to be denied or delayed housing opportunities, including the economic and non-economic benefits of such housing, such as cheaper or more affordable housing, housing that is more valuable or suitable for the same or less money, or housing that provides residents with a range of benefits of living in a particular community (access to commerce, schools, transportation, etc.).

98.     Moreover, Ms. Opiotennione and the members of the proposed Class were denied information about housing that they have a right to receive on equal terms as younger persons.  Ms. Opiotennione and members of the proposed class had a genuine interest in receiving information about housing from defendants, but were denied that information because of their age.

34

99.     Ms. Opiotennione, the members of the proposed Class and the general public also have been harmed by virtue of being segregated, classified and treated in an unequal manner by defendants relative to younger persons because of their age.  The defendants' discriminatory conduct perpetuated archaic and stereotypic notions about the undesirability of older persons and stigmatized older persons as innately inferior and less worthy of renting to, causing stigmatic harm to the Plaintiff and other older persons.

100.    The defendants' practices have reduced the age-diversity in housing—both at the defendants' properties and other properties in the D.C. metropolitan area—and denied Ms. Opiotennione, the members of the proposed Class and the general public from living in integrated settings. In particular, by engaging in practices that attracted more younger people to the defendants' properties, the defendants caused fewer older people to live at their properties. Ms. Opiotennione, the members of the proposed Class and the general public all have an interest in living in integrated housing.

101.    On information and belief, members of the proposed Plaintiff Class have all suffered these harms by regularly being denied housing ads on Facebook by defendants, which resulted in them not having the opportunity to apply for, compete for, or secure housing at defendants' rental properties.  Regardless of whether Ms. Opiotennione or the members of the proposed Class would have obtained housing with the defendants, the defendants' actions made it harder for them to learn about and compete for such housing opportunities.

## HRI's Mission, Investigation and Education and Outreach Efforts

102.    HRI is a non-profit organization dedicated to promoting lawful real estate practices, including promotion of the rights of tenants and other housing-related consumers, and providing information and assistance to tenants and individuals seeking housing in the New York City and Washington, D.C. metropolitan areas.  These efforts include the promotion of equal opportunity in

the provision of housing and furthering the advancement of equal housing opportunities in the New York City and District of Columbia metropolitan areas and throughout the United States.

103.    In 2018, an HRI staff member, who was within the age range of persons to whom defendants targeted their ads, learned through his own Facebook News Feed that housing providers were targeting him with housing ads because of his age.  Following this discovery, HRI learned that this discriminatory practice was common and pervasive in the housing industry, including that dozens of residential property management companies had published age-restricted housing advertisements in the District of Columbia and New York City metropolitan areas.

104.    Upon learning of the size, scope, and impact of this practice, HRI was compelled to divert scarce resources to attempt to further identify and combat this discrimination.  HRI diverted such resources away from its core programs of combatting fraud and predatory-landlord practices to instead address the discriminatory acts of housing providers who were engaging in unlawful age-restricted targeting of housing advertisements.  Prior to and at the time of the filing of this Complaint, HRI has diverted, and continues to divert, scarce and valuable financial and human resources to the tasks of identifying and counteracting defendants' unlawful discriminatory practices through investigation, education, and outreach targeting prospective tenants, housing providers, and the public in general.  In fact, HRI has already dedicated dozens of hours to investigating and taking action to combat the discriminatory practices challenged in this action

105.    **Testing & Investigation**.  As a result of defendants' wrongdoing, HRI has devoted substantial staff time to identifying the extent of defendants' discriminatory actions.  For example, HRI devoted scarce resources to investigating defendants' properties in the District of Columbia metropolitan area to identify potential fair housing violations or complainants.

106.    **Increased Educational Efforts**.  Defendants' conduct has required HRI to increase its educational efforts to attempt to stop the practices challenged in this action and inform residential

property management companies on how to ensure equal opportunity when advertising rental properties.  As a result of defendants' wrongdoing, HRI has diverted, and continues to divert, resources to educating leaders in age-related fair housing advocacy and anti-discrimination principles, as well as other members of the community.

