**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **HOUSING RIGHTS INITIATIVE,** *et al.*     ) | |
|     ) | |
| **Plaintiffs,**     ) | |
|     ) | |
| **v.**     ) | **Case No. 20-cv-1956** |
|     ) | |
| **BOZZUTO MANAGEMENT COMPANY,** *et al.*     ) | |
|     ) | |
| **Defendants.**     ) | |

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS
PLAINTIFFS' FIRST AMENDED COMPLAINT**

/s/ Lynn E. Calkins
Lynn E. Calkins, Bar No. 12121
Holland & Knight LLP
800 17th Street, N.W., Suite 1100
Washington, D.C. 20006
Telephone: (202) 955-3000
lynn.calkins@hklaw.com

*Counsel for Bozzuto Management Company*

/s/ Matthew M. Moore
Matthew M. Moore, Bar No. 14030
Thomas John Gartner, Bar No. 18808
Shulman Rogers
12505 Park Potomac Ave., 6th Floor
Potomac, MD  20854
Telephone: (301) 230-6560
mmoore@shulmanrogers.com

*Counsel for Greystar Management Services L.P.*

/s/ Sharon Oras Morgan
Sharon Oras Morgan, Bar No. 29663
W. Christian Moffitt, *pro hac vice*
Fox Rothschild LLP
10 Sentry Parkway, Suite 200
Blue Bell, PA 19422
Telephone: (610) 397-7073
cmoffit@foxrothschild.com

*Counsel for Kettler Management, Inc.*

/s/ Emmett F. McGee, Jr.
Adriana R. Midence, *pro hac vice*
Emmett F. McGee, Jr., Bar No. 08462
Eric R. Mangus, *pro hac vice*
Kelli Church, *pro hac vice*
Jackson Lewis P.C.
171 17th Street, NW, Suite 1200
Atlanta, GA  30363
Telephone: (404) 586-1822
emmett.mcGee@jacksonlewis.com

*Counsel for Wood Residential Services, LLC*

  /s/ Grace E. Speights
Grace E. Speights, Bar No. 05254
Morgan Lewis & Bockius LLP
111 Pennsylvania Ave. NW
Washington, DC  20004
Telephone: (202) 739-5189
grace.speights@morganlewis.com

*Counsel for JBG SMITH Management
Services, L.L.C.*

  /s/ Michael Jaffe
Michael Evan Jaffe, Bar No.06694
David C. Grossman, Bar No. 21260
Pillsbury Winthrop Shaw Pittman LLP
1200 17th Street, NW
Washington, DC  20036
Telephone: (202) 663-8068
michael.jaffe@pillsburylaw.com
david.grossman@pillsburylaw.com

*Counsel for Tower Construction Group LLP*

  /s/ Kathleen Pontone
Kathleen Pontone, Bar No. 01225
Elisabeth Koloup Hall, Bar No. 18734
Miles and Stockbridge PC
100 Light Street, 10th Floor
Baltimore, MD  21202
Telephone: (410) 385-3757
kpontone@milesstockbridge.com

*Counsel for Berkshire Communities, LLC*

  /s/ Leslie Paul Machado
Leslie Paul Machado, Bar No. 14952
O'Hagan Meyer
2560 Huntington Avenue
Suite 204
Alexandria, VA 22303
Telephone: (703) 775-8607
lmachado@ohaganmeyer.com

*Counsel for Pinnacle Campus Living LLC*

/H. Matson Coxe, IV
H. Matson Coxe, IV, Bar No. 19388*
Elisabeth L. Shu, *pro hac vice*
Wilson Elser Moskowitz Edelman &
Dicker, LLP
8444 Westpark Drive, Suite 510
McLean, VA 22102
Telephone: (703) 852-7793
lisa.shu@wilsonelser.com
H.Matson.CoxeIV@wilsonelser.com

*Counsel for Vantage Management Inc.*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................... iii

INTRODUCTION ................................................................................................. 1

FACTUAL BACKGROUND ................................................................................ 2

ARGUMENT ........................................................................................................ 5

    A.      PLAINTIFFS LACK STANDING TO BRING THESE CLAIMS. ........................... 6

        1.    Plaintiff Opiotennione Lacks Standing Because She Has Not Suffered An    Injury In Fact That Is Traceable To Defendants' Alleged Conduct ..................................... 7

        2.    Plaintiff HRI Lacks Standing to Bring This Action ................................................ 10

        a.    HRI Lacks Organizational Standing. ................................................................. 10

        b.    HRI Also Lacks Representational Standing. ........................................................ 13

    B.      PLAINTIFFS' AMENDED COMPLAINT FAILS TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED. ................................................................. 14

        1.    Plaintiffs' Amended Complaint Fails to State A Claim Under the Montgomery County Code. ................................................................................... 15

        a.    Plaintiffs Do Not Allege That the Facebook Advertisements Indicate A Discriminatory Preference. ............................................................................... 15

        b.    Plaintiffs Fail to Plausibly Allege That Defendants' Overall Advertising Excludes Older Individuals. ............................................................................. 16

        c.    The "Why Am I Seeing This Ad" Statements Were Not Made By Defendants. ......20

        d.    Plaintiffs Cannot State a Claim Against Defendants for Facebook's Algorithm. ......23

        2.    Plaintiffs' Amended Complaint Fails to State A Claim Under DCHRA. .......... 24

        3.    Plaintiffs' Amended Complaint Fails to State A Claim Under the CPPA. ........ 26

        a.    D.C. Courts Have Rejected Attempts to Manufacture CPPA Claims Where the Conduct Is Addressed by A More Specific Statute. ................................................. 27

        b.    The Amended Complaint Fails to Allege A Consumer-Merchant Relationship Between Ms. Opiotennione And All Defendants. ................................................... 30

        c.    Plaintiffs' Amended Complaint About Defendants' Advertising Does Not Support A CPPA Claim. ............................................................................................. 32

        d.    Plaintiffs Cannot Ground Their CPPA Claim Against Greystar, Wood, Pinnacle, Vantage, or Berkshire on an Alleged Violation of the DCHRA When, by Their Conduct, They Have Effectively Conceded That These Defendants Are Not Liable Under the DCHRA. ......................................................................................... 33

        e.    Plaintiffs Cannot State a Claim Against Tower, Kettler or Vantage Under the District of Columbia CPPA Inasmuch as None of the Relevant Residential Properties Ae Located in Washington, D.C. ....................................................... 33

4.      Plaintiffs Have Failed to Demonstrate a Right to Injunctive Relief. ........................34

CONCLUSION.................................................................................................................35

## TABLE OF AUTHORITIES

**Cases**                                                           **Page(s)**

*Adler v. Vision Lab Telecomms., Inc.*,
  393 F. Supp. 2d 35 (D.D.C. 2005) ............................................................... 29, 30

*Allen v. Wright*,
  468 U.S. 737 (1984) ......................................................................................... 9, 10

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) .................................................................................. 14, 15, 18

*Baylor v. Mitchell Rubenstein & Assocs., P.C.*,
  857 F.3d 939 (D.C. Cir. 2017) .............................................................................. 30

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007) .................................................................................... 14, 18

*Bradley, et al. v. T-Mobile US, Inc., et al.*,
  No. 17-CV-07232-BLF, 2020 WL 1233924 (N.D. Cal. Mar. 13, 2020) ................................. 9

*Brandywine Apartments, LLC v. McCaster*,
  964 A.2d 162 (D.C. 2009) ................................................................................ 24

*CGM, LLC v. BellSouth Telecomms., Inc.*,
  664 F.3d 46 (4th Cir. 2011) ................................................................................. 6

*Chappell v. Southern Maryland Hosp., Inc.*,
  320 Md. 483 (1990) ........................................................................................ 30

*City of New York v. U.S. Dep't of Defense*,
  913 F.3d 423 (4th Cir. 2019) ............................................................................. 35

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) ..................................................................................... 7, 9

*Corey v. Sec'y, U.S. Dep't of Hous. & Urban Dev. ex rel. Walker*,
  719 F.3d 322 (4th Cir. 2013) ............................................................................. 15

*Demetry v. Lasko Prod., Inc.*,
  284 F. App'x 14 (4th Cir. 2008) ........................................................................ 14

*Driscoll v. George Washington Univ.*,
  938 F. Supp. 2d 19 (D.D.C. 2013) ................................................................... 28, 29

*Evans v. B.F. Perkins Co., a Div. of Standex Int'l Corp.*,
  166 F.3d 642 (4th Cir. 1999) .............................................................................. 6

*Fair Employment Council of Greater Washington, Inc. v. BMC Mktg. Corp.*,
   28 F.3d 1268 (D.C. Cir. 1994) ............................................................................... 12

*FDS Rest., Inc. v. All Plumbing Inc.*,
   No. 16-CV-1009, 2020 WL 1465919 (D.C. Mar. 26, 2020) ..................................... 22

*Feemster v. BSA Limited P'Ship*,
   471 F. Supp. 2d 87 (D.D.C. 2007), *aff'd in part, rev'd in part on other grounds*,
   548 F.3d 1063 (D.C. Cir. 2008) ............................................................................... 28

*Floyd v. Wash. Suburban Sanitary Commission*,
   No. 14-cv-1749, 2016 WL 4415055 (D. Md. Aug. 19, 2016) (Messitte, J.) ........................ 30

*Ford v. Chartone, Inc.*,
   908 A.2d 72 (D.C. 2006) ........................................................................................... 30

*Friends of Lubavitch v. Baltimore Cty., Maryland*,
   421 F. Supp. 3d 146 (D. Md. 2019) ......................................................................... 18

*George Washington Univ. v. D.C. Bd. of Adjustment*,
   831 A.2d 921 (D.C. 2003) ......................................................................................... 25

*Gomez v. Independence Management of Delaware, Inc.*,
   967 A.2d 1276 (D.C. 2009) .......................................................................... 27, 29, 30

*Green v. H & R Block, Inc.*,
   735 A.2d 1039 (Md. 1999) ....................................................................................... 22

*Hall v. Virginia*,
   385 F.3d 421 (4th Cir. 2004) ..................................................................................... 4

*Hamad v. Woodcrest Condo. Ass'n*,
   328 F.3d 224 (6th Cir. 2003) ................................................................................... 26

*Henneghan v. D.C.*,
   916 F. Supp. 2d 5 (D.D.C. 2013) ............................................................................. 25

*Jimenez v. Chase Bank*,
   No. 18-CV-3297 (GHW) (SN), 2019 WL 919626 (S.D.N.Y. Jan. 28, 2019) ...................... 19

*Knowledge Ecology Int'l v. Nat'l Institutes of Health*,
   No. CV PJM 18-1130, 2019 WL 1585285 (D. Md. Apr. 11, 2019) ..................................... 12

