IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

_____ )
)
NEUHTAH OPIOTENNIONE, )
on behalf of herself and all others similarly situated )
)
Plaintiff, )
) Case No. 20-1956
v. )
)
BOZZUTO MANAGEMENT COMPANY, *et al.,* )
)
Defendants )
_____ )

BRIEF OF AARP AND AARP FOUNDATION
AMICUS CURIAE IN SUPPORT OF
PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Daniel Kohrman
Maryland Bar No. 12912
Elizabeth Aniskevich
Susan Ann Silverstein
AARP Foundation
601 E Street, N.W.
Washington, D.C.  20049
202-434-2064
dkorhman@aarp.org

# TABLE OF CONTENTS

Page(s)

TABLE OF AUTHORITIES .............................................................. ii

INTEREST OF AMICI AND SUMMARY OF ARGUMENT ............................................ 1

BACKGROUND ................................................................................ 2

I.    The Federal Fair Housing Act Provides Guidance for
      Interpreting the Montgomery County Code and the D.C.
      Human Rights Law's Prohibition on Discriminatory Advertising ................... 2

II.   Fair Housing Law Bans on Discriminatory Advertising
      are Broad in Scope ......................................................... 4

III.  Longstanding Prohibitions on Discriminatory Advertising
      Should Apply with Equal Force to Digital Advertising ....................... 6

ARGUMENT .................................................................................. 8

I.    Standing To Enforce the Fair Housing Laws' Prohibitions
      on Discriminatory Advertising is Generously Construed ...................... 8

II.   Deprivation of Living in an Integrated Community is a
      Concrete and Particularized Harm ........................................... 9

III.  Stigmatic Harm is a Concrete and Particularized Harm ...................... 13

CONCLUSION ............................................................................... 15

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Bank of America Corp. v. City of Miami,*
137 S. Ct. 1296 (2017) ............................................................................. 8, 9

*Borum v. Brentwood Village, LLC,*
218 F. Supp. 3d 1 (D. D.C. 2016) ............................................................ 4

*Executive Sandwich Shoppe, Inc. v. Carr Realty Corp.,*
749 A.2d 724 (D.C. 2000) ......................................................................... 8

*Fair Housing in Huntington Comm. Inc. v. Town of Huntington,*
316 F.3d 357 (2d Cir. 2003) ..................................................................... 9

*Francis v. Kings Park Manor, Inc.,*
No. 15-1823-cv, 2021 WL 1137441 (2d Cir. Mar. 25, 2021) ...................... 1

*Gladstone Realtors v. Village of Bellwood,*
441 U.S. 91 (1979) ................................................................................. 9, 10

*Guevara v. UMH Properties, Inc.,*
No. 2:11-cv-2339, 2014 WL 5488918 (W.D. Tenn. Oct. 29, 2014) ............. 7

*Hamad v. Woodcrest Condo Ass'n,*
328 F.3d 224 (6th Cir. 2003) ................................................................... 13

*Havens Realty Corp. v. Coleman,*
455 U.S. 363 (1982) ................................................................................. 9

*Heckler v. Mathews,*
465 U.S. 728 1984) ................................................................................. 13

*Hunter v. District of Columbia,*
64 F. Supp. 3d 158 (D. D.C. 2014) ........................................................... 4

*Linmark Associates, Inc. v. Willingboro,*
431 U.S. 85 (1977) ................................................................................... 9

*Martinez v. Optimus Props., LLC,*
    No. 2:16-cv-08598-SVW-MRW, 2017 WL 1040743 (C.D. Cal. Mar. 14, 2017) ......... 7

*Mayers v. Ridley,*
    465 F.2d 630 D.C. Cir. 1972) ...................................................................................... 8

*Paralyzed Veterans of Am. v. Ellerbe Becket Architects & Eng'rs, P.C.,*
    950 F. Supp. 393 (D. D.C. 1996) ................................................................................ 4

*Ragin v. New York Times Co.,*
    923 F.2d 995 (2d Cir. 1991) ....................................................................................... 5

*Rhodes v. Parklane Apartments,*
    No. 8:19-cv-01463-PX, 2019 WL 7293398 (D. Md. Dec. 27, 2019) ........................... 4

*Ryan v. Mary Ann Morse Healthcare Corp.,*
    483 Mass. 612, 135 N.E.3d 711 (2019) ...................................................................... 1

*Spann v. Colonial Village, Inc.,*
    899 F.2d 24 (D.C. Cir. 1990) ...................................................................................... 6

*Texas Dep't of Housing and Comm. Affairs v. Inclusive Comm. Project, Inc.,*
    576 U.S. 519  (2015) ............................................................................................. 9-10

*Trafficante v. Met. Life Ins. Co.,*
    409 U.S. 205 (1972) ..................................................................................... 8, 9, 12, 13