107.    For example, members of HRI's staff traveled to Washington, DC to meet with representatives of the AARP to discuss the pervasiveness of these discriminatory advertising practices and how to combat them. A member of HRI's staff also traveled to the D.C. metropolitan area and distributed flyers to residents of the area to educate them about these practices that deny equal opportunity to older residents in the D.C. metropolitan Area. HRI also devoted resources to the creation of content on its web site dedicated to educating the public about defendants' unlawful advertising practices. HRI staff also have fielded calls from community members who are concerned that they are being discriminated against by housing providers on the basis of their age.

108.    **The Education and Outreach Letter.**  The defendants' wrongdoing also required HRI to divert scarce resources to (a) educate Defendants, and (b) attempt to persuade defendants to bring themselves into compliance with fair housing and anti-discrimination laws.

109.    In November 2018, HRI, through its counsel, sent an "Education and Outreach" letter to defendants.  The letter was designed to address and resolve defendants' practices of discriminatory advertising. In the letter, HRI brought defendants' discriminatory practices to their attention, provided defendants with materials regarding their obligations under D.C. law and the Montgomery County Code, notified defendants of their non-compliance with such laws, and offered defendants the opportunity to reach a resolution that would address HRI's concerns and further defendants' business interests.  None of the defendants has resolved this matter with HRI.

110.    By devoting staff time to address defendants' discriminatory policies or practices, HRI has diverted scarce resources from other planned efforts. If defendants' discriminatory conduct

had not required HRI to divert its scarce resources to investigating and counteracting defendant's discrimination, HRI would have spent these resources toward activities in which it routinely takes part, including rent stabilization advocacy, data analysis, and research.

111.    The defendants' policies or practices have significantly frustrated HRI's purpose of promoting equal opportunity in housing and have impaired HRI's programs. Defendants' pattern or practice of discrimination has made HRI's mission of assisting tenants and individuals seeking housing more difficult. As a result of defendants' wrongdoing, HRI has committed, is committing, and will continue to commit its scarce resources, including staff time, to identify and counsel complainants, investigate complaints, engage in an education and outreach campaign, and develop and disseminate educational materials to ameliorate the effects of defendants' discrimination and to prevent the recurrence of discrimination in the future.

## CLASS ACTION ALLEGATIONS

112.    Plaintiff Opiotennione brings each of her claims under Rules 23(a), (b)(2), (b)(3), and/or (c)(4) of the Federal Rules of Civil Procedure, on behalf of the following proposed class:

> All persons who have actively searched for housing and/or changed residences in the District of Columbia metropolitan area, and who have routinely used Facebook and have been or are being excluded from receiving a housing-related advertisement from defendants because defendants placed an upper age limit on the population of Facebook users who were eligible to receive a housing-related advertisement that excluded such persons, at any time from the earliest date actionable under the limitations period applicable to the given claim until the date of judgment.

113.    Not included in the Class are the following individuals and/or entities: defendants' officers and directors and all judges assigned to hear any aspect of this litigation, as well as their staffs and immediate family members.

114.    Plaintiff HRI also brings claims under the D.C. Consumer Protection and Procedures Act on behalf of itself and on behalf of the same class of consumers that Plaintiff Opiotennione seeks to represent for all of her claims.

115.    The limitations period for each claim is the full statute of limitations period for each such claim under Montgomery County and District of Columbia law.  The violations alleged in this Complaint are continuing violations.

116.    The named plaintiffs will seek to certify the proposed Class pursuant to Rules 23(a) and (b)(3) for both the purposes of injunctive and monetary relief.  In the alternative, the plaintiffs will seek to certify the proposed Class pursuant to Rules 23(a), (b)(2), and (c)(4), or under Rules 23(a) and (b)(2).

117.    **Numerosity.**  The plaintiff class is so numerous that joinder of all members is impracticable.  The exact size of the class is not known.  On information and belief, the class consists of at least thousands of older Facebook users who sought housing in the District of Columbia metropolitan area, regularly used Facebook, and were excluded from receiving the defendants' age-restricted housing advertisements due to the upper age limit placed on those advertisements.