*Lane v. Holder*,
   703 F.3d 668 (4th Cir. 2012) ............................................................................. 10, 11

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
   572 U.S. 118 (2014) ................................................................................................... 9

*Long Term Care Pharm. Alliance v. UnitedHealth Group, Inc.*,
    498 F. Supp.2d 187 (D.D.C. 2007) ................................................................... 12

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ................................................................................... 7, 10

*Metro. Milwaukee Fair Hous. Council v. Labor & Indus. Review Comm'n*,
    173 Wis. 2d 199, 496 N.W. 2d 159 (Ct. App. Wis. 1992) ................................... 17

*Miami Valley Fair Hous. Ctr., Inc. v. Connor Group*,
    805 F. Supp. 2d 396 (S.D. Ohio 2011) ............................................................ 17

*Michaels v. NCO Financial Systems, Inc.*,
    No. 16-cv-1339, 2020 WL 2800664 (D.D.C. May 29, 2020) ............................... 32

*Mott v. Accenture, LLP*,
    No. 8:17-CV-00231-PX, 2019 WL 1934727 (D. Md. Apr. 29, 2019).................... 15

*Nelson v. Nationwide Mortg. Corp.*,
    659 F. Supp. 611 (D.D.C. 1987) ..................................................................... 34

*Opiotennione v. Facebook*,
    3:19-cv-07185-JSC (N.D. Cal.) ............................................................*passim*

*Penkoski v. Bowser*,
    No. 20-CV-01519 (TNM), 2020 WL 4923620 (D.D.C. Aug. 21, 2020) ................. 9

*Ragin v. New York Times Co.*,
    923 F.2d 995 (2d Cir. 1991) ........................................................................... 15

*Richardson v. Petasis*,
    160 F. Supp. 3d 88 (D.D.C. 2015) .................................................................. 25

*Spokeo, Inc. v. Robins*,
    __ U.S. __, 136 S. Ct. 1540 (2016) ......................................................... 6, 7, 10

*Stone v. Landis Const. Co.*,
    120 A.3d 1287 (D.C. 2015) ....................................................................... 30, 31

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009) ....................................................................................... 7

*Thompson v. Digicon Corp.*,
    107 F. Supp. 3d 49 (D.D.C. 2015) .................................................................. 29

*United States v. Hays*,
    515 U.S. 737 (1995) ....................................................................................... 7

*United States v. W.T. Grant Co.*,
   345 U.S. 629, 73 S.Ct. 894 (1953) .................................................................35

*Warth v. Seldin*,
   422 U.S. 490 (1975) ..............................................................................................6

*White Tail Park, Inc. v. Stroube*,
   413 F.3d 451 (4th Cir. 2005) ...............................................................................6

*Wilson v. Glenwood Intermountain Properties, Inc.*,
   98 F.3d 590 (10th Cir. 1996) ...............................................................................9

*Worsham v. Travel Options, Inc.*,
   No. JKB-14-2749, 2016 WL 4592373 (D. Md. Sept. 2, 2016) ...........................18

*Yudzon v. Sage Title Group, LLC*,
   No. 18-cv-2076, 2020 WL 2615579 (D.D.C. May 22, 2020) ..............................30

## Statutes

D.C. Code § 28-3901, *et seq.* .............................................................................*passim*

D.C. Code § 2-1402.01, *et seq.* ..........................................................................*passim*

42 U.S.C. § 3604 ...................................................................................................15

Md. Code, State Gov't 20-1202 ..............................................................................5

Montgomery County Code § 27-12 ................................................................15, 16

Montgomery County Code § 27-19 .......................................................................17

## Other Authorities

24 C.F.R. § 109.25(c) ...........................................................................................19

61 FR 14378-01 .....................................................................................................19

Federal Rule of Civil Procedure 12(b)(1) ..............................................................6

Federal Rule of Civil Procedure Rule 12(b)(2) ......................................................6

Federal Rule of Civil Procedure Rule 12(b)(6) ..................................................6, 14

Federal Rule of Civil Procedure Rule 21 ...............................................................5

Fed. R. Evid. 201 ..................................................................................................18

Restatement (Second) of Agency §§ 12–14 (1958) ............................................22

## INTRODUCTION

Plaintiffs initially sued nine unrelated multifamily housing providers that own and/or manage rental properties in Montgomery County and/or the District of Columbia, alleging that, by targeting certain Facebook ads at younger users and relying on Facebook's proprietary algorithm to display those ads to members of a target audience, each of the named Defendants separately discriminated against older individuals based on age, in violation of the Montgomery County Code, the D.C. Human Rights Act (DCHRA), and/or D.C. Consumer Protection and Procedures Act (CPPA).

Changing course after reviewing Defendants' initial motion to dismiss, in their First Amended Complaint ("Amended Complaint"), Plaintiffs now assert that only four of the Defendants have violated the Montgomery County Code and the DCHRA but that all nine Defendants have violated the CPPA. Plaintiffs' claims continue to rest solely on the assertion that each Defendant's separate use of Facebook's ad targeting tools and algorithm as part of larger advertising campaigns constitutes age-based discrimination.

Plaintiffs' positions in this lawsuit are directly contradicted by judicial admissions that Plaintiff Opiotennione has made in another lawsuit against Facebook, and Plaintiffs' attempts to cure the deficiencies by shifting the legal grounds for the counts they plead does nothing to remedy the fundamental factual flaws with their allegations. Plaintiffs' amendments fail to cure their lack of standing to pursue their claims; neither Ms. Opiotennione, as an individual, nor the Housing Rights Initiative ("HRI"), as an organization, suffered any injury as a result of the alleged conduct. And, even if they had standing, Plaintiffs still have failed to state a viable cause of action on which relief can be granted against any of the Defendants, as none of the Defendants engaged in a

discriminatory advertising practice in violation of the Montgomery County Code or the DCHRA and none of the Defendants participated in any misleading consumer practice under the CPPA.

Given that Plaintiffs have twice failed to allege sufficient facts to establish standing or to state a claim upon which relief can be granted, Defendants again request that this Court dismiss Plaintiffs' Amended Complaint with prejudice and end this action.

## FACTUAL BACKGROUND

Plaintiff Opiotennione is a 55-year-old resident of Washington, D.C., who works for the D.C. Public School system. (*Id.* ¶ 6.) Ms. Opiotennione alleges that she was regularly looking for housing opportunities in the region in 2018 and 2019 and was specifically in the market for a two- or three-bedroom apartment with a housing budget of at least $2,500 a month. (*Id.*) She admits that, ultimately, "in 2010, after being unable to find suitable rental housing, she purchased a home in the District of Columbia[.]" (*Id.*).

Despite contending she was looking to rent an apartment, Ms. Opiotennione makes no allegations about the actual steps she took to seek rental housing. She does not identify any specific property that she allegedly visited or applied for, and she provides no allegations about whether she even reviewed any of the myriad of online websites that carried information about rental housing opportunities in Washington, D.C., Montgomery County, Maryland or Arlington, Virginia, or, if not, why not.

 With no such assertions, Ms. Opiotennione rests her allegations on the pure conjecture that, had she seen one or more Facebook ads that Defendants purportedly targeted to younger audiences, she "would have clicked on the ads, she would have reviewed the information on all of the defendants' websites to learn about their housing opportunities in the D.C. metropolitan area, and she would have applied for and secured a two-bedroom apartment at one or more of the

properties of Bozzuto, JBG Smith, Kettler, and Tower for which she was qualified."  (*Id.* ¶ 7.)

Although the Amended Complaint identifies 39 properties that one of the Defendants individually owns, operates, or manages, Ms. Opiotennione concedes that she would have only considered renting a unit in one of six of the 39 properties:  two Bozzuto properties - one in D.C. and another in Silver Spring, two JBG Smith Properties in D.C., one Kettler property in Bethesda, and one Tower property in Silver Spring.  She does not contend that she would have rented a unit at any property owned, operated, or managed by Greystar, Wood, Pinnacle, Vantage, or Berkshire; she does not contend that she would have rented a unit at a JBG Smith property located in Montgomery County; and she does not contend that she would have rented a unit at any D.C. property owned or managed by Kettler or Tower.

Although Plaintiff alleges that Defendants have engaged in systematic "digital discrimination" by knowingly steering "older people" away from the companies' rental properties in violation of District of Columbia and Montgomery County law (*id.* p. 4), the Amended Complaint identifies only isolated examples of advertisements allegedly published by each Defendant, which Plaintiffs claim was part of a "pattern or practice" of discrimination targeted at age ranges that would have excluded Plaintiff Ms. Opiotennione.  (Am. Compl. ¶ 44 & Ex. A pp. 61–76.)  Plaintiffs do not, and cannot, allege that Defendants worked in concert with one another.

The Amended Complaint also does not allege that the advertisements on Facebook are facially discriminatory.  Instead, Plaintiffs contend that Defendants targeted younger audiences with some portion of their online advertisements (Am. Compl. p. 3) and that it is  Facebook – and Facebook alone – that "uses an algorithm and machine learning to determine which persons within a particular audience selection will receive a particular advertisement."  (*Id.* ¶  35.)  Plaintiffs contend that Defendants discriminated by their "reliance on Facebook's ad-delivery algorithm . . .

3

which determines which Facebook users will receive the ads" based on several factors including age and that Defendants "ma[de] matters worse[] [by] [] expressly t[elling] recipients that they wanted to reach only younger people." (*Id.* pp. 2-3.). Although Plaintiffs allege "[o]n information and belief" that all of Defendants' advertisements on Facebook were targeted solely to younger individuals (*Id.* ¶45), the Amended Complaint contains no specific facts that would support this wholly speculative assertion. [1]

In addition to this action, Plaintiff Opiotennione was the lead plaintiff in a class action against Facebook in the Northern District of California, which raised similar claims about financial services advertisements including mortgage-related advertisements. *See Opiotennione v. Facebook*, 3:19-cv-07185-JSC (N.D. Cal.).[2]   As set forth in this memorandum, Plaintiff Opiotennione and her counsel have taken contrary positions in these two cases, and they have failed to name Facebook as a party in this suit—despite seeking relief which cannot be effectuated without Facebook.   In her prior litigation, Ms. Opiotennione admitted that "Facebook is solely responsible for developing its ad delivery algorithm and the resulting denial of ads to … older people." *Id.*, Dkt. No. 39 at 27.[3]   Although she acknowledges in the Amended Complaint that Facebook is ultimately responsible for the algorithm and ad distribution, in this action, Plaintiffs seek to hold advertisers responsible for Facebook's statements and its algorithm. (Am. Compl. ¶¶

[1] Similarly, despite asserting that some housing providers have circumvented a limitation by Facebook which has not permitted housing providers to restrict advertisements by age group since late 2019, Plaintiffs make no such assertion about any of the Defendants. (Am. Compl ¶ 40.)