*United States v. Space Hunters, Inc.,*
    429 F.3d 416 (2d Cir. 2005) ....................................................................................... 5

**STATUTES**

42 U.S.C. § 3603 ................................................................................................................... 5

42 U.S.C. § 3604............................................................................................................... 3, 5

**REGULATIONS**

24 C.F.R. 100.7(c)(3) ........................................................................................................... 3

24 CFR § 100.301(a) ................................................................................. 10

**LOCAL CODES**

D.C. Human Rights Act ........................................................................ 3, 4

Montgomery County, Md. Code ........................................................... 3, 4

**LEGISLATIVE**

114 Cong. Rec. 2706 (1968) ..................................................................... 9

114 Cong. Rec. 3422 (1968) ..................................................................... 9

**MISCELLANEOUS**

Muhammad Ali, et al.,
 *Discrimination through Optimization: How Facebook's Ad Delivery
 Can Lead to Skewed Outcomes*,
 3 Proceedings of the ACM on Human-Computer Interactions,
 Article 199 at 5 (2019), https://bit.ly/3dyyI0E ....................................... 6, 8

Anna Rosa Donizzetti,
 *Ageism in an Aging Society: The Role of Knowledge, Anxiety about Aging,
 and Stereotypes in Young People and Adults*,
 16 Int'l J. Env't Rsch. Pub. Health 1 (April 2019),
 https://bit.ly/3dAX7Tc ............................................................................. 14

Amy J. Cuddy, et al.,
 *This Old Stereotype: The Pervasiveness and Persistence of the Elderly Stereotype*,
 61 J. Soc. Issues 267, 268 (2005),
 https://hbs.me/3n7myPB ........................................................................... 14

Marc Freedman & Trent Stamp,
 *Overcoming Age Segregation*,
 Stanford Soc. Innovation Rev. (Mar. 15, 2021),

https://bit.ly/2QIHWyB ........................................................................................ 11

Marc Freedman & Trent Stamp,
    *The U.S. Isn't Just Getting Older. It's Getting More Segregated by Age,*
    Harvard Business Review (June 6, 2018),
    https://bit.ly/3grYDt0 ................................................................................ 10, 11

Gunhild O. Hagestad & Peter Uhlenberg,
    *The Social Separation of Old and Young: A Root of Ageism,*
    61 J. Soc. Issues 345-346 (2005) ................................................... 10, 11, 15

Thomas Nicolaj Iversen et al.,
    *A conceptual analysis of Ageism,*
    Nordic Psychology, no. 3, 2009 ................................................................ 14

Ava Kofman & Ariana Tobin,
    *Facebook Ads Can Still Discriminate Against Women and Older Workers,*
    *Despite a Civil Rights Settlement,*
    ProPublica (Dec. 13, 2009, 5:00 AM),
    https://bit.ly/3tGzHS8 ................................................................................ 7

Stephen Mihm, Opinion,
    *Coronavirus Exposes the Dangers of Age Segregation,*
    Bloomberg (April 21, 2020, 9:00 A.M.),
    https://bloom.bg/3syJrg0 ........................................................................ 10, 11

Reuben Ng, et al.,
    *Increasing Negativity of Age Stereotypes across 200 Years: Evidence from a*
    *Database of 400 Million Words,*
    PLoS One (February 12, 2015),
    https://bit.ly/2P9E49m ........................................................................ 13, 14

Nat'l Ass'n of REALTORS,
    *Real Estate in a Digital Age 2019 Report,*
    https://bit.ly/2QHgPDU ............................................................................ 6

David Ray Papke,
    *Segregation of a Different Sort: Age-Segregation in the Housing and*
    *Accommodation of Older Americans,*
    Marquette University Law School, Research Paper No. 20-08 (December 2020),
    https://bit.ly/2Ql1JnF ................................................................................ 11

Elena Portacolone & Jodi Halpern,
    *"Move or Suffer": Is Age-Segregation the New Norm for Older Americans Living Alone?*,
    35 J. of Applied Gerontology 836 (2014) ................................................................. 12

Jon Pynoos, et al., *Aging In Place, Housing, and the Law*,
    16 Elder L.J. 77 (2008) .......................................................................................... 12

Matilda White Riley & John W. Riley, Jr.,
    *Age Integration: Conceptual and Historical Background*,
    40 The Gerontologist, no. 3 (June 2000),
    https://bit.ly/3emWPyw ....................................................................................... 12

Robert G. Schwemm,
    *Discriminatory Housing Statements and Section 3604(c):*
    *A New Look at the Fair Housing Act's Most Intriguing Provision*,
    29 Fordham Urb. L.J. 187, 191 (2001) ...................................................................... 4

Till Speicher et al.,
    *Potential for Discrimination in Online Targeted Advertising*,
    Proc. of Mach. Learning Rsch. (2018),
    https://bit.ly/3n5KSkH ......................................................................................... 7