118.    **Commonality.**  There are numerous questions of law and fact that are common to all Class Members.  The plaintiffs and proposed Class Members were subjected to and injured by the same uniform practice in which defendants used Facebook's ad platform to exclude older individuals from receiving housing advertisements and make discriminatory, ageist statements in the housing advertisements they published in violation of Montgomery County and District of Columbia civil rights laws, as well as making the same misleading statements and engaging in the same deceptive practices that violate District of Columbia consumer law. Each defendant engaged in the same practice that the plaintiffs and the proposed Class challenge.  Moreover, the plaintiffs and proposed Class Members experienced the same types of harm, because they were excluded from the population of Facebook users who were eligible to receive defendants' housing-related Facebook ads, were deprived of important information about housing opportunities, including housing

39

opportunities in Montgomery County and the District of Columbia, and were subjected to the same misleading statements and deceptive practices.

119.    Each defendant used Facebook's ad platform to place an age ceiling on which Facebook users would receive their housing advertisements and requested that Facebook not send the advertisement to anyone above the relevant age ceiling.  Each defendant consequently excluded older individuals from receiving their housing advertisements for properties that each defendant manages. And each defendant made the same exact type of statement in its housing advertisements on Facebook that it wanted to reach people within a certain age range that excluded older persons, communicating the same discriminatory message with respect to age influencing, affecting, preferencing, limiting, or discriminating based on age. Finally, each defendant has relied on Facebook's age-biased delivery algorithm and machine learning to compound the harm of its explicit age restrictions when publishing or causing to be published its housing advertisements on Facebook.

120.    The questions of law or fact that are common to the class members include:

(a)    Did defendants rely upon on Facebook's ad platform in which they could limit which Facebook users would receive housing-related advertisements based on their age?

(b)    Did defendants purchase and send housing advertisements via Facebook's uniform ad platform that expressly excluded older individuals, including members of the proposed Class, from receiving housing-related ads on Facebook because of their age?

(c)    Were members of the proposed Class denied the opportunity to receive housing-related advertisements that were created, purchased, and published by the defendants on Facebook because the defendants placed an upper limit on the age of the Facebook users who were eligible to receive the advertisements?

(d)     Did the defendants, in excluding older individuals from receiving housing-related advertisements, violate Montgomery County and District of Columbia laws that prohibit age discrimination in housing advertising, because (1) the ads challenged in this action indicate a preference or discrimination based on age, or (2) the segregation, classification, and explicit denial of housing advertising to older persons constitutes intentional discrimination in the denial of rental properties?

(e)     Did the defendants—though their statements and logos about their fair housing commitment and the "Why am I seeing this ad" statement—make misrepresentations of material facts that have a tendency to mislead or represent that transactions confer rights, remedies, or obligations that it does not have or involve, or that are prohibited by law?

(f)     Whether the pattern or practice challenged in this action is a continuing violation?

(g)     Whether and what types of injunctive and/or declaratory relief should be ordered with respect to the past and ongoing pattern or practice of defendants, including whether the Court should prohibit defendants from engaging in age-based exclusionary advertising on *all* digital platforms on which defendants advertise, or prohibit defendants from advertising their housing opportunities on Facebook until age is no longer used to influence ad delivery?

(h)     Whether and what types and amounts of damages should be awarded to the plaintiffs and the members of the proposed Class.

121.    **Typicality.** The claims of Ms. Opiotennione are typical of the claims of the proposed Class she seeks to represent on her civil rights claims. The claims of Ms. Opiotennione arise from the same pattern or practice and rely on the same legal theories and factual allegations that the challenged pattern or practice violates Montgomery County and District of Columbia civil rights

41

statutes.  Similarly, the claims of Ms. Opiotennione and HRI are typical of the consumer claims of the proposed Class they seek to represent, as they arise from the same statements and conduct of the defendants that violates District of Columbia consumer law.

122.    **Adequacy.**  The named plaintiffs will adequately represent the members of the Class, do not have any conflicts with the other Class Members, and are represented by experienced counsel who have substantial experience in housing discrimination, consumer protection, and class action litigation, and who will vigorously prosecute the action on behalf of the class.

**Rule 23(b)(3)**

123.    This action is also properly maintainable as a class action under Rule 23(b)(3).

124.    The questions of law and fact common to the members of the Plaintiff Class predominate over questions affecting individual class members, and a class action is superior to all other available methods for the fair and efficient resolution of this controversy.

125.    By resolving the common issues described above in a single class action proceeding, each member of the proposed Class will receive a determination of whether defendants violated Montgomery County and District of Columbia fair housing laws by excluding the proposed Class Members from receiving their housing ads in the same uniform manner.