[2] The action was dismissed without prejudice at a hearing on August 13, 2020 for lack of standing and failure to state a claim. *See* Ex. A, Order (October 2, 2020).  On November 2, 2020, Plaintiff voluntarily dismissed the action.

[3] The Court may take judicial notice of Ms. Opiotennione's statements in these filings—the fact that she made these contradictory allegations is a matter of public record not reasonably in dispute. *See Hall v. Virginia*, 385 F.3d 421, 424 n. 3 (4th Cir. 2004).

29, 34.)

Plaintiff Opiotennione is joined in this action by Plaintiff HRI.  HRI describes itself on its website as an organization, "taking a proactive, systematic, and data-driven approach to targeting, investigating, and fighting fraudulent real estate practices and connecting tenants to legal support" by "launch[ing] investigations and generat[ing] class action lawsuits against predatory real estate companies."  For this litigation, however, HRI alleges that it is "a non-profit public interest organization dedicated to promoting lawful real estate practices, including promotion of the rights of tenants and other housing-related consumers, and providing information and assistance to tenants and individuals seeking housing in the New York City and Washington, D.C. metropolitan areas."  (Am. Compl., ¶ 8.)

In July 2020, Plaintiffs filed this class action alleging violations of the Montgomery County Code, the DCHRA, and CPPA.  Defendants filed a joint motion to dismiss (Dkt. 47), and, in response, Plaintiffs filed this Amended Complaint.  (Dkt. 59.)[4]

## ARGUMENT

Plaintiffs' Amended Complaint fails to cure the deficiencies, and, as a matter of law, this

---

[4] Defendants have jointly moved to dismiss the Amended Complaint for judicial efficiency and to avoid duplication in raising these common legal issues.  Should this case proceed beyond the initial motion phase, Defendants respectfully reserve the right to move to sever these disparate claims pursuant to Rule 21.  Plaintiffs have lumped together distinct allegations against 9 large, but separate, property owner and/or managers that operate in various jurisdictions and have different advertising practices and policies.  With 9 different property management companies and at least 39 separate apartment complexes involved in this case, there likely will be between 9 and 39 different governing housing policies, and between 9 and 39 different advertising policies setting forth the advertising/marketing procedures, target audiences, strategies and methods for each property owned or managed by each Defendant in Montgomery County and D.C.

action should be dismissed under Rule 12(b)(1) and, alternatively, Rule 12(b)(6).

## A. PLAINTIFFS LACK STANDING TO BRING THESE CLAIMS.[5]

Rule 12(b)(1) requires the Court to dismiss a complaint where there is a lack of subject matter jurisdiction. *CGM, LLC v. BellSouth Telecomms., Inc.*, 664 F.3d 46, 52 (4th Cir. 2011). When resolving a motion under Rule 12(b)(1), "the district court is to regard the pleadings as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Evans v. B.F. Perkins Co., a Div. of Standex Int'l Corp.*, 166 F.3d 642, 647 (4th Cir. 1999) (citation and internal quotation marks omitted). A plaintiff bears the burden of "clearly . . . alleg[ing] facts demonstrating that he is a proper party to invoke judicial resolution of the dispute." *Warth v. Seldin*, 422 U.S. 490, 518 (1975).

Dismissal for lack of subject matter jurisdiction is required where no named plaintiff has standing to pursue a claim. *See White Tail Park, Inc. v. Stroube*, 413 F.3d 451, 458 (4th Cir. 2005). Plaintiffs must allege sufficient facts to demonstrate that each has suffered an injury in fact that is fairly traceable to the challenged conduct of Defendants and that is likely to be redressed by a favorable judicial decision. *Spokeo, Inc. v. Robins*, __ U.S. __, 136 S. Ct. 1540, 1547 (2016). As the parties invoking federal jurisdiction, Plaintiffs bear the burden of establishing the existence of Article III standing and, at the pleading stage, "must clearly allege facts demonstrating each

---

[5] Defendant Berkshire also moves to dismiss the Amended Complaint due to a lack of personal jurisdiction pursuant to Rule 12(b)(2). To show grounds for personal jurisdiction in Maryland, Plaintiffs must (1) identify a provision in Maryland's long-arm statute that creates jurisdiction and (2) show that Berkshire's contacts with Maryland suffice to satisfy due process. Plaintiffs have not and cannot meet their burden because they have not pled, nor could they, facts sufficient to establish that this Court has general or specific personal jurisdiction over Berkshire. This Court cannot exercise general jurisdiction over Berkshire because it is not headquartered, incorporated, or otherwise "at home" in Maryland. Additionally, Plaintiffs cannot establish that their claims arise out of Berkshire's forum-related activities, and thus have not established specific jurisdiction over Berkshire. Accordingly, the Complaint must be dismissed against Defendant Berkshire.

element." *Id.* at 1547 (internal quotes and citations omitted).

### 1.     Plaintiff Opiotennione Lacks Standing Because She Has Not Suffered An Injury In Fact That Is Traceable To Defendants' Alleged Conduct.

An injury in fact is "an invasion of a legally protected interest" that is (1) "concrete," (2) "particularized," and (3) "actual or imminent, not conjectural or hypothetical." *Id.* at 1548 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). A "concrete" injury is one that "actually exist[s]"—i.e., it is "real" and not "abstract." *Id.* "For an injury to be 'particularized,' it must affect the plaintiff in a personal and individual way." *Id.* Generalized grievances do not suffice. *See Lujan*, 504 U.S. at 575; *Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009). The requirement that an injury be "actual or imminent" "ensure[s] that the alleged injury is not too speculative for Article III purposes—that the injury is certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). There must be a sufficient "causal connection between the injury and the conduct complained of." *United States v. Hays*, 515 U.S. 737, 743 (1995).

Ms. Opiotennione asserts she suffered the following purported injuries:

- She was excluded from "hearing about housing opportunities in the District of Columbia metropolitan area" on Facebook, which, in turn, meant that she would not know that she could "apply for, compete for, or secure housing at defendants' rental properties." (Am. Compl., ¶¶ 93, 97, 106);

- She was deterred from learning about or applying to live at Defendants' properties because she did not receive (or, she admits, was unlikely to receive), age-restricted ads through Facebook. (*Id.* ¶¶ 87-89, 91);

- She did not receive ads on Facebook and, theoretically, would have obtained more expensive or inferior housing opportunities than younger individuals who received the Facebook ads. (*Id.* ¶¶ 94, 96, 101);

- She was harmed "by virtue of being segregated, classified, and treated in an unequal manner . . . that perpetuated archaic and stereotypic notions about the undesirability of older persons and stigmatized older persons as innately inferior and less worthy." (*Id.* ¶ 104); and

7

- The ads purportedly "reduced the age-diversity in housing—both at the Defendants' properties and other properties in the D.C. metropolitan area—and denied Ms. Opiotennione, the members of the proposed Class and the general public from living in integrated settings." (*Id.* at ¶ 105.)

Each of these alleged injuries fails because it is (1) not concrete, (2) relies on a "highly attenuated chain of possibilities," and/or (3) constitutes a generalized grievance.

Ms. Opiotennione's first three alleged injuries are not supported by any factual allegations that plausibly suggest that Ms. Opiotennione missed out on any specific housing opportunity or housing special with respect to one or more properties owned or managed by any of the Defendants.  Ms. Opiotennione does not allege which unit or which property she wished to rent, what she did to learn about that property, or whether she applied to and was denied housing on the same terms as younger people who she claims received advertisements she did not receive through Facebook.  Ms. Opiotennione also does not allege that any of the properties in question were running a specific deal advertised *only* through Facebook, that she missed seeing a particular advertisement, or that she applied to live at any properties owned or managed by any of the Defendants and then was offered a lease on different terms and conditions than those advertised on Facebook or to younger residents who received the Facebook advertisements.  Indeed, she did not allege that any property advertised by Greystar, Wood, Pinnacle, Vantage, or Berkshire even fit her criteria.

Even if Ms. Opiotennione had made any of these specific allegations, she still could not state a cognizable injury because her alleged injury would rest upon a "highly attenuated chain of possibilities" that she speculates could, in theory, result in an injury.   Specifically, she contends that had she received and clicked on the ads, she would have identified an apartment that she was interested in renting at one of the Defendants' properties, and, had she thereafter applied to rent one of the advertised apartments, she would have been approved as a resident.   Each one of these

steps relies on one or more in a series of compounding speculative assumptions and thus is legally infirm. *See Clapper*, 568 U.S. at 410; *Bradley, et al. v. T-Mobile US, Inc., et al.*, No. 17-CV-07232-BLF, 2020 WL 1233924 (N.D. Cal. Mar. 13, 2020) (dismissing case alleging that employers restricted Facebook advertisements based on age where plaintiffs failed to "identify—even by way of example—a single job for which [their] allegations are true.")[6]

Ms. Opiotennione's other alleged injuries—the perpetuation of stereotypes and the denial of age-diverse communities—are also insufficient to confer standing. The alleged perpetuation of stereotypes is a stigmatic injury, which "accords a basis for standing *only to those persons who are personally denied equal treatment by the challenged discriminatory conduct.*" *Allen v. Wright*, 468 U.S. 737, 755-56 (1984) (citations omitted)(emphasis added).[7] S*ee also Penkoski v. Bowser*, No. 20-CV-01519 (TNM), 2020 WL 4923620, at *4 (D.D.C. Aug. 21, 2020); *Wilson v. Glenwood Intermountain Properties, Inc.*, 98 F.3d 590, 596 (10th Cir. 1996) ("Persons who merely see a discriminatory advertisement" but are not interested in the advertised housing or lack qualifications are no more than "concerned bystanders."). Here, Ms. Opiotennione did not even see the allegedly discriminatory advertisement and she has not alleged that she was denied equal treatment by any Defendant, and therefore, could not have reasonably suffered any stigmatic injury. If the standing requirement were satisfied merely with an allegation that the plaintiff felt stigmatized, "standing would extend nationwide to all members of the particular [age] group . . . regardless of . . . location[,]" interest, and ability to afford the housing opportunity. *Allen*, 468

---

[6] Even assuming *arguendo* that Ms. Opiotennione's allegations are sufficient to demonstrate that she suffered a concrete injury and has individual standing, Ms. Opiotennione's Amended Complaint only pleads facts to support claims related to the six properties identified in Paragraph 90 of the Amended Complaint.

[7] *Allen v. Wright* was abrogated on other grounds by *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014).

U.S. at 755–56.