Chandler Nicholle Spinks,
    Comment, *Contemporary Housing Discrimination: Facebook,*
    *Targeted Advertising, and The Fair Housing Act*, 5
    7 Hous. L. Rev. 925 (2020) ................................................................................. 6, 7

Stephanie M. Stern,
    *A Social Norm Theory of Regulating Housing Speech Under*
    *the Fair Housing Act*,
    84 Mo. L. Rev. 435 (2019) ............................................................................... 5, 6, 8

Peter Uhlenberg,
    *Introduction: Why Study Age Integration*,
    40 The Gerontologist, no. 3, June 2000
    https://bit.ly/3x9MqyN ........................................................................................ 12

U.S. Dep't of Hous. & Urban Dev., Press Release,
    HUD Files Housing Discrimination Complaint Against
    Facebook (Aug. 17, 2018),
    https://bit.ly/2QISHks ................................................................................................. 8

## INTEREST OF AMICI AND SUMMARY OF ARGUMENT

AARP is the nation's oldest nonprofit, nonpartisan organization dedicated to empowering Americans 50 and older to choose how they live as they age. With nearly 38 million members and offices in every state, the District of Columbia, Puerto Rico, and the U.S. Virgin Islands, AARP works to strengthen communities and advocate for what matters most to families, with a focus on financial stability, health security and personal fulfillment. AARP Foundation, AARP's charitable affiliate, works to end senior poverty by helping vulnerable older adults build economic opportunity and social connectedness.

AARP and AARP Foundation have a profound interest in ensuring that older Americans are afforded fair housing opportunities.[1] As the courts have recognized in construing the Fair Housing Act ("FHA"), strong prohibitions against discriminatory advertising of such opportunities – aided by a generous standing doctrine – are indispensable components of the legislative scheme underlying the FHA. The same broad interpretations of prohibited acts, and standing doctrine, are necessary to properly enforce Montgomery County's and the District of Columbia's housing ordinances. Both expressly prohibit discriminatory advertising on the basis of age and are patterned after the FHA.

Here, Defendants, relying on a misinterpretation of our country's fair housing laws, argue that they cannot be held liable for causing Facebook to publish age-restricted digital housing ads that excluded individuals who were over 40, 45, 48, or 50, depending on the advertiser.

---

[1] *See, e.g., Francis v. Kings Park Manor, Inc.*, No. 15-1823-cv, 2021 WL 1137441 (2d Cir. Mar. 25, 2021); *Ryan v. Mary Ann Morse Healthcare Corp.*, 483 Mass. 612, 135 N.E.3d 711 (2019).

Defendants' argument rest, in part, on the assertion that Plaintiff does not have standing to assert claims because she did not see the ads at issue and suffered no cognizable harm.

Defendants' interpretation of the fair housing laws offends common sense and is at odds with the legislature's intent, and amici respectfully urge the Court to deny Defendants' Motion to Dismiss. As discussed below, our Nation's fair housing laws are interpreted broadly, as is standing under those laws. Amici respectfully seek to assist the Court in its consideration of two bases for standing cited by Plaintiff that, in particular, are of growing concern to AARP and AARP Foundation's constituency. First, older adults suffer injury when they are prevented from receiving housing ads and are therefore deprived of even the opportunity to live in an age-integrated community. Age-segregation has reached new heights in our country, with the young and the old now being as segregated as Whites and Hispanics. Age-segregation can have social, economic, professional, and emotional consequences, blocking essential opportunities for older adults to meet and interact with younger people and move beyond stereotypical ageist notions. Second, older adults suffer a stigmatic injury when they are denied housing opportunities based on age. This practice perpetuates archaic and prejudiced notions against older adults that, when internalized, have myriad impacts on older adults' health and well-being. Because the injuries flowing from Defendants' conduct are genuine and concrete, amici respectfully request the Court deny Defendants' Motion to Dismiss.

**BACKGROUND**

I.    **The Federal Fair Housing Act Provides Guidance for Interpreting the Montgomery County Code and the D.C. Human Rights Law's Prohibition on Discriminatory Advertising**

In their effort to abolish discrimination, reduce segregation, and promote integration, our country's housing laws broadly prohibit discriminatory advertising. While the federal FHA does

2

not prohibit discriminatory advertising based on age, the laws at issue in this litigation do.[2]

Defendants concede that these laws should have the same meaning as the FHA, on which they

were patterned. Defs. Mot. at 15, n.8. Accordingly, throughout this brief, amici rely on FHA case

law, and respectfully submit that the proper interpretation of that law and its underlying policies

call for a broad and common-sense interpretation of the local housing laws at issue in this

litigation as well.

The FHA, passed in 1968, prohibits housing advertisements that "indicate any preference,

limitation or discrimination" based on a protected class.[3] 42 U.S.C. § 3604(c). The Department of

Housing and Urban Development ("HUD"), the federal agency charged with enforcing the FHA,

also has prohibited discriminatory advertising by regulation, including "selecting media or

locations for advertising the sale or rental of dwellings which deny particular segments of the

housing market information about housing opportunities" because of a protected status. 24 C.F.R.