126.    Members of the Class do not have a significant interest in individually controlling the prosecution of separate actions. The damages of each member of the proposed Class are modest compared to the expense and burden of individual prosecution of this litigation.

127.    Other than this action, no pending litigation concerning age discrimination in housing advertising via Facebook ads has been commenced by any member of the proposed Class against any of the defendants.

128.    This is not only an appropriate forum for these claims because jurisdiction and venue are proper, but it is also the most appropriate forum because defendants published age-restricted

housing ads to persons in this District and adjacent locations, and because most of the properties

that are the subject of those age-restricted housing ads are located in this District and the District of

Columbia. Three of the defendants—Bozzuto, JGB, Tower, and Vantage—have their headquarters

in this District. Moreover, prosecuting this case as a single class action against the defendants, who

are properly joined in this action, will ensure that there are not inconsistent judgments and that a

single injunction and rule will apply to all of the defendants, 10 large property management

companies, that engaged in the challenged practice and continue to advertise on Facebook and/or

other digital platforms.

129.    Concentration of this litigation in this forum is desirable, as this action challenges

company-wide practices, and it will benefit the proposed Class Members and defendants to have the

Class Members' claims and defenses adjudicated in a single proceeding.

**Rule 23(b)(2)**

130.    This action is also properly maintainable as a class action under Rule 23(b)(2).  On

information and belief, the defendants have violated fair housing laws in the same manner as to all

members of the proposed Class, and have acted and/or refused to act on grounds generally

applicable to the proposed Class, making appropriate declaratory and injunctive relief with respect

to the proposed Class.

131.    On information and belief, the defendants expressly excluded older individuals from

receiving housing advertisements sent via Facebook and continue to use Facebook's ad platform in

a manner that excludes older individuals from receiving their housing ads on an equal basis as

younger individuals in violation of Montgomery County and District of Columbia civil rights laws,

and made the same misleading statements and engaged in the same deceptive practices that violate

District of Columbia consumer law. Plaintiffs Opiotennione, HRI, and the proposed Class seek a

declaration that the age discrimination challenged in this action is unlawful and they seek an

injunction preventing defendants from sending such discriminatory ads in the future on Facebook and all other digital platforms that defendants use to advertise housing opportunities. They also seek a declaration that the defendants have made misleading statements and engaged in deceptive practices that violate District of Columbia consumer law and seek an injunction to stop these practices in the future.

**Rule 23(c)(4)**

132.   Pursuant to Rule 23(c)(4), the plaintiffs bring this action to adjudicate particular issues that are appropriate to adjudicate with respect to defendants, including but not limited to whether the pattern or practice that they have all, on information and belief, engaged in—excluding older individuals from receiving housing advertisements via Facebook's ad platform, and relying on an age-biased ad delivery algorithm—violates various civil rights laws that prohibit discrimination in housing advertising, whether the defendants have made misleading statements and/or engaged in deceptive practices, and whether such unlawful practices should be enjoyed to prevent continuing and additional harm to older individuals and consumers impacted by this practice.

### COUNT I
### Violations of the Montgomery County Code
### (On Behalf of Plaintiff Opiotennione and the Proposed Class)

133.   The preceding paragraphs of this complaint are incorporated as if set forth fully herein.

134.   The Maryland State Government Code provides that "a person that is subjected to a discriminatory act prohibited by the [Montgomery County] code may bring and maintain a civil action against the person that committed the alleged discriminatory act for damages, injunctive relief, or other civil relief." Md. State Gov. Code § 20-1202.

135.   The Montgomery County Code makes it unlawful to "publish or circulate, or cause to be published or circulated, any housing notice, statement, listing or advertisement . . . indicating

44

that . . . age could influence or affect" the rental, lease, or sale of housing or the availability of housing. Montgomery County Code § 27-12(d)(1); *see also id.* § 27-12(a)(1)-(3).

136.    The Montgomery County Code makes it unlawful to "refuse, or refuse to negotiate, to sell, . . . lease, sublease, rent, assign, or otherwise transfer the title, leasehold, or other interest in any housing"' "represent that housing is not available for inspection, sale, sublease, rental, assignment, or other transfer when it is available"; or "otherwise deny or withhold any housing from any person" because of age.  *Id.* § 27-12(a)(1)-(3).