Likewise, Ms. Opiotennione's assertion that she and the general public were denied age-diverse communities fails.  This is another generalized grievance, which is "undifferentiated and common to all members of the public," which she admits.  (Am. Compl. ¶ 104.)  Even if this could constitute an allegation of a particularized injury, Mr. Opiotennione has not alleged that Defendants refuse to rent apartments to older individuals or that the tenant populations in Defendants' properties lack age-diverse residents due to their Facebook advertising practices.

### 2. Plaintiff HRI Lacks Standing to Bring This Action.

As with Ms. Opiotennione, the Amended Complaint fails to cure HRI's lack of standing to bring the claims asserted in this action.  In fact, Plaintiffs' amendment weakens any argument that HRI may have had for organizational standing given that HRI fails to allege any facts that demonstrate any injury to the organization, much less an injury traceable to Defendants' conduct and provides no basis for HRI to claim representational standing.

### a. HRI Lacks Organizational Standing.

Organizations seeking to bring claims on their own behalf must satisfy the same three requirements for standing set forth in *Spokeo* and *Lujan* as an individual plaintiff by alleging that the organization has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo*, 136 S. Ct. at 1547; *see also Lane v. Holder*, 703 F.3d 668, 671 (4th Cir. 2012).  An organization like HRI adequately alleges an injury in fact when it claims "a defendant's actions impede its efforts to carry out its mission." *Lane*, 703 F.3d at 674 (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982)).  There is no such allegation in the Amended Complaint.  In addition, as discussed in Defendants' original Motion to Dismiss, there could be none.  (*See* Dkt. 47-1, pp. 10–15.)

10

In *Lane*, the Fourth Circuit held that an advocacy organization could not establish an injury in fact by claiming that a defendant's action caused it to divert resources from other goals because such voluntary "budgetary choices" are not cognizable Article III injuries.   703 F.3d at 671.  "[O]rganizations with merely 'abstract concern[s] with a subject that could be affected by an adjudication'" lacked the concrete injury required by Article III.  *Id.* (quoting *Simon v. E. Kentucky Welfare Rights Org.*, 426 U.S. 26, 27 (1976)).  Rather, to establish an injury in fact, an organization must establish that the defendants' actions "impede its efforts to carry out its mission."  *Id.* at 674.

Any purported diversion of resources in response to Defendants' alleged actions was wholly voluntary, and HRI does not allege that these diversions diminished its ability to operate and function as an organization.   The Amended Complaint does nothing to cure these fatal deficiencies, and in fact, exacerbates them.

Plaintiffs previously alleged that "HRI was compelled to divert scarce resources to attempt to further identify and combat this discrimination," "diverted such resources away from its core programs of combatting fraud and predatory landlord practices," and "diverted, and continues to divert scarce and valuable financial and human resources to the tasks of identifying and counteracting" the alleged actions of Defendants.  (Compl., Dkt. 1 ¶ 104; *see also* Am. Compl Redline (Ex. 1), Dkt. 57-1 at p. 44.)

In the Amended Complaint, Plaintiffs have backed away from these allegations of diversion of resources.  Plaintiffs now merely allege that, in response to Defendants' actions, ". . . HRI focused efforts on identifying and combatting this discrimination" and that, "[p]rior to and at the time of the filing of this Complaint, HRI has taken steps to identify and counteract defendants' unlawful discriminatory practices through investigation, education, and outreach targeting prospective tenants, housing providers, and the public in general."  (Am. Compl. ¶ 109; *see also*

11

Am. Compl. Redline ¶¶ 109, 112 (showing removal of allegations that HRI diverted resources in response to Defendants' actions).

Plaintiffs now allege only that HRI took voluntary action as part of its normal mission of "promoting lawful real estate practices" by "providing information and assistance to tenants" when it learned of the alleged discrimination.   (Am. Compl. ¶ 107.)   Further, although Plaintiffs previously alleged that "Defendants' conduct has required HRI to increase its educational efforts to attempt to stop the practices challenged in this action," they now allege that these educational efforts were "prompted" by Defendants' actions, rather than "required" by them.

Not only do these allegations describe voluntary, uncompelled activities, but the Amended Complaint now fails to allege *any* diversion of resources from HRI's other activities, much less a diversion that undermines HRI's ability to perform its normal operations and activities.   Such a recitation of voluntary activities, even if prompted by Defendants' actions, is insufficient to establish Article III injury in fact.   *See, e.g.*, *Fair Employment Council of Greater Washington, Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1277 (D.C. Cir. 1994); *Long Term Care Pharm. Alliance v. UnitedHealth Group, Inc.*, 498 F. Supp.2d 187, 191-92 (D.D.C. 2007) (advocacy organizations' diversion of resources from other priorities to focus on defendant's alleged violations of contract and law was not injury in fact where organizations failed to allege that their activities were impeded by defendant's conduct other than asserting "an abstract conflict between defendant's activities and plaintiff's advocacy goals"); *Knowledge Ecology Int'l v. Nat'l Institutes of Health*, No. CV PJM 18-1130, 2019 WL 1585285, *1, *4–*6 (D. Md. Apr. 11, 2019) (organization did not suffer Article III injury based on its expenditure of resources on lawsuit and underlying events since its "core purpose as an organization is pursuing precisely the type of advocacy it undertook here").

There can be no plausible claim that HRI's purpose has been frustrated by Defendants'

actions, which, according to Plaintiffs, prompted HRI to investigate and file this lawsuit because, as its website makes clear, HRI's core mission is to fight housing discrimination by "launch[ing] investigations and generat[ing] class action lawsuits against predatory real estate companies." This case is not a diversion of HRI's resources, but part of its core purpose.

HRI cannot base its Article III standing on a generalized interest in advocating for equal opportunity in housing. It must allege a specific injury in fact to the organization that is traceable to Defendants' conduct—something it does not and cannot do.

### b.     HRI Also Lacks Representational Standing.

Having failed to allege any organizational injury, the only other avenue for HRI to bring these claims is to establish representational standing, which requires that HRI demonstrate that (1) it has members who would have standing to sue in their own right; (2) the interests the organization seeks to protect are germane to the organization's purpose; and (3) neither the claim nor the relief sought requires the participation of individual members in the lawsuit. *See S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184 (4th Cir. 2013).

In the Amended Complaint, HRI does not allege that it has any members with standing in their own right. In fact, it does not allege that it has any members at all. Instead, the Amended Complaint merely states that "HRI brings its claims on behalf of the class of consumers described herein against all of the defendants in this action." (Am. Compl. ¶ 8.) The Amended Complaint describes these purported class members not as members of HRI, but as "individuals for whom HRI advocates and engages with in education and outreach campaigns." (Am. Compl. ¶¶ 93, 94.) And the only individual HRI staff member mentioned in the Amended Complaint, described as being within "the age range of persons to whom defendants targeted their ads," is expressly *not* a member of any purported class. (Am. Compl. ¶ 108.)

13

HRI cannot satisfy the requirements of representational standing simply because it "advocates" for or "engages in . . . education and outreach" to a group of individuals who may or may not have a complaint.  Nor does the Amended Complaint make any effort to explain the basis for HRI to bring a claim on behalf of class members who are not members of HRI.

### B.     PLAINTIFFS' AMENDED COMPLAINT FAILS TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED.

Even if this Court were to conclude that Plaintiffs have standing to proceed, the claims in the Amended Complaint continue to fail as a matter of law, and the action should still be dismissed.

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Plausibility is something more than a possibility.  "The complaint must not only allege but also 'show' the Plaintiff is entitled to relief." *Id.* at 679.  Factual allegations that are simply "labels and conclusions, and a formulaic recitation of the elements of a cause of action," or "naked assertion[s] devoid of further factual enhancement" will not suffice.  *Id.* (citations and internal quotations marks omitted).  Courts need not accept legal conclusions couched as factual allegations, nor is "the court . . . . required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences or allegations that contradict matters properly subject to judicial notice or by exhibit." *Demetry v. Lasko Prod., Inc.*, 284 F. App'x 14, 15 (4th Cir. 2008) (citations and internal quotation marks omitted). The factual allegations must "be enough to raise a right to relief above the speculative level," *Twombly*, 550 U.S. at 555, and must be sufficient to "permit the court to infer more than the mere possibility of misconduct" based upon "its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

1.      **Plaintiffs' Amended Complaint Fails to State A Claim Under the Montgomery County Code.**

Count I of Plaintiffs' Amended Complaint fails to state a viable claim under Md. State Gov. Code § 20-1202 and Montgomery County Code § 27-12.  Defendants Bozzuto, JBG Smith, Kettler, and Tower did not "publish or circulate, or cause to be published or circulated, any housing notice, statement, listing or advertisement . . . indicating that . . . age could influence or affect" the rental, lease, or sale of housing or the availability of housing.

a.      **Plaintiffs Do Not Allege That the Facebook Advertisements Indicate A Discriminatory Preference.**

The Montgomery County Code prohibits publishing any housing advertisement, "indicating that age could influence or affect" the rental, lease, or sale of housing or the availability of housing.  Montgomery County Code § 27-12(d).  Courts evaluate whether an advertisement expresses a discriminatory preference under an "ordinary reader" standard.  *Corey v. Sec'y, U.S. Dep't of Hous. & Urban Dev. ex rel. Walker*, 719 F.3d 322, 326 (4th Cir. 2013) (citing *United States v. Hunter*, 459 F.2d 205, 215 (4th Cir. 1972)).[8]  "The ordinary reader is neither the most suspicious nor the most insensitive of our citizenry."  *Ragin v. New York Times Co.*, 923 F.2d 995, 1002 (2d Cir. 1991).

The advertisements at issue in the Amended Complaint are not discriminatory.  (Am. Compl., Ex. A.)  No advertisement indicates a discriminatory age preference on its face.  Instead, each advertisement describes the particular property and its amenities in a facially neutral, non-

---

[8] Maryland courts analyze discrimination claims under analogous federal frameworks. *Cf. Mott v. Accenture, LLP*, No. 8:17-CV-00231-PX, 2019 WL 1934727, *1, *10 (D. Md. Apr. 29, 2019) (citations omitted) (applying Title VII framework to employment discrimination case brought pursuant to Montgomery County Code § 27-19 and Md. Code, State Gov't 20-1202).  The analogous federal framework for discriminatory housing advertisement is the federal Fair Housing Act ("FHA"). *Compare* Mont. Cty. Code § 27-19(d) *with* 42 U.S.C. § 3604(c).  However, unlike the Montgomery County Code, the FHA does not recognize age as a protected class.

discriminatory way.  For example:

- The Banks are "Boutique, modern style residences perfectly placed where Southwest meets the Wharf."  (Am. Compl., Ex. A at 62.)