100.7(c)(3).

---

[2] *See* Montgomery County, Md. Code, MCC § 27-12(d)(1)(A) ("A person must not publish or circulate, or cause to be published or circulated, any housing notice, statement, listing, or advertisement . . . indicating that  . . . age . . . could influence or affect [the sale or rental of a dwelling]; *see also* D.C. Code § 2-1402.21(a)(5) ("It shall be an unlawful discriminatory practice to . . . make, print, publish, or cause to be made, printed, or published any notice, statement, or advertisement [for housing] [which] indicates or attempts unlawfully to indicate any preference, limitation, or discrimination based on . . . age . . . of any individual.")

[3] The full text of § 3604(c), the provision that prohibits discriminatory advertisements, provides it is a violation of the FHA "to make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, sex, handicap, familial status, or national origin, or an intention to make any such preference, limitation, or discrimination."

Using the FHA as a model, the Montgomery County Code ("MCC") prohibits advertisements that indicate that protected status "could influence or affect" the rental, sale, or lease of housing. MCC § 27-12(d)(1)(A). The D.C. Human Rights Act ("DCHRA") bans advertisements that "unlawfully indicate[] or attempts to unlawfully indicate" any preference, limitation, or discrimination" based on a protected status. DCHRA § 2-1402.21(a)(5). Because these local laws are nearly identical in language to the FHA, courts interpreting them often turn to case law interpreting the FHA as guidance. *See, e.g., Rhodes v. Parklane Apartments*, No. 8:19-cv-01463-PX, 2019 WL 7293398, at *3 (D. Md. Dec. 27, 2019) ("When local laws such as these bear such striking resemblance to the FHA, the Court applies the same pleading standards."); *Borum v. Brentwood Village, LLC*, 218 F. Supp. 3d 1, 16 (D. D.C. 2016) ("The plain language of the DCHRA commands the same finding as the language of the FHA."); *Hunter v. District of Columbia*, 64 F. Supp. 3d 158, 178-79 (D. D.C. 2014) (DCHRA bars discrimination in housing "in language that parallels that of the analogous provision of the FHA."). Accordingly, this Court should look to the FHA for guidance when interpreting the MCC and DCHRA. *See, e.g., Hunter*, 64 F. Supp. 3d at 179 (quoting *Paralyzed Veterans of Am. v. Ellerbe Becket Architects & Eng'rs, P.C.*, 950 F. Supp. 393, 405 (D. D.C. 1996)) ("The D.C. courts have always looked to cases from the federal courts in interpreting the D.C. Human Rights Act, and have followed, wherever applicable, precedents from the federal courts' treatment of comparable civil rights statutes.").

II.   <u>Fair Housing Law Bans on Discriminatory Advertising are Broad in Scope</u>

The FHA's ban on discriminatory advertising has been called the statute's "most intriguing provision" because of its under-enforcement, despite its broad scope and applicability. Robert G. Schwemm, *Discriminatory Housing Statements and Section 3604(c):  A New Look at the Fair Housing*

*Act's Most Intriguing Provision*, 29 Fordham Urb. L.J. 187, 191 (2001) ("§3604's ban on

discriminatory statements has not been the subject of much litigation or debate."). Unlike

traditional discrimination cases under the FHA, such as a claim that landlord refused to rent to an

applicant because of a protected status, the ban on discriminatory advertising effectively imposes

strict liability. No discriminatory intent by an advertiser need be shown to establish a violation. *See,*

*e.g., Ragin v. New York Times Co.*, 923 F.2d 995, 1000 (2d Cir. 1991) ("[T]he statute prohibits all ads

that indicate a racial preference to an ordinary reader whatever the advertiser's intent."). Nor must

advertisements contain the "most provocative and offensive expressions" to be considered

discriminatory. *Id.* at 999. The FHA protects against even "subtle methods of indicating . . .

preferences." *Id.* at 1000 (finding the near exclusive use of white models in housing advertisements

sufficient to state a claim for discriminatory advertising under the FHA). Finally, whereas small

landlords who live on the premises are generally excepted from the strictures of the FHA, they are

not exempted from §3604(c) and are not permitted to make discriminatory statements in

connection with the sale or lease of housing. *See* 42 U.S.C. § 3603(b)(2); *United States v. Space*

*Hunters, Inc.*, 429 F.3d 416, 424 (2d Cir. 2005) (The statute "does not provide any specific

exemptions or designate the persons covered, but rather . . . applies on its face to anyone" who

makes a "prohibited statement.").