137.    Ms. Opiotennione is a person within the meaning of Montgomery County Code § 27-6.

138.    When advertising housing opportunities via Facebook's advertising platform, defendants targeted housing advertisements towards younger individuals on the Facebook advertising platform and simultaneously excluded older individuals from receiving the housing advertisements and information that defendants directed to younger individuals.

139.    This pattern or practice violates the publication provision of the Montgomery County Code § 27-12(d)(1), and the plaintiffs may challenge such a violation under Md. State Gov. Code § 20-1202.

140.    First, an ad campaign that directly relies on a person's age to exclude older persons from receiving housing advertisements indicates that age could influence or affect the rental, lease, or sale of housing or the availability of housing.  Exclusionary housing advertising that steers housing advertisements away from older people based on age communicates a message to an ordinary reader that the housing provider prefers to rent to younger persons who are in the age range of persons who received the advertisements and/or will discriminate against older persons who are not in the age range of persons who received the advertisements.  Every time an age-restricted advertisement is published, the ad campaign indicates a preference or discrimination based on age.

141.    Second, when defendants make a statement within a housing advertisement that they want to reach people between an age range that excludes all or most older individuals, the advertisement communicates the message that defendants are less interested or not interested in renting to older individuals, including individuals who are older than the upper age limit to with the advertisement or notice was sent.  Such an advertisement or notice informs the ordinary reader of the advertisement and the public at large, including Plaintiff Opiotennione and the proposed Plaintiff Class Members, that the property management company sending the advertisement has a preference for younger individuals over older individuals as prospective tenants and that the property management company or apartment complex may limit housing opportunities to younger individuals.  And by drawing a distinction between younger and older prospective tenants in defendants' advertising, an ordinary reader of the advertisement and the public would understand this as a message that age could influence or affect the rental, lease or sale of housing or the availability of housing.  Defendants knew or reasonably should have known that when they chose to exclude older individuals from seeing their housing advertisements that a portion of the advertisement would make a statement that the property management company wants to reach people between a certain age range.

142.    Moreover, when defendants use Facebook's ad platform to tell Facebook to limit the population of Facebook users who will receive their housing advertisements – for example, by changing the age range from the default 18 to 65+ to 28 to 45 years old – they are publishing or circulating or causing to be published or circulated a "notice" or "statement . . . indicating" that that age could influence or affect the rental, lease, or sale of housing or the availability of housing.  In other words, defendants are publishing discriminatory statements to Facebook when they provide directions to Facebook to discriminate in the audience selection for their housing ads.

143.    In addition, regardless of the content in the advertisement, the practice of excluding older individuals from receiving housing-related advertisements constitutes a refusal to lease, a representation that housing is not available for rent, the practice of steering, and otherwise denying individuals housing due to their age in violation of the Montgomery County Code § 27-12(a) and (c).

144.    This policy or practice of discrimination constitutes intentional discrimination and disparate treatment in violation of the Montgomery County Code § 27-12(a) and (c). It treats older individuals worse that younger individuals in the renting of real property—including steering, refusing to lease, and otherwise denying housing—based on their age, because defendants have excluded older individuals from receiving the same housing advertisements and information that younger individuals received via defendants' ads on Facebook.

145.    Denying older individuals housing advertising and steering them away from housing disproportionately reduces the number of applications from older persons and increases the number of applications from younger individuals, resulting in an artificially high share of younger individuals than older individuals renting from Defendants.  Such a practice makes it more likely that younger people will apply for and obtain housing at defendants' properties than older people will.

**COUNT II**
**Violations of the D.C. Human Rights Act**
**(On Behalf of All Plaintiffs and the Proposed Class)**

146.    The preceding paragraphs of this complaint are incorporated as if set forth fully herein.

147.    The D.C. Human Rights Act (DCHRA) makes it unlawful to "make, print, or publish, or cause to be made, printed or published, any notice, statement, or advertisement, with respect to a transaction, or proposed transaction, in real property . . . which notice, statement, or advertisement unlawfully indicates or attempts unlawfully to indicate any preference, limitation, or discrimination based on . . . age . . . of any individual." D.C. Code § 2-1402.21(a)(5).