- "Our spacious Studio – 3 bedroom apartments offer you a unique living experience that will make you fall in love with our community.  Call and schedule a tour today!"  "Enjoy a Lifestyle of Zen and Luxury at The Pearl." (*Id.* at 73.)

No ordinary reader could view any of these advertisements as discriminating based on age as a matter of law.[9]  For this reason alone, the Amended Complaint fails to state a claim under the Montgomery County Code.

> **b.     Plaintiffs Fail to Plausibly Allege That Defendants' Overall Advertising Excludes Older Individuals.**

Plaintiffs contend that Defendants have violated the Montgomery County Code by targeting one or more of their Facebook advertisements to reach individuals in younger age brackets, even though the content is entirely age neutral. This position is inconsistent with the statute's plain language, governing case law, and, even guidance from the U.S. Department of Housing and Urban Development, the agency responsible for enforcing federal fair housing laws.

By its plain terms, the Montgomery County Code addresses only an advertisement's content, not the distribution of advertisements.  *See* Montgomery County Code § 27-12(d) ("A person must not publish or circulate, or cause to be published or circulated, any housing notice, statement, listing, or advertisement . . . indicating that age could influence or affect [a covered real estate transaction].").

Courts recognize that advertising, by its very nature, targets groups of people, and any advertisement—and indeed, any product—will likely appeal more to some demographics than others. *See Opiotennione*, 3:19-cv-07185-JSC (N.D. Cal.) at Dkt. 69, Hrg. Tr. August 13, 2020 at

---

[9] As discussed in Section B.1.c *infra*, the "Why am I Seeing This" text that accompanies each Facebook ad is not a part of the ad's content and cannot be attributed to any of the Defendants.

10:7–9 (". . . there is no law that says you cannot target [an advertisement]. . ."); *id.* at 43:20–22 (". . . I just feel like you're just saying you can't target ads at all; right?  And I just think that's ludicrous."); *see also id.* at Dkt. 70 at 6 ("Under Plaintiff's theory, *any* person who was excluded from the possibility of receiving that advertisement because of her age would have standing.  Not so.") (italics in original); *Miami Valley Fair Hous. Ctr., Inc. v. Connor Group*, 805 F. Supp. 2d 396, 408 (S.D. Ohio 2011), *jury verdict vacated on other grounds,* 725 F.3d 571, 581 (6th Cir. 2013) (facially discriminatory ads are *per se* violations of Fair Housing Act, but ads whose language merely target certain subgroups do not necessarily violate the law); *Metro. Milwaukee Fair Hous. Council v. Labor & Indus. Review Comm'n*, 173 Wis. 2d 199, 204–05, 496 N.W. 2d 159, 162 (Ct. App. Wis. 1992) ("Our inquiry is not limited to whether the effect of the advertisement is to dissuade some potential renters from applying.  Most advertisements will tempt some and deter others.  Rather, the correct inquiry is whether such dissuasion is the product of any discriminatory statement or indication in the advertisement.").

Even if the Montgomery County Code could be stretched to address distributing ads in a targeted way, Plaintiffs' original Complaint challenged only certain individual Facebook advertisements rather than any of the Defendants' overall advertising campaigns.  Recognizing that this was not enough to state a claim, Plaintiffs now claim, "[o]n information and belief," that Defendants "did not take any action in publishing advertisements" to ensure their ad campaign "reached a balanced, diverse audience based on age" and that they are "unaware of any non-age-restricted advertising of the defendants' properties" on any platform that allows for age-restricted advertising.  (Am. Compl. ¶¶ 45-98.)[10]

---

[10] Ms. Opiotennione claims that she "searched for housing opportunities by reviewing both online and offline sources of information."  (Am. Compl. ¶ 87.)  But she fails to plead any facts related to which online and offline resources she used, what type(s) of buildings or rental units she

These speculative and conclusory allegations are insufficient to support Plaintiffs' claim under the pleading standard articulated in *Twombly* and *Iqbal*.  *See Friends of Lubavitch v. Baltimore Cty., Maryland*, 421 F. Supp. 3d 146, 166 (D. Md. 2019) (dismissing civil rights claim by religious organization claiming county treated it differently than secular organizations but did not name a single institution or organization treated differently or attempt to find one in the public record); *Worsham v. Travel Options, Inc.*, No. JKB-14-2749, 2016 WL 4592373, at *6 n.4 (D. Md. Sept. 2, 2016), *aff'd*, 678 F. App'x 165 (4th Cir. 2017) (finding that the complaint made "naked assertions" and "conclusions, couched as factual allegations, [that] are insufficient to nudge the complaint against [] [corporate officer defendant] 'across the line from conceivable to plausible.'") (citing *Twombly*, 550 U.S. at 557, 570).

A basic Internet search[11] shows that Bozzuto, JBG Smith, Kettler, and Tower each advertise in multiple online forums and that Facebook ads were not the only portal through which Plaintiffs could have learned about Defendants' apartments and websites.  A number of apartment locator websites provide extensive lists of apartments in the DC metropolitan region.  These include Apartments.com, ApartmentFinder.com, ApartmentRatings.com, ApartmentGuide.com, BuzzBuzzHome.com, RentCafe.com, and Zillow.com, among others.

Plaintiffs could have learned about Defendants' properties by using general searches—

---

searched for, what specific areas she desired to live in, or what price range she was searching.

[11] At any point in a proceeding, "[t]he court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b), (d). The Court can take judicial notice that an Internet search locates these websites and these websites offer extensive listings of apartments, particularly those in major buildings in the D.C. metropolitan area, and have done so for many years. *See, e.g.* Apartments.com's "About Us" page, About Us, Apartments.com, https://www.apartments.com/about.

price, size, general area, amenities, move-in date, affordability, keywords, square footage—on these websites. Further, each of the Defendants maintained a website for each specific property— which is itself a form of online advertising.

Absent any factual allegation showing any Defendants' advertising (taken as a whole) excluded an age demographic, a claim based on individual ad targeting fails to assert a violation of law. *See* 24 C.F.R. § 109.25(c) (emphasis added) ("The selective use of advertising media or content *when particular combinations thereof are **used exclusively*** with respect to various housing developments or sites can lead to discriminatory results and may indicate a violation of the Fair Housing Act."); *Jimenez v. Chase Bank*, No. 18-CV-3297 (GHW) (SN), 2019 WL 919626, at *4 (S.D.N.Y. Jan. 28, 2019), *report and recommendation adopted*, No. 1:18-CV-3297-GHW, 2019 WL 917210 (S.D.N.Y. Feb. 25, 2019) (dismissing fair housing claim where plaintiff did "not offer any facts from which the Court can infer that this non-inclusive online ad campaign is racial[ly] discriminatory or that it concerns the housing market.").[12]

The Amended Complaint fails to make any plausible, specific allegations regarding the full scope of Defendants' other social media advertising, other online advertising (including the individual property websites), advertisements in traditional media outlets, or in-person advertisements (including advertisements on or around the properties). Without factual allegations about any Defendants' advertising as a whole, allegations of a few examples of age-targeted Facebook advertisements and speculative, conclusory statements on "information and belief" about other advertising are insufficient to state a claim as a matter of law.

---

[12] 24 C.F.R. § 109.25(c) was removed as part of a Clinton Administration effort to streamline regulations and remove non-binding guidance from the Code of Federal Regulations. *See* 61 FR 14378-01. It is still used by HUD to evaluate FHA claims. *See id.*; HUD, "Part 109 Fair Housing Advertising," FHEO Guidance.

c.      The "Why Am I Seeing This Ad" Statements Were Not Made By
        Defendants.

Plaintiffs also contend that Facebook's "Why am I seeing this ad?" statements express a

discriminatory preference.  (Am. Compl. ¶¶ 47–51.)

The Amended Complaint unambiguously recognizes that all statements made in the "Why

am I seeing this ad?" page are created and controlled by Facebook.  Facebook generates the page

and chooses what to reveal in it as part of *Facebook's* transparency efforts.[13]  As the page's name

suggests, it purports to provide Facebook users with information about why *Facebook*, not

advertisers, has *chosen* their specific profile for a specific advertisement.  For example, they

explain that the user may be seeing an advertisement because:

- the apartment complex "wants to reach people interested in food and drink"
  (*Id.* Ex. A at 67);

- the apartment complex is looking to reach people "who live or were recently
  near Silver Spring, Maryland" (*Id.* at 61–76);

- the apartment complex "wants to reach people who were recently near their
  business" (*id.* at 64), or "based on [user] activity such as liking Pages or
  clicking on ads" (*Id.* at  65.)

Facebook itself admits the ads are *not* delivered wholly based on advertisers' preferences

but also on a plethora of factors relating to a specific user's activity on and off Facebook that

Facebook tracks for its own marketing purposes.  On its website, Facebook includes the following:

**How we [Facebook] decide which ads to show *you*:**

We [Facebook] want the ads *you see* on Facebook to be as interesting and useful *to
you* as possible.  These are examples of things we use *to decide which ads to show
you*:

- *Your* activity on Facebook (such as liking a Page or clicking on ads you

---

[13] Facebook's "Why am I seeing this?" page is available—but not viewed by—all users who
receive an advertisement.  Users must actively choose to view the page before receiving any
additional information Facebook wishes to publish *about* an advertisement.

        see).

- Other *information about you* from your Facebook account (example: *your* age, your gender, your location, the devices *you* use to access Facebook).
- Information advertisers, their partners, and our marketing partners share with us that they already have, like your email address.
- *Your activity* on websites and apps off of Facebook. Learn more about how to turn this off in your ad settings.

Facebook Help Center, "How does Facebook decide which ads to show me?" (emphasis added) (retrieved August 21, 2020).[14]

      As noted above, in the now-dismissed class action that she filed against Facebook in California, Ms. Opiotennione argued that this is a standard disclosure made to a recipient of an advertisement solely by Facebook and not by advertisers. *See* Pls' Opp. To Mot. To Dismiss, *Opiotennione*, Case No. 3:19-cv-07185-JSC (N.D. Cal.), Dkt. 39 at p. 20 ("Facebook wholly creates these [very same] statements, as it exercises total control over 'whether to make the statement and on the relevant content and images in the statement.'"); s*ee also id.* (alleging that the "Why am I seeing this ad" statements as statements that "*Facebook* made *entirely on its own* to tell users that they have received ads 'because of their age or gender'" (emphasis in the original)). In fact, in the Amended Complaint that she filed in that case, Ms. Opiotennione not only admitted that the "Why am I seeing this ad?" statement "is created, developed, and made by Facebook . . . [which] has complete discretion on whether to make the …statement and on relevant content and images in the statement," but also admitted that advertisers only know that Facebook is making the statement in "some cases." *Id.,* Dkt. No. 30 at ¶ 78.). For these reasons, the claim against these Defendants is without foundation.