Because discriminatory advertisements have the power to influence social norms and

entrench prejudices, these sweeping prohibitions are necessary to stamp out – not just deter –

discrimination. *See* Stephanie M. Stern, *A Social Norm Theory of Regulating Housing Speech Under the*

*Fair Housing Act*, 84 Mo. L. Rev. 435, 451 (2019) (hereinafter "Stern") ("Discriminatory housing

statements shape the perceived norms of landlords, sellers, lenders, and other housing market

participants."); *Spann v. Colonial Village, Inc.*, 899 F.2d 24, 30 (D.C. Cir. 1990) (discriminatory advertisements can create "a public impression that segregation in housing is legal, thus facilitating discrimination"). Discriminatory housing advertisements communicate "prejudiced norms," and empirical research demonstrates that just a *single* communication reflecting a societal norm can influence the observer's prejudice and behavior, while "reducing the *appearance* of prejudiced attitudes or acts of discrimination can lessen the expression of prejudiced attitudes and promote more egalitarian behaviors." Stern, 84 Mo. L. Rev. at 437, 452, 457, 458.

III.     <u>Longstanding Prohibitions on Discriminatory Advertising Should Apply with Equal Force to Digital Advertising</u>

Traditionally, housing was largely advertised in newspapers, flyers, traditional classifieds, and other printed media. But, with the increasing dominance of online advertising, housing advertisements have gone digital. Muhammad Ali, et al., *Discrimination through Optimization: How Facebook's Ad Delivery Can Lead to Skewed Outcomes*, 3 Proceedings of the ACM on Human-Computer Interactions, Article 199 at 5 (2019), https://bit.ly/3dyyI0E (hereinafter "Ali") ("Online display advertising is now an ecosystem with aggregate yearly revenues closer to $100 billion."). Rather than opening a paper to find suitable housing opportunities, individuals now scour social media platforms and online classifieds. Today, 72% of apartment-seekers and 90% of home buyers use the internet to facilitate their housing searches. Chandler Nicholle Spinks, Comment, *Contemporary Housing Discrimination: Facebook, Targeted Advertising, and The Fair Housing Act*, 57 Hous. L. Rev. 925, 928 (2020) (hereinafter "Spinks"). Among older adults, 89% of individuals age 64-72 used online resources to find a home, whereas 72% of individuals age 73-93 turned to the internet to aide their housing search. *See* Nat'l Ass'n of REALTORS, *Real Estate in a Digital Age 2019 Report*, at 7, https://bit.ly/2QHgPDU.

Many of those searching for housing online will turn to Facebook, an online advertising giant. Facebook controls 22% of the U.S. market for digital ads and is one of the largest online platforms in terms of number of users reached by ads, the number of advertisers, and the amount of personal data gathered about users and provided to advertisers. *See* Ava Kofman & Ariana Tobin, *Facebook Ads Can Still Discriminate Against Women and Older Workers, Despite a Civil Rights Settlement*, ProPublica (Dec. 13, 2009, 5:00 AM), https://bit.ly/3tGzHS8; Till Speicher et al., *Potential for Discrimination in Online Targeted Advertising*, Proc. of Mach. Learning Rsch. (2018), https://bit.ly/3n5KSkH. Facebook's advertising platform is fueled by powerful algorithms and marketing techniques that allow advertisers to target specific audiences for their ads through "inclusion and exclusion" features. Spinks, 57 Hous. L. Rev. at 932. In other words, Facebook and its advertisers can use Facebook's arsenal of user data to ensure certain classes of individuals either will or not receive an ad, based on the advertisers' preferences. *Id.*

While age-targeted digital advertising could potentially be useful or beneficial (and lawful) in other contexts, using it in a manner that denies housing opportunities to protected classes puts advertisers on a collision course with our country's fair housing laws. *Cf. Martinez v. Optimus Props., LLC*, No. 2:16-cv-08598-SVW-MRW, 2017 WL 1040743, at *5 (C.D. Cal. Mar. 14, 2017) (finding plaintiff stated a claim for discriminatory advertising based on defendant's practice of selectively advertising to particular segments of the housing market while denying information to people with disabilities, Latinos, and families with children); *Guevara v. UMH Properties, Inc.*, No. 2:11-cv-2339, 2014 WL 5488918, at *6 (W.D. Tenn. Oct. 29, 2014) (allegation that Defendant only advertised in Spanish language media outlets for apartments in predominately African-American area was sufficient to state a claim for discriminatory advertising). The practice of systematically excluding

subsets of housing seekers from even receiving digital advertisement is particularly pernicious. Unlike traditional print media, where an individual can access outlets regardless of an advertisers' desire to reach "ideal" buyers or renters (i.e., by purchasing a certain newspaper or watching a certain program), those excluded from online housing advertisements cannot easily learn about the housing opportunities included in the ads they are denied. Ali, *supra*, at 24. As HUD Assistant Secretary Anna Maria Farias explained, "[w]hen Facebook uses the vast amount of personal data it collects to help advertisers to discriminate, it is the same as slamming the door in someone's face." Press Release, U.S. Dep't of Hous. & Urban Dev., HUD Files Housing Discrimination Complaint Against Facebook (Aug. 17, 2018), https://bit.ly/2QISHks.