148.    The D.C. Human Rights Act makes it unlawful to "refuse or fail to initiate or conduct any transaction in real property . . . or to represent falsely that an interest in real property is not available for transaction" "wholly or partially for a discriminatory reason based on the actual or perceived . . . age . . . of any individual." *Id.* § 2-1402.21(a)(1).

149.    HRI and Ms. Opiotennione are persons within the meaning of the DCHRA § 2-1401.02(21).

150.    On September 18, 2019, Plaintiffs filed administrative charges of discrimination against Defendants Bozzutto, Greystar, Kettler, Wood, Tower and Fairfield with the District of Columbia Office of Human Rights (DCOHR). On October 29, 2019, the plaintiffs filed administrative charges of discrimination against Defendants Pinnacle and JBG Smith with DCOHR. Plaintiffs withdrew these charges prior to the commencement of this lawsuit.

151.    When advertising housing opportunities via Facebook's advertising platform, defendants targeted their housing advertisements towards younger individuals on the Facebook advertising platform and simultaneously excluded older individuals from receiving the same housing advertisements and information that defendants directed to younger individuals.

152.    As described above, on information and belief, Defendants have a pattern or practice of engaging in discriminatory housing advertising, including by excluding older individuals from the population of individuals to whom Defendants direct their housing advertisements on Facebook's ad platform.

153.    This pattern or practice violates the publication provision of the DCHRA, D.C. Code § 2-1402.21(a)(5).

154.    First, an ad campaign that directly relies on a person's age to exclude older persons from receiving housing advertisements indicates a preference, limitation, or discrimination based on age  Exclusionary housing advertising that steers housing advertisements away from older people

based on age communicates a message to an ordinary reader that the housing provider prefers to rent to younger persons who are in the age range of persons who received the advertisements and/or will discriminate against older persons who are not in the age range of persons who received the advertisements.  Every time an age-restricted advertisement is published, the ad campaign indicates a preference, limitation, or discrimination based on age.

155.    Second, when defendants make a statement within a housing advertisement that they want to reach people between an age range that excludes all or most older individuals, the advertisement communicates the message that defendants are less interested or not interested in renting to older individuals, including individuals who are older than the upper age limit to with the advertisement or notice was sent.  Such an advertisement or notice informs the ordinary reader of the advertisement and the public at large, including Plaintiff Opiotennione and the proposed Plaintiff Class Members, that the property management company sending the advertisement has a preference for younger individuals over older individuals as prospective tenants and that the property management company or apartment complex may discriminate or limit housing opportunities based on age. And by drawing a distinction between younger and older prospective tenants in defendants' advertising, an ordinary reader of the advertisement and the public would understand this as a message that the advertiser may prefer, discriminate, or limit housing based on age.  Defendants knew or reasonably should have known that when they chose to exclude older individuals from seeing their housing advertisements that a portion of the advertisement would make a statement that the property management company wants to reach people between a certain age range.

156.    Moreover, when defendants use Facebook's ad platform to tell Facebook to limit the population of Facebook users who will receive their housing advertisements – for example, by changing the age range from the default 18 to 65+ to 28 to 45 years old – they are making, printing, publishing, or causing to be made a notice or statement with respect to a housing transaction or

proposed housing transaction that indicates a preference, limitation, or discrimination based on age. In other words, defendants are making and/or publishing discriminatory statements to Facebook when they provide directions to Facebook to discriminate in the audience selection for their housing ads.

157.    D.C. Code §2-1402.62 further provides that "It shall be an unlawful discriminatory practice for any person to aid, abet, invite, compel, or coerce the doing of any of the acts forbidden under the provisions of this chapter or to attempt to do so." To the extent that any of the discriminatory statements alleged herein are also made in whole or in part by Facebook—an entity that is subject to the D.C. Human Rights Act's housing provisions—the actions of the defendants aided, abetted and invited Facebook to make such statements.   The defendants associated themselves with Facebook and participated in the discriminatory advertisement restrictions and statements about those ad restrictions, seeking by these actions to restrict the audience of such advertisements.