      Yet, despite having taken this position in her other case, Ms. Opiotennione ignores her

---

[14] Available at https://www.facebook.com/help/562973647153813?helpref=faq_content.

prior admissions and argues here that the offending statements are Defendants' responsibility because Facebook was acting as Defendants' agent.  In doing so, Plaintiffs attempt to turn a service contract into a contract that creates an agency relationship. [15]

It is well-established that an express or implied agency relationship is only created if the agent is empowered to alter the legal obligations of a principal and has a duty to act for the principal's benefit, *and* the principal has the right to control the agent.  *See Green v. H & R Block, Inc.*, 735 A.2d 1039, 1047 (Md. 1999) (relying on Restatement (Second) of Agency §§ 12–14 (1958)).  The party claiming the agency relationship bears the burden of proving its existence.  *Id.* at 1048 (quoting *Hofherr v. Dart Industries, Inc.*, 853 F.2d 259, 262 (4th Cir. 1988)).

Plaintiffs fail to meet this burden because they allege only that Facebook's Terms of Service ("TOS") create an agency relationship.  No express or apparent agency relationship was formed when each Defendant agreed to Facebook's terms of service.

Plaintiffs allege that the terms of use allow Facebook to provide users with information related to why they receive a particular advertisement and the choice of what to disclose, including advertisers' preferences.  But, Plaintiffs do not allege that advertisers have any actual control over Facebook's disclosures.  At most, Plaintiffs allege that Defendants can make some selections to target advertisements and that Facebook is permitted to share information related to those choices.  These allegations are insufficient to establish an agency relationship under Maryland or D.C. law.

Allegations that Facebook helped "advertisers" create ads and provided "advertisers" with information and analytics are also insufficient to establish an agency relationship.  (Am. Compl. ¶

---

[15] Both D.C. and Maryland follow the Restatement of Agency. *See, e.g.*, *FDS Rest., Inc. v. All Plumbing Inc.*, No. 16-CV-1009, 2020 WL 1465919, *1, *11 (D.C. Mar. 26, 2020); *Green v. H & R Block, Inc.*, 735 A.2d 1039, 1047 (Md. 1999).

25.)  Facebook was not entitled to alter Defendants' legal obligations.  It was not a fiduciary of Defendants required to act in Defendants' best interests, and Defendants were not able to control Facebook's actions.  Therefore, Facebook was not an agent of any Defendant and no Defendant can be held responsible for Facebook's statements.

### d.   Plaintiffs Cannot State a Claim Against Defendants for Facebook's Algorithm.

Plaintiffs also claim that Defendants violated the Montgomery County Code when they relied on Facebook's algorithm.  Again, Plaintiffs cannot state a claim against Defendants for Facebook's actions, including but not limited to Facebook's use of its advertising algorithm.

Algorithms like those used by Google and Facebook are highly protected trade secrets.  Although Facebook claims to disclose some of the information that goes into its algorithm—it does not disclose every factor that its algorithm uses to publish advertisements.

Plaintiffs' allegation that advertisers like Defendants rely on Facebook to distribute advertisements is insufficient to create an agency relationship or other basis for liability.  All advertisers, by necessity, rely on a publication or website's distribution network. Facebook alone determines how its algorithm works and does not provide anyone, including Defendants, information sufficient to determine how it works.  *See* Upturn, Inc. Amicus Brief, *Opiotennione*, No. 3:19-cv-07185-JSC (N.D. Cal.), Dkt. 44 at p. 7 (Facebook's algorithm "chooses each member of the Lookalike Audience, *reaching beyond* the source audience provided by the advertiser") (emphasis added).[16] *See also* Pl's Opp. to Mot. to Dismiss, *Opiotennione*, Case No. 3:19-cv-

---

[16] Upturn, Inc. is "a nonprofit organization based in Washington, D.C. that works in partnership with many of the nation's leading civil rights and public interest organizations to promote equity and justice in the design, governance, and use of digital technology." In the Northern District of California action, it filed an amicus brief in support of Ms. Opiotennione's opposition to Facebook's motion to dismiss.

07185-JSC (N.D. Cal.), Dkt. 39 at p. 18 (acknowledging that "Facebook is solely responsible for developing its ad delivery algorithm."). Defendants are not responsible for Facebook's algorithm.

**2.      Plaintiffs' Amended Complaint Fails to State A Claim Under DCHRA.[17]**

Plaintiffs allege in Count II that Bozzuto, JBG Smith, Kettler, and Tower's Facebook advertising violated the DCHRA in four ways: (1) by making an advertisement that unlawfully states a preference based on a protected class under D.C. Code § 2-1402.21(a)(5); (2) by unlawfully refusing or failing to initiate or conduct a transaction for real estate, or falsely representing "that an interest in real property is not available for transaction wholly or partially for a discriminatory reason based on the actual or perceived . . . age . . . of any individual" pursuant to § 2-1402.21(a)(1); (3) by aiding and abetting Facebook's violation of DCHRA pursuant to § 2-1402.62; and (4) by denying older individuals advertising and thereby "steering" them in violation of § 21-1402.22. (Am. Compl. ¶¶ 152–66, 173–85.) Like the original complaint, the Amended Complaint has failed to state a viable claim under the DCHRA—D.C.'s fair housing law.

First, as noted above, Plaintiffs have failed to allege any facts that demonstrate that Defendants have published ads that stated a discriminatory preference based on age.

Second, DCHRA reaches only "intentionally discriminatory acts." *Brandywine Apartments, LLC v. McCaster*, 964 A.2d 162, 167–68 (D.C. 2009) (citations omitted) ("To establish a claim of *intentional* discrimination . . . the plaintiff must prove intentional and

---

[17] Defendant Tower does not have any residential rental properties in the District of Columbia. Accordingly, there is no basis for claims against them based on the District of Columbia's fair housing law or under its consumer protection law. Similarly, the Amended Complaint fails to allege any facts to suggest that Defendant Vantage violated any D.C. laws—all allegations concern advertisements by a Maryland company for a rental property located in Bethesda, Maryland. Ms. Opiotennione has also conceded that she would only have considered renting a Kettler property located in Maryland and none of the properties owned or managed by Greystar, Wood, Pinnacle, Vantage, or Berkshire.

24

purposeful conduct based on his membership in a protected class."). Targeting some Facebook advertisements is not intentionally discriminatory. Plaintiffs have asserted no facts demonstrating that any Defendant intentionally discriminated against any individual, that they refused to initiate or conduct a transaction for real estate, or that they falsely represented that a housing opportunity was not available for a discriminatory reason. Therefore, they have failed to meet their burden to plead a *prima facie* case that Defendants made and published their ads for discriminatory reasons. *See Henneghan v. D.C.*, 916 F. Supp. 2d 5, 10–11 (D.D.C. 2013).

Third, Plaintiffs' aiding and abetting claims fail because Plaintiffs have not and cannot allege an independent primary violation by Facebook. *See Richardson v. Petasis*, 160 F. Supp. 3d 88, 138–39 (D.D.C. 2015) (an individual cannot be liable under the aiding and abetting provision of the DCHRA absent an underlying direct violation of the DCHRA) (citing *Gaujacq v. EDF, Inc.*, 601 F.3d 565, 576 (D.C. Cir. 2010)). Thus, there was nothing for any Defendant to aid or abet.

Fourth, Plaintiffs have not plausibly alleged that Defendants steered older renters away from their properties. Plaintiffs do not allege that Defendants ever directed people to a different property or area because of their age, nor did they try to induce anyone to discriminate. *See* D.C. Code of § 21-1402.22 (defining steering as offering real estate falsely or to "promote, induce, influence . . . a real estate transaction [or attempt to do so] . . . *calculated to induce a person to discriminate or to engage in such transaction wholly or partially in response to discrimination, prejudice, fear or unrest. . . .*"); *George Washington Univ. v. D.C. Bd. of Adjustment*, 831 A.2d 921, 941–42 & n.17 (D.C. 2003) (holding that a provision of the Board of Zoning Adjustment plan would violate the DCHRA because it had the potential "effect of 'steering,' *i.e.*, directing students to different areas because they are students."); *see also Hamad v. Woodcrest Condo. Ass'n*, 328

25

F.3d 224, 233 (6th Cir. 2003) ("Steering" "is the practice of *directing* seekers of housing away from certain locations for the purpose of maintaining patterns of segregation.").

> **3.    Plaintiffs' Amended Complaint Fails to State A Claim Under the CPPA.**

In Count III of their original Complaint, Plaintiffs alleged that: (1) the same conduct that constituted a violation of the anti-discrimination provisions of the DCHRA, as alleged in Count II and asserted against all Defendants, supported a claim under the CPPA; and (2) each of the Defendants independently violated the CPPA by including deceptive and misleading logos and statements on their websites.  (Am. Compl. ¶¶ 162-79.)  After Defendants showed why these theories of liability were flawed as a matter of law, (*see* Defs' Mot. to Dismiss, Dkt. 47-1 at 35-42), Plaintiffs significantly revised their operative pleading.  (Am. Compl. ¶¶ 167-90.)

The Amended Complaint now asserts that some—*but not all*—Defendants violated the DCHRA.  (*Id.* ¶¶ 150–166.)  Specifically, Count II, brought under the DCHRA, is now asserted against Defendants Bozzuto, JBG Smith, Kettler, and Tower, but not against Defendants Greystar, Wood, Pinnacle, Vantage, or Berkshire.  (*Id.*) For Count III, Plaintiffs continue to assert a CPPA claim against all Defendants, but now, the allegedly deceptive conduct is now limited only to the alleged violations of the DCHRA. (Am. Compl. ¶¶ 167-90.)  In other words, Plaintiffs are no longer grounding their CPPA claim on allegedly deceptive logos or statements on Defendants' websites or on any other conduct of Defendants beyond the alleged violations of the DCHRA. *Id.*

Consequentially, because Count II fails as a matter of law, as shown earlier in Section B.2, Count III also necessarily fails as a matter of law.  But even if that were not the case, Count III still fails to state a claim because: (a) D.C. courts have rejected attempts to manufacture CPPA claims where the conduct is addressed by a more specific statute; (b) there is no consumer-merchant relationship alleged between Ms. Opiotennione and any Defendant; and (c) Plaintiffs'

26

allegations about Defendants' advertising methods do not support a CPPA claim. And, as to those Defendants sued only in Count III (Greystar, Wood, Pinnacle, Vantage, and Berkshire), Count III fails to state a claim for the additional reasons that Plaintiffs have effectively conceded they have no claim against these Defendants under the DCHRA.