## ARGUMENT

### I.   Standing To Enforce the Fair Housing Laws' Prohibitions on Discriminatory Advertising is Generously Construed

"It is well established that civil rights statutes should be read expansively in order to fulfill their purpose. . . . There is no reason why [a] reading of [the FHA] should not comport with this rule." *Mayers v. Ridley*, 465 F.2d 630, 635 (D.C. Cir. 1972); *see also Executive Sandwich Shoppe, Inc. v. Carr Realty Corp.*, 749 A.2d 724, 732 (D.C. 2000) ("The Council undoubtedly intended the [DCHRA] to be a powerful, flexible, and far-reaching prohibition against discrimination of many kinds."); Stern, 84 Mo. L. Rev. at 468 ("Social norms also lend support to the expansive standing to bring suit for violation of § 3604(c)"). Thus, standing under our fair housing laws is given a "generous construction" that extends as broadly "as is permitted by Article III of the Constitution." *Trafficante v. Met. Life Ins. Co.*, 409 U.S. 205 at 209, 212 (1972); *see also Bank of America Corp. v. City of Miami*, 137 S. Ct. 1296, 1303 (2017). While an asserted injury must fall

within the "zone of interest" of the FHA, that zone is given great expanse.[4] *See, e.g.*, *Bank of America Corp.*, 137 S. Ct. at 1303-1305 (finding city's injuries fell within the zone of interest of the FHA where city alleged violations based on bank's decade-long pattern of racially discriminatory lending).

> II.    <u>Deprivation of Living in an Integrated Community is a Concrete and Particularized Harm</u>

A chief aim of the FHA and our country's housing laws is to achieve "truly integrated and balanced living patterns." 114 Cong. Rec. 3422 (1968). When discriminatory housing practices prevent integration, "the whole community" suffers. 114 Cong. Rec. 2706 (1968); *accord Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 111 (1979) ("As we have said before, '[there] can be no question about the importance' to a community of 'promoting stable, . . . integrated housing.'") (quoting *Linmark Associates, Inc. v. Willingboro*, 431 U.S. 85, 94 (1977)). Thus, the United States Supreme Court has recognized that "the lost benefits of living in an integrated community" and the "missed business and professional advantages which would have accrued" from living with different groups are concrete and particularized injuries that give rise to standing. *Trafficante*, 409 U.S. at 208, 209; *Gladstone*, 441 U.S. at 111-112 (noting the Court's past decisions finding injury from lack of integration sufficient injury for standing); *see also Havens Realty Corp. v. Coleman*, 455 U.S. 363, 376 (1982) (recognizing loss of benefits from living in an integrated society was an injury); *Fair Housing in Huntington Comm. Inc. v. Town of Huntington*, 316 F.3d 357, 362 (2d Cir. 2003) ("Supreme Court cases make plain that a plaintiff sufficiently establishes standing to bring suit under the FHA by alleging that a defendant's acts impinge on the plaintiff's right to live in an

---

[4] Defendants do not argue that Plaintiff's injuries fall outside the zone of interest, and only raise a constitutional argument to standing.

integrated community). Lack of integration deprives individuals of the right to "important social, professional, business and economic, political, and aesthetic benefits of [integrated] associations." *Havens*, 455 U.S. at 376; *Texas Dep't of Housing and Comm. Affairs v. Inclusive Comm. Project, Inc.*, 576 U.S. 519, 547 (2015) ("The Court acknowledges the Fair Housing Act's continuing role in moving the Nation toward a more integrated society.")

For years, the Supreme Court and scholars have recognized the problems associated with housing segregation based on race. *See, e.g.*, *Gladstone*, 441 U.S. at 111, 111 n.24 (noting the problems associated with segregated housing, including price deflation, tax base diminution, and school segregation). But, little attention has been paid to age segregation, despite the fact that we live in a highly age-stratified society. *See* Gunhild O. Hagestad & Peter Uhlenberg, *The Social Separation of Old and Young: A Root of Ageism*, 61 J. Soc. Issues 345-346 (2005) (hereinafter "Hagestad & Uhlenberg") (describing the nature of age segregation in the United States). Age segregation is so rampant that it is "as ingrained as racial segregation; the old and the young are roughly as segregated as Hispanics and whites." Marc Freedman & Trent Stamp, *The U.S. Isn't Just Getting Older. It's Getting More Segregated by Age*, Harvard Business Review (June 6, 2018), https://bit.ly/3grYDt0 (hereinafter "Harvard Business Review"). In fact, fewer than 10% of adults over the age of 65 report having one non-kin individual in their network who is less than 35 years old. Hagestad & Uhlenberg, *supra*, at 353. Just 6% of people over 60 have discussed an "important" topic with a non-family member who is under 36. Harvard Business Review, *supra*. And, a third of Americans over the age of 55 live exclusively among others of the same age cohort.[5]