158.    In addition, regardless of the content in the advertisement, the practice of excluding older individuals from receiving housing-related advertisements constitutes a refusal or failure to initiate or conduct housing transactions and/or a false representation that housing is not available based on age.  D.C. Code § 2-1402.21(a)(1).

159.    This policy or practice of discrimination constitutes intentional discrimination and disparate treatment in violation of D.C. Code § 2-1402.21(a)(1). It treats older individuals worse that younger individuals in the renting of real property based on their age because defendants have excluded older individuals from receiving the same housing advertisements and information that younger individuals received via defendants' ads on Facebook.

160.    Denying older individuals housing advertising disproportionately reduces the number of applications from older persons and increases the number of applications from younger

individuals, resulting in an artificially high share of younger individuals than older individuals renting from Defendants. Such a practice makes it more likely that younger people will apply for and obtain housing at defendants' properties than older people will.

161.    Moreover, the same practices constitute unlawful "steering" under D.C. Code § 21-1402.22, which makes it an "unlawful discriminatory practice for any person . . . directly or indirectly to engage in the practice[] of 'steering[.]'"  As described above, such discriminatory advertising practices steer older people away from the defendants' housing.

**COUNT III**
**Violations of the D.C. Consumer Protections and Procedures Act**
**(On Behalf of All Plaintiffs, the Proposed Class and the General Public)**

162.    The preceding paragraphs of this complaint are incorporated as if set forth fully herein.

163.    The plaintiffs bring this count against the defendants for violations of the District of Columbia Consumer Protection Procedures Act ("DC CPPA"), D.C. Code § 28-3901 *et. seq.*

164.    The defendants are "persons" within the meaning of D.C. Code § 28-3901(a)(1), are "merchants" under § 28-3901(3), and provide "goods and services" within the meaning of § 28-3901(a)(7).

165.    The plaintiffs are "persons" within the meaning of D.C. Code § 28-3901(1)

166.    Plaintiff Opiotennione is a "consumer" within the meaning of D.C. Code § 28-3901 (2).

167.    Plaintiff HRI is a "nonprofit organization" and a "public interest organization" within the meaning of D.C. Code § 28-3901(a)(14) & (15).

168.    D.C. Code § 28-3904, makes it an "unlawful trade practice" to, *inter alia*, "misrepresent as to a material fact which has a tendency to mislead," *id.* § 28-3904(e), "[r]epresent that a transaction confers or involves rights, remedies, or obligations which it does not have or

involve, or which are prohibited by law," *id.* § 28-3904(e)(1), and to violate other laws, such as the D.C. Human Rights Act.

169.    The DC CPPA makes such conduct an unlawful trade practice "whether or not any consumer is in fact misled, deceived, or damaged thereby." D.C. Code § 28-3904.

170.    The defendants' inclusion of the Equal Housing Opportunity logo on their websites and the related fair housing statements stating and/or indicating that the defendants do not engage in unlawful discrimination, would lead a reasonable reader to believe that the defendants' housing advertising complies with local fair housing law, when they are not, in fact, complying with local fair housing law. The same logo and related fair housing statements, in conjunction with the "Why am I seeing this ad" statements, also would lead a reasonable reader to believe that it is lawful for the defendants to prefer tenants of certain ages, make statements about preferring tenants of a certain age, or exclude their advertisements from older people, when, as described in Count II, such practices violate the D.C. Human Rights Act. Accordingly, such practice has a tendency to mislead consumers and violates the DC CPPA.

171.    When the defendants have advertised on Facebook, the recipients of the ad have been told why they were selected to receive that particular advertisement, in a portion of the advertisement called "Why am I seeing this ad." For example, if the advertiser directed Facebook to apply an audience selection of people who are 18 to 40 years old, then the "Why am I seeing this ad" portion of the advertisement told the Facebook user that the person received the advertisement because the advertiser wanted to reach people ages 18-40. Such statements would lead a reasonable reader to believe that it is lawful to have such a preference, make such a statement, or exclude advertisements from older people, when, as described in Count II, it is unlawful under the D.C. Human Rights Act to make such age-based statements with respect to housing or exclude housing

advertisements from people based on age. Accordingly, such practice has a tendency to mislead consumers and violates the DC CPPA.