**a.     D.C. Courts Have Rejected Attempts to Manufacture CPPA Claims Where the Conduct Is Addressed by A More Specific Statute.**

Count III initially fails to state a claim as a matter of law because the core allegations— alleged discrimination related to housing advertisements—are addressed by a comprehensive statute with a full suite of protections and remedies: the DCHRA. In this circumstance, courts applying D.C. law have regularly rejected efforts to assert a parallel claim under the CPPA, reasoning that the conduct, if actionable, should be addressed by the law specifically enacted to address such conduct and not by the general consumer protection statute.

The D.C. Court of Appeals' decision in *Gomez v. Independence Management of Delaware, Inc.*, 967 A.2d 1276 (D.C. 2009), is instructive. There, a tenants' association alleged the transfer of their building from a company to its wholly-owned subsidiary was a "sale" that triggered a notice and opportunity to purchase obligation under the DC Rental Housing Conversion and Sale Act. In addition to asserting a claim under the Sale Act, the association alleged the same conduct violated the CPPA. *Id.* at 1285 n.8.

The Court of Appeals held that the defendants were entitled to judgment on the CPPA claim because the Sales Act was the appropriate statute under which the defendants' alleged conduct could be attacked and addressed:

> [T]here is no compelling reason to shoehorn the allegations made here into the ill-fitting language of the CPPA because the Sale Act is comprehensive legislation which not only creates the right at issue here but also establishes detailed requirements for compliance. Most importantly, the Sale Act also contains its own detailed provisions for implementation and enforcement. See D.C. Code §§ 42-3405.01

27

to 42-3405.13 (2001 & 2008 Supp.). "Resisting the force of the
better-fitted statute requires a good countervailing reason, and none
appears here." *EC Term of Years Trust v. United States*, 550 U.S.
429, 434, 127 S.Ct. 1763, 1767, 167 L.Ed.2d 729 (2007).

*Id.* at 1285.

Similarly, in *Feemster v. BSA Limited P'Ship*, 471 F. Supp. 2d 87 (D.D.C. 2007), *aff'd in

part, rev'd in part on other grounds,* 548 F.3d 1063 (D.C. Cir. 2008), the plaintiff tenants alleged

their landlord's refusal to accept rent vouchers and efforts to force them to leave the building

violated the DCHRA and the CPPA, among other laws.  The court dismissed the CPPA claim,

reasoning that the plaintiffs' right to relief, if any, was in the specific statutes addressing the issue

of housing discrimination:

> [T]he Court notes that the District of Columbia has a wealth of
> statutory authority addressing landlord-tenant relations, thus,
> causing the Court to conclude that allowing the plaintiff to seek
> relief through the CPPA, rather than the laws specifically enacted to
> address such matters, would be an inappropriate back door
> expansion of the range of remedies made available to tenants in
> landlord tenant matters. . . . [I]t is these provisions under which the
> plaintiffs must seek relief.

*Id.* at 105-06.  *See also Adler v. Vision Lab Telecomms., Inc.*, 393 F. Supp. 2d 35, 40 (D.D.C. 2005)

("The Court sees no need to extend the already broad reach of the CPPA to allow plaintiffs to

challenge conduct that is already covered by federal law").

These conclusions are not surprising.  "It is a longstanding and well-established principle

of statutory construction that 'a specific statute controls over a general one.'" *Driscoll v. George

Washington Univ.*, 938 F. Supp. 2d 19, 23 (D.D.C. 2013) (quoting *Bulova Watch Co. v. U.S.*, 365

U.S. 753, 758 (1961)).  "Furthermore, D.C. courts have long held that '[w]hen a statute provides

a comprehensive enforcement scheme for violations of its substantive provisions, a legislative

intent to provide an exclusive remedy may be inferred.'" *Id.* (citation omitted).

28

In *Driscoll*, the court held the D.C. Council's "comprehensive" and "detailed" enforcement scheme for violations of the District of Columbia Minimum Wage Act made that statute the plaintiff's exclusive remedy for claimed overtime violations, even though the same conduct also violated the District of Columbia Wage Payment and Collection Law. *Id.* at 23–24.  *See also Thompson v. Digicon Corp.*, 107 F. Supp. 3d 49, 52 (D.D.C. 2015) (dismissing plaintiff's overtime claims under the District of Columbia Wage Payment and Collection Law because the sole remedy, if any, was under the District of Columbia Minimum Wage Act as the more specific statute).

Here, the District of Columbia has a specific statute addressing alleged housing discrimination: the DCHRA, Part C. Housing and Commercial Space, D.C. Code § 2-1402.21, *et seq.*  That comprehensive statute provides a detailed list of prohibited acts, *id.* at §§ 2-1402.21-1402.22, and exceptions, *id.* at § 2-1402.24.  It includes an exhaustive procedure for the investigation, conciliation, and prosecution of complaints, and separate procedures for private causes of action.  *Id.* at § 2-1403.01, *et seq.*  This wide-ranging scheme provides aggrieved parties with a means for pursuing claims of housing discrimination.  Nothing in the language of the CPPA shows or even suggests that the DC Council intended Plaintiffs to be able to pursue claims under both the DCHRA and the CPPA based on the same conduct.  The DCHRA is not listed as one of the statutes in the CPPA.  And, "there is no compelling reason to shoehorn the allegations made here into the ill-fitting language of the CPPA because the [DCHRA] is comprehensive legislation which not only creates the right at issue here but also establishes detailed requirements for compliance. . . . implementation and enforcement." *Gomez*, 967 A.2d at 1285.[18]

---

[18] Courts applying Maryland law have similarly held where there are specific anti-discrimination statutes addressing the conduct at issue a more general remedy is unavailable because the plaintiff's right to relief, if any, lies with the remedies provided by the specific anti-discrimination statute.  *See, e.g., Floyd v. Wash. Suburban Sanitary Commission*, No. 14-cv-1749, 2016 WL 4415055, at *10 (D. Md. Aug. 19, 2016) (Messitte, J.) (applying Maryland law and dismissing

### b. The Amended Complaint Fails to Allege A Consumer-Merchant Relationship Between Ms. Opiotennione And All Defendants.

"The CPPA applies *only to* consumer-merchant relationships." *Baylor v. Mitchell Rubenstein & Assocs., P.C.*, 857 F.3d 939, 948 (D.C. Cir. 2017) (citing *Snowder v. District of Columbia*, 949 A.2d 590, 598-600 (D.C. 2008); *Howard v. Riggs Nat'l Bank*, 432 A.2d 701, 709 (D.C. 1981)) (emphasis added). *See also Yudzon v. Sage Title Group, LLC*, No. 18-cv-2076, 2020 WL 2615579, at *5 (D.D.C. May 22, 2020) (granting motion to dismiss CPPA claim arising out of alleged misrepresentations involving the purchase of real property because the allegations did not support a consumer-merchant relationship). "In other words . . . *a valid claim for relief under the CPPA must originate out of a consumer transaction.*" *Ford v. Chartone, Inc.*, 908 A.2d 72, 81 (D.C. 2006) (emphasis added). Without a consumer-merchant relationship based on a consumer transaction, there is no viable claim under the statute. *See Stone v. Landis Const. Co.*, 120 A.3d 1287, 1289 (D.C. 2015) (holding a plaintiff who alleged discriminatory hiring practices could not bring a claim under the CPPA because the relationship was not one of a consumer and merchant); *Adler v. Vision Lab Telecomms., Inc.*, 393 F. Supp. 2d 35, 40 (D.D.C. 2005) (dismissing CPPA claim because, even though the defendants were merchants, the plaintiffs never bought anything, and thus were not consumers).

Only individuals that completed or were on the verge of completing a real estate transaction can bring a CPPA claim. *See* D.C. Code § 28-3901(a)(2). The statute defines "consumer" as "a person who, other than for purposes of resale, *does or would purchase, lease (as lessee)* or receive consumer goods or services." D.C. Code § 28-3901(a)(2) (emphasis added). "Would" means "to express plan or intention." Merriam-Webster, "Would." <u>https://www.merriam-</u>

---

wrongful termination claim because plaintiff's remedy, if any, was under Title VII); *Chappell v. Southern Maryland Hosp., Inc.*, 320 Md. 483, 493 (1990) (where civil statutory remedies addressed alleged conduct, plaintiff could not resort to more general wrongful discharge claim).

webster.com/dictionary/would.   In this context, the use of the word "would" requires that the consumer had a specific plan or intention of completing a transaction with a specific merchant. *See Stone*, 120 A.3d at 1289-90 (citing D.C. Code § 28-3901(a)(2)(A)).

Defendants previously highlighted that the original Complaint did not allege facts showing that Ms. Opiotennione was actively looking for housing at any of the Defendants' properties, or even that she was specifically looking for rental housing at large class-A buildings.  (Defs' Mot. to Dismiss, Dkt.  47-1 at 37.)  Although Ms. Opiotennione attempts to remedy this deficiency in the Amended Complaint, she still fails to plead facts that plausibly suggest she was a "consumer" within meaning of the CPPA.  For example, nowhere in the Amended Complaint does Ms. Opiotennione allege any facts showing she took specific steps towards renting an apartment at any of the Defendants' properties (or any specific property), such as by touring their available apartments, visiting their properties, or completing (or even requesting) rental applications for available apartments at their properties.  Nor has she alleged she was visiting the websites of Defendants' properties or aggregators (e.g., apartments.com).  She also does not allege that any properties offered by Greystar, Wood, Pinnacle, Vantage, or Berkshire even fit her criteria.  Without these necessary factual allegations, Ms. Opiotennione has failed to plausibly allege that she had a specific plan or intention of completing a transaction with a specific Defendant.  Indeed, her vague, self-serving claim that she merely would have investigated Defendants' websites had she received their Facebook ads, is too speculative to create the necessary relationship with any Defendant, much less all of them.[19]

_____

[19] Furthermore, for Defendants Greystar, Wood, Pinnacle, Vantage, and Berkshire, the Amended Complaint does not allege any facts to support the conclusion that Ms. Opiotennione was on the verge of completing a real estate transaction at any of their properties, because she has not even alleged those properties fit her criteria or that, if she received their ads, she would have applied for and secured a two-bedroom apartment at one of their properties. Therefore, Count III fails to state

###### c.      Plaintiffs' Amended Complaint About Defendants' Advertising Does Not Support A CPPA Claim.

Third, Plaintiffs' CPPA claim is fundamentally wrong.  The CPPA "creates an 'enforceable right to truthful information from merchants about consumer goods and services that are or would be purchased, leased, or received in the District of Columbia.'" *Michaels v. NCO Financial Systems, Inc.*, No. 16-cv-1339, 2020 WL 2800664, at \*7 (D.D.C. May 29, 2020) (quoting D.C. Code § 28-3901(c)).  A violation under the CPPA is the attempted, or even the inadvertent, misleading of a consumer in connection with the possible purchase of some product or service that the consumer is in danger of buying without correct information about its quality or nature.