---

[5] Notably, the Housing for Older Persons Act of 1995 exempted housing for older persons from liability for family status discrimination under the FHA.  *See* 24 CFR § 100.301(a).  Thus, older adults can *choose* to live in an age-restricted community if they wish.  However, there is a stark

Stephen Mihm, Opinion, *Coronavirus Exposes the Dangers of Age Segregation*, Bloomberg (April 21, 2020, 9:00 A.M.), https://bloom.bg/3syJrg0 (hereinafter "Bloomberg").

Societal forces have fueled the rapid increase in age segregation across America. Harvard Business Review, *supra* (explaining that the United States has gone from one of the most age integrated societies to the "polar opposite."); Hagestad & Uhlenberg, *supra*, at 347-349 (discussing spatial segregation based on age). As society industrialized, chronological age became increasingly important as society stratified individuals into a "tripartite" life course, with the young focused on preparation and education, adults focused on family building and work, and older adults focused on retirement. *Id.* at 345. Moreover, before turn of the nineteenth century, the vast majority of older adults lived with their adult children. Bloomberg, *supra*. In 1850, 70% of older adults lived with their adult children. *Id.* By 2000, only 13% did. *Id.* Industrialization coupled with this shift in family structure impacted the integration of older adults into larger society, and reduced cross-generational contact. *Id. See also* Marc Freedman & Trent Stamp, *Overcoming Age Segregation*, Stanford Soc. Innovation Rev. (Mar. 15, 2021), https://bit.ly/2QIHWyB (discussing how societal measures based on age produced efficiencies, but also contributed to the age segregation of older adults.).

Age segregation carries serious consequences. It "blocks essential opportunities" for older adults to meet and interact with younger adults and to "move beyond" stereotypical ageist notions. Hagestad & Uhlenberg, *supra*, at 349. It leads to feeling of loneliness and isolation among older adults, causing them to internalize many of the prejudiced stereotypes lodged against them. David

---

difference between choosing to live among one's own age cohort and being forced to do so as a result of invidious discrimination of the type presented in this case.

Ray Papke, *Segregation of a Different Sort: Age-Segregation in the Housing and Accommodation of Older Americans*, Marquette University Law School, Research Paper No. 20-08, at 1 (December 2020), https://bit.ly/2Ql1JnF. Age segregation also reduces the visibility of older adults in society and robs them of the role they could play in nurturing younger generations. *Id.*

Older adults and younger persons both stand to benefit from an age-integrated society. Cross-age relationships stimulate wider participation, encourage shared responsibility, and preserve our collective history. Matilda White Riley & John W. Riley, Jr., *Age Integration: Conceptual and Historical Background*, 40 The Gerontologist, no. 3, at 266, 268 (June 2000), https://bit.ly/3emWPyw. They also promote a sense of belonging and mutual respect among people of different ages. Elena Portacolone & Jodi Halpern, *"Move or Suffer": Is Age-Segregation the New Norm for Older Americans Living Alone?*, 35 J. of Applied Gerontology 836, 837 (2014).

While age-segregation is currently entrenched in our society, there are ways to combat it. By removing structural barriers that prohibit older adults from integrating, as well as promoting cross-age relationships, we can move towards a more cohesive community. Peter Uhlenberg, *Introduction: Why Study Age Integration*, 40 The Gerontologist, no. 3, June 2000, at 261, 262, https://bit.ly/3x9MqyN. Rigorous enforcement of fair housing laws that protect against housing discrimination on the basis of age is a critical starting point in combating age-segregation because it both removes the societal barriers that promote age stratification and help bring together communities of individuals of different ages. Jon Pynoos, et al., *Aging In Place, Housing, and the Law*, 16 Elder L.J. 77, 103 (2008) ("Age-integrated housing can thus foster greater interaction between young and old and increase the vitality of the community."). In order to allow for this rigorous enforcement, courts must construe standing "generous[ly]," *Trafficante*, 409 U.S. at 212,

and permit those who have suffered due to the lack of an integrated community the opportunity to bring suit against discriminatory policies.

### III.   Stigmatic Harm is a Concrete and Particularized Harm

Housing discrimination can strike at the heart of a person's identity by communicating to them that they are "less worthy" than the favored group. *Accord Heckler v. Mathews*, 465 U.S. 728, 789 (1984) ("[D]iscrimination itself, by perpetuating of 'archaic and stereotypic notions' or by stigmatizing members of the disfavored group as 'innately inferior' and therefore less worthy . . . can cause serious non-economic injuries."). The Supreme Court's generous recognition of "stigmatic" harm under the FHA extends even to those individuals not the object of the discrimination, but who nevertheless suffered associated stigmatic harm. *See Trafficante*, 409 U.S. at 208 (finding standing where a white plaintiff, too, alleged "embarrassment . . . from being 'stigmatized' as residents of a 'white ghetto'"). This stigmatic harm is sufficient for standing. *See Hamad v. Woodcrest Condo Ass'n*, 328 F.3d 224, 232 (6th Cir. 2003) (finding standing on behalf of plaintiffs who alleged they suffered a "stigmatic harm of living in a community whose members were segregated on the basis of a prohibited classification").