172.    The defendants have maintained policies and practices with respect to advertising of housing that violate the anti-discrimination provisions of the DCHRA, as described in Count II above, which are therefore "unfair or deceptive trade practices" prohibited by the CPPA because Facebook violated a District of Columbia statute in the context of a consumer transaction.  D.C. Code § 28-3904.

173.    Defendants' failure to disclose to consumers that their policies and practices with respect to housing advertising do not comply with the DCHRA are material facts, the omission of which tended to mislead consumers and are unfair and deceptive trade practices that violate the CPPA.  D.C. Code § 28-3904(f).

174.    The statements encouraging only younger prospective tenants to apply cause housing in the DC Metropolitan area to become less integrated and less age-diverse.

175.    The DC CPPA provides that "[a] consumer may bring an action seeking relief from the use of a trade practice in violation of a law of the District." D.C. Code § 28-3905(k)(1)(A).

176.    The DC CPPA further provides that "[a] nonprofit organization may, on behalf of itself . . . and on behalf of the general public, bring an action seeking relief from the use of a trade practice in violation of a law of the District." D.C. Code § 28-3905(k)(1)(C).

177.    The DC CPPA further provides that "a public interest organization may, on behalf of the interests of a consumer or a class of consumers, bring an action seeking relief from the use by any person of a trade practice in violation of a law of the District," D.C. Code § 28-3905(k)(1)(D).

178.    Plaintiff Opiotennione brings this claim on behalf of herself and the proposed Class. Plaintiff HRI brings this claim on behalf of itself, the general public, and the proposed Class.

179.    As a direct and proximate result of Defendants' conduct, Plaintiffs, the class and the general public have suffered injuries and monetary damages as described herein, including treble damages, or $1,500 per violation, whichever is greater, for violations of the CPPA.

### PRAYER FOR RELIEF

For all these reasons, the plaintiffs ask that judgment be entered against the defendants on all claims and respectfully request that this Court award the following relief:

A. Declare that the pattern or practice described above violates the Montgomery County Code, the D.C. Human Rights Act and the D.C. Consumer Protection and Procedures Act;

B. Enter an order permanently enjoining defendants from engaging in the types of discriminatory advertising practices described in this complaint, either on Facebook or other platforms.

C. Enter an order enjoining defendants from advertising on Facebook unless and until Facebook no longer uses a discriminatory algorithm to determine the recipients of advertisements.

D. Certify a Plaintiff Class under Rule 23(a) and (b)(3), or in the alternative Rule 23(a),(b)(2), and (c)(4) of the Federal Rules of Civil Procedure, appoint Plaintiffs' counsel as Class Counsel, and appoint the named plaintiff as the Class Representative

E. Require defendants to pay the plaintiffs and members of the Class for the economic harm they have suffered due to such unlawful age discrimination, as well as any restitution, penalties, liquidated damages, exemplary damages, punitive damages, pre-judgment and post-judgment interest as provided by law, that may be owed;

F. Require defendants to pay Plaintiffs' attorneys' fees and costs, including based upon the common fund doctrine;

G. Appoint a monitor to ensure that defendants comply with the injunction provisions of any decree that the Court enters;

H. Enter an order retaining jurisdiction over this action to ensure that defendants comply with such a decree; and

I. Grant such other further relief as the Court deems proper, appropriate, just, or equitable.

## DEMAND FOR JURY TRIAL

Under Rule 38(b) of the Federal Rules of Civil Procedure, the plaintiffs hereby demand a jury trial on all causes of action and claims with respect to which they have a right to jury trial.

Dated: July 1, 2020                                 Respectfully submitted,


 /s/ Matthew K. Handley                              Peter Romer-Friedman**
Matthew K. Handley (D. Md. Bar # 18636)             GUPTA WESSLER PLLC
Rachel Nadas*                                       1900 L Street, NW, Suite 312,
HANDLEY FARAH & ANDERSON PLLC                       Washington, DC 20036
777 6th Street, NW                                  Telephone: (202) 888-1741
Eleventh Floor                                      Email: peter@guptawessler.com
Washington, DC 20001
Telephone: (202) 559-2411
Email: mhandley@hfajustice.com
Email: rnadas@hfajustice.com


*pro hac vice forthcoming*
***D. Md. Application has been
approved, but swearing in has been
delayed due to covid-19 and Standing
Order 2020-07.*