Here the "goods or services" provided by the Defendants are the various rental properties they manage.  But Plaintiffs are not alleging that there was anything "misleading" or "deceptive" about those properties or the way in which the Defendants manage them.  Plaintiffs are not, for example, alleging that a particular property was promoted as containing a gym or a rooftop pool, when it did not.  Or that a property was represented to be smoke-free when it was not.  Or even that a property was advertised as renting to persons of all ages, when in reality it did not.  In fact, the Amended Complaint says *nothing* about the respective properties nor Defendants' rental practices, let alone that there was anything misleading or deceptive about them.

Instead, Plaintiffs allege solely that Defendants "have maintained policies and practices *with respect to advertising of housing* that violates the anti-discrimination provisions of the DCHRA, which are, therefore 'unfair or deceptive trade practices' prohibited by the CPPA."  (Am. Compl. ¶ 177) (emphasis added).  As discussed above however, advertising is not the "good or service" that the Plaintiffs are in danger of being falsely induced to obtain from Defendants; rather,

---

a claim for this additional reason and must be dismissed as to these defendants.

the commodity that Defendants offer to consumers is *residential rental properties*. Because the Amended Complaint does not allege that the Defendants' "goods and services" (*e.g.*, the rental properties) were misleading or deceptive, it fails to state a claim under the CPPA.

> **d.      Plaintiffs Cannot Ground Their CPPA Claim Against Greystar, Wood, Pinnacle, Vantage, or Berkshire on an Alleged Violation of the DCHRA When, by Their Conduct, They Have Effectively Conceded That These Defendants Are Not Liable Under the DCHRA**

By intentionally dropping Greystar, Wood, Pinnacle, Vantage, and Berkshire as Defendants with respect to their DCHRA claim in Count II of the Amended Complaint, Plaintiffs have conceded that they cannot establish DCHRA violations with respect to those Defendants. It would thus be incongruous and inappropriate for the Court to now allow the Plaintiffs to rely upon the exact same conduct alleged in Count II to assert a CPPA claim against these Defendants.

In Count III, Plaintiffs allege that they can assert a CPPA claim because "Defendants violated a District of Columbia statute [the DCHRA] in the context of a consumer transaction." (Am. Compl. ¶ 177). Yet, for Defendants Greystar, Wood, Pinnacle, Vantage, and Berkshire, Plaintiffs have conceded that they *did not* violate the DCHRA because Plaintiffs have not asserted a claim against these Defendants in Count II of the Amended Complaint. (*Id.* ¶¶ 150-166).

This backdoor attempt to impose liability that cannot be imposed through the front door is supported by neither the law nor common sense.

> **e.      Plaintiffs Cannot State a Claim Against Tower, Kettler or Vantage Under the District of Columbia CPPA Inasmuch as None of the Relevant Residential Properties Ae Located in Washington, D.C.**

As the only Tower, Kettler, or Vantage properties mentioned in the Amended Complaint are in Maryland (Am. Compl. ¶ 90), even if Ms. Opiotennione could otherwise satisfy the requisites for bringing a claim under the District of Columbia CPPA, she could have no claim against either Tower, Kettler, or Vantage under that statute. Tower does not lease residential

33

properties in the District, and the only Kettler and Vantage advertisements at issue in Plaintiffs' Amended Complaint concern Maryland properties. Therefore, any lease transaction with Tower, Kettler or Vantage could not, by definition, qualify as "goods or services that would be purchased, *leased*, or received *in the District of Columbia.*" D.C. Code § 28-3902(c) (emphasis supplied). The mere fact that Ms. Opiotennione alleges that she was a District resident when she was searching for rental housing is not sufficient to call into play the CPPA for a prospective lease of a property outside of the District of Columbia. *See Nelson v. Nationwide Mortg. Corp.*, 659 F. Supp. 611, 616–17 (D.D.C. 1987) (dismissing a claim under the District of Columbia CPPA where the relevant transactions occurred in Virginia because the CPPA was not "intended to apply to every commercial transaction involving a District of Columbia resident, wherever and with whomever that transaction occurs.")

### 4. Plaintiffs Have Failed to Demonstrate a Right to Injunctive Relief.

If this Court is not inclined to dismiss Plaintiffs' claims in their entirety, it must still dismiss Plaintiffs' dual requests for injunctive relief. Plaintiffs asks this Court to issue an Order enjoining Defendants "from engaging in the types of [allegedly] discriminatory advertising practices described in this complaint" and "from advertising housing opportunities on Facebook unless and until Facebook no longer uses a discriminatory algorithm to determine the recipients of advertisements." Plaintiffs concede that Facebook no longer permits housing advertisers to limit their audience selection based on age, but contends that some housing providers have found a way to circumvent that prohibition. Critically, Plaintiffs' Amended Complaint does not allege that *any* of the Defendants have published purportedly discriminatory housing ads since Facebook put that prohibition in place or have attempted to circumvent that prohibition.

Assuming *arguendo* that Defendants alleged past advertising practices potentially violated one or more laws, which Defendants deny, Plaintiffs have failed to demonstrate any entitlement to

injunctive relief with respect to Defendants future advertising practices.  Plaintiffs have the "stiff burden of showing that [they are] currently under imminent threat of suffering further harm in the absence of the injunctive relief" that they seek, but they have not even come close to meeting that burden.  "The purpose of an injunction is to prevent future violations," meaning that Plaintiffs must satisfy the Court that "there exists some danger of recurrent violation, something more than the mere possibility which serves to keep the case alive."  *United States v. W.T. Grant Co.*, 345 U.S. 629, 73 S.Ct. 894 (1953), *abrogated on other grounds by Jones v. Carter*, 915 F.3d 11447, (7th Cir. 2019)).  Here, Plaintiffs have failed to plead any facts that demonstrate a right to injunctive relief and, as a result, they seek little more than a disfavored injunction that merely requires the Defendants to "obey the law."  *City of New York v. U.S. Dep't of Defense*, 913 F.3d 423, 431 (4th Cir. 2019).

## CONCLUSION

For the foregoing reasons, not only do Plaintiffs lack standing to maintain this action against any of the Defendants, but they fail to state any plausible claim on which relief could be given.  Plaintiffs' amendments to their original allegations do nothing to cure these fatal flaws, and instead actually *weaken* their claims.  Accordingly, Defendants ask this Court to dismiss the First Amended Complaint with prejudice.

Respectfully submitted,

| | |
|---|---|
| /s/ Lynn E. Calkins | /s/ Matthew M. Moore |
| Lynn E. Calkins, Bar No. 12121 | Matthew M. Moore, Bar No. 14030 * |
| Holland & Knight LLP | Thomas John Gartner, Bar No. 18808 |
| 800 17th Street, N.W., Suite 1100 | Shulman Rogers |
| Washington, D.C. 20006 | 12505 Park Potomac Ave., 6th Floor |
| Telephone: (202) 955-3000 | Potomac, MD  20854 |
| lynn.calkins@hklaw.com | Telephone: (301) 230-6560 |
| | mmoore@shulmanrogers.com |

*Counsel for Bozzuto Management Company*                    *Counsel for Greystar Management Services L.P.*

  /s/ Sharon Oras Morgan
Sharon Oras Morgan, Bar No. 29663 *
W. Christian Moffitt, *pro hac vice*
Fox Rothschild LLP
10 Sentry Parkway, Suite 200
Blue Bell, PA 19422
Telephone: (610) 397-7073
cmoffit@foxrothschild.com


*Counsel for Kettler Management, Inc.*


  /s/ Grace E. Speights
Grace E. Speights, Bar No. 05254 *
Morgan Lewis & Bockius LLP
111 Pennsylvania Ave. NW
Washington, DC  20004
Telephone: (202) 739-5189
grace.speights@morganlewis.com


*Counsel for JBG SMITH Management Services, L.L.C.*


  /s/ Michael Jaffe
Michael Evan Jaffe, Bar No.06694 *
David C. Grossman, Bar No. 21260
Pillsbury Winthrop Shaw Pittman LLP
1200 17th Street, NW
Washington, DC  20036
Telephone: (202) 663-8068
michael.jaffe@pillsburylaw.com
david.grossman@pillsburylaw.com


*Counsel for Tower Construction Group LLP*

  /s/ Emmett F. McGee, Jr.
Adriana R. Midence, *pro hac vice*
Emmett F. McGee, Jr., Bar No. 08462 *
Eric R. Mangus, *pro hac vice*
Kelli Church, *pro hac vice*
Jackson Lewis P.C.
171 17th Street, NW, Suite 1200
Atlanta, GA  30363
Telephone: (404) 586-1822
emmett.mcGee@jacksonlewis.com


*Counsel for Wood Residential Services, LLC*


  /s/ Leslie Paul Machado
Leslie Paul Machado, Bar No. 14952 *
O'Hagan Meyer
2560 Huntington Avenue
Suite 204
Alexandria, VA 22303
Telephone: (703) 775-8607
lmachado@ohaganmeyer.com


*Counsel for Pinnacle Campus Living LLC*


  /s/ H. Matson Coxe, IV
H. Matson Coxe, IV, Bar No. 18576*
Elisabeth L. Shu, *pro hac vice*
Wilson Elser Moskowitz Edelman & Dicker, LLP
8444 Westpark Drive, Suite 510
McLean, VA 22102
Telephone: (703) 852-7793
lisa.shu@wilsonelser.com
H.Matson.CoxeIV@wilsonelser.com


*Counsel for Vantage Management Inc.*

  /s/ Kathleen Pontone
Kathleen Pontone, Bar No. 01225 *
Elisabeth Koloup Hall, Bar No. 18734
Miles and Stockbridge PC
100 Light Street, 10th Floor
Baltimore, MD  21202
Telephone: (410) 385-3757
kpontone@milesstockbridge.com

*Counsel for Berkshire Communities, LLC*

*\* Signed by Lynn E. Calkins with permission*
 *of the signing attorney*

37

## **CERTIFICATE OF SERVICE**

I hereby certify that, on this 7th day of January, 2021, a true copy of the foregoing was

served by ECF on:

Matthew K. Handley
Rachel Nadas
HANDLEY FARAH & ANDERSON PLLC
777 6th Street, NW
Eleventh Floor
Washington, D.C. 20001

Peter Romer-Friedman
GUPTA WESSLER PLLC
1900 L Street, NW, Suite 312,
Washington, D.C. 20036

　/s/ Lynn E. Calkins　　　　　　　
Lynn E. Calkins