Stigmatization of older adults is a significant problem in our country, and Defendants' refusal to generate housing ads to older adults simply because they are older only serves to further entrench archaic stereotypes and prejudiced attitudes towards older people. Since the late 1800s, stereotypes toward older adults have become significantly more negative over time in the United States. Reuben Ng, et al., *Increasing Negativity of Age Stereotypes across 200 Years: Evidence from a Database of 400 Million Words*, PLoS One, at 2 (February 12, 2015), https://bit.ly/2P9E49m (hereinafter "Ng"). One particularly harmful stereotype, for example, is that older adults "hinder[]

13

productivity and social dynamism." Amy J. Cuddy, et al., *This Old Stereotype: The Pervasiveness and Persistence of the Elderly Stereotype*, 61 J. Soc. Issues 267, 268 (2005), https://hbs.me/3n7myPB (hereinafter "Cuddy:); *see also* Anna Rosa Donizzetti, *Ageism in an Aging Society: The Role of Knowledge, Anxiety about Aging, and Stereotypes in Young People and Adults*, 16 Int'l J. Env't Rsch. Pub. Health 1 (April 2019), https://bit.ly/3dAX7Tc (hereinafter "Donizzetti"). These views are deeply ingrained in our society, but unlike other prejudices, "there are no social sanctions against people who express negative prejudices or stereotypes" against older people. Thomas Nicolaj Iversen et al., *A conceptual analysis of Ageism*, Nordic Psychology, no. 3, 2009, at 4, 8-9. Instead, we live in a country where it is generally accepted that one will express negativity against older adults. *Id*. This stands in stark contrast to how society views racial, gender, or other prejudices. *Id*.

Our country's tacit acceptance of age stereotypes has significant impacts on the health and well-being of older adults. Negative self-perceptions of aging, perpetuated by internalizing stereotypes, causes reduced self-efficacy among older adults, directly affects the presence of depression, and can even impact older adults' immune systems and cardiovascular health. Donizzetti*, supra*, at 1. Further, bias against older adults leads to social isolation which carries its own physical and mental health risks. Cuddy, *supra*, at 280. Stigmas also inhibit older adults from participating in social activities, work, and recreation and limits them from the positive feelings associated with contributing to society. Donizzetti, *supra*, at 2.

Negative stereotypes about older adults are often internalized in youth and intensify over time. *Id*. at 8. The linear nature of the increase in prejudices over time against older adults "suggests [this trend] is systemic" and that "only a societal-based campaign is likely to successfully combat the ageism that is expressed through . . . stereotypes," Ng, *supra*, at 5, including education

programs and increasing opportunities for sustained familiarity with those of different ages. Hagestad & Uhlenberg, *supra*, at 355. Here, Defendants' discriminatory advertising is particularly insidious. It not only entrenches segregation based on age, it also reinforces the ageist views of younger adults, who, when they discover they were shown an ad because of their age, believe that they are more desirable as consumers, tenants, and neighbors of the community. It caused Plaintiff to feel stigmatized when she learned that she was not even given the opportunity to review ads based on her age alone, causing her to feel less worthy and undesirable as a tenant. In order to combat the further entrenching of ageist beliefs, courts must recognize that the impacts of stigmatic harm are real and genuine, and that those who have suffered such harm must have standing to sue to challenge discriminatory practices, including those in housing.

<u>CONCLUSION</u>

Because discriminatory housing ads that exclude older adults exact real harm on older adults, the Court should hold that Plaintiff has standing in this case to challenge Defendants' discriminatory housing advertisements.

Dated:  April 26, 2021                    Respectfully Submitted,

                                          /s/ Daniel Kohrman
                                          Daniel Kohrman
                                          Maryland Bar No. 12912
                                          Elizabeth Aniskevich
                                          Susan Ann Silverstein
                                          AARP Foundation
                                          601 E Street, N.W.
                                          Washington, D.C.  20049
                                          202-434-2064
                                          dkorhman@aarp.org

                                          *Attorneys for Amicus Curiae*

**CERTIFICATE OF SERVCIE**

I hereby certify that on April 26, 2021, the foregoing was served by filing a copy using the Court's ECF filing system, which will send notice of the filing to all counsel of record.

<u>/s/ Daniel Kohrman</u>
Daniel Kohrman
Maryland Bar No. 12912

17