### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| NEUHTAH OPIOTENNIONE,<br>　　　　　*Plaintiff-Appellant*,<br><br>　　v.<br><br>BOZZUTO MANAGEMENT COMPANY,<br>et al.,<br>　　　　　*Defendants-Appellees*. | **NOTICE OF APPEAL**<br><br>Case No. 20-cv-1956 |

Notice is hereby given that Plaintiff Neuhtah Opiotennione appeals to the United States Court of Appeals for the Fourth Circuit from the Memorandum Opinion and Order of July 20, 2021 granting the Defendants' Joint Motion to Dismiss the First Amended Complaint.

Copies of the July 20, 2021 memorandum opinion and order are attached. The fee required by Federal Rules of Appellate Procedure Local Rule 3(a) will be paid using the Pay.gov website immediately upon the filing of this notice.

　　　　　　　　　　　　　　　　　　　Respectfully submitted,

Dated: August 18, 2021　　　　By:　*/s/Peter Romer-Friedman*

　　　　　　　　　　　　　　　　　　　PETER ROMER-FRIEDMAN
　　　　　　　　　　　　　　　　　　　Gupta Wessler PLLC
　　　　　　　　　　　　　　　　　　　2001 K Street NW, Suite 850 North
　　　　　　　　　　　　　　　　　　　Washington, DC 20006
　　　　　　　　　　　　　　　　　　　(202) 888-1714

## CERTIFICATE OF SERVICE

I, Peter Romer-Friedman, counsel for Plaintiff Neuhtah Opiotennione, do hereby certify that on this 18th day of August, 2021, a true and correct copy of the foregoing, *Plaintiff's Notice of Appeal*, was electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

    Respectfully submitted,

    */s/ Peter Romer-Friedman*
    PETER ROMER-FRIEDMAN

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **NEUHTAH OPIOTENNIONE,** *on behalf of herself and all others similarly situated*, <br><br> Plaintiff, <br><br> v. <br><br> **BOZZUTO MANAGEMENT COMPANY** *et al.*, <br><br> Defendants. | Civil No. **20-1956 PJM** |

## MEMORANDUM OPINION

Neuhtah Opiotennione has filed this putative class action against nine companies that manage various apartment buildings in the Washington, D.C., area (collectively, Defendants).[1] Plaintiff, a 55-year-old prospective tenant in the region, alleges that Defendants engaged in "digital housing discrimination" by routinely and deliberately excluding older people such as her from receiving advertisements on Facebook for dozens of apartment complexes in the D.C. area, in violation of D.C. and Montgomery County civil rights and consumer protection laws. She seeks a declaration that the alleged digital discrimination is unlawful, an injunction against the alleged discriminatory advertising practices, and monetary damages on behalf of herself and the putative class of "thousands of other older persons who have been denied housing information and opportunities."[2] Am. Compl. at 4, ECF No. 57.

---

[1] Housing Rights Initiative was originally a co-plaintiff in this suit but voluntarily dismissed its claim after Defendants filed the present motion to dismiss.

[2] Plaintiff describes the putative class generally as "Facebook users who have actively searched for housing and/or changed residences in the District of Columbia metropolitan area, and who have routinely used Facebook and have been or are being excluded from receiving a housing-related advertisement from defendants because defendants placed an upper age limit on the population of Facebook users who were eligible to receive a housing-related advertisement that excluded such persons, at any time from the earliest date actionable under the limitations period applicable to the given claim until the date of judgment." Am. Compl. ¶ 92.

Defendants have moved to dismiss the case pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction and Rule 12(b)(6) for failure to state a claim. The Court finds that Plaintiff has failed to demonstrate an injury in fact sufficient to confer Article III standing and will **GRANT** Defendants' motion and **DISMISS** this case.

## I. Background

Plaintiff is a decades-long resident of the District of Columbia who submits that, throughout 2018 and 2019, she regularly searched for two- and three-bedroom rental housing in the D.C. area (including the District; Montgomery County, Maryland; and northern Virginia) in the price range of approximately $2,500 per month or more. Am. Compl. ¶ 6. She states that in 2019, after she was unable to find suitable rental housing, she purchased a home in the District of Columbia. *Id.* She explains that she has been a regular user of Facebook since prior to 2018 and, at all appropriate times, has been interested in receiving information about housing opportunities on Facebook. *Id.* ¶ 7. She alleges, however, that, because Defendants deliberately excluded persons more than 50 years of age from receiving their advertisements, she was denied the opportunity to receive Defendants' Facebook housing advertisements targeted to younger potential tenants, which contributed to the difficulty she experienced in finding suitable rental housing. *Id.* She states that, had she seen such advertisements, she would have clicked on them, would have reviewed the information on Defendants' linked websites, and potentially would have applied for and secured an apartment at one of Defendants' properties. *Id.*

In creating a targeted Facebook advertisement, advertisers can determine who sees their advertisements based on such characteristics as age, gender, location, and preferences. *Id.* ¶¶ 26–36. Plaintiff alleges that Defendants routinely used this targeting function to exclude older

individuals such as herself from receiving their Facebook advertisements for rental housing the D.C. area, which were instead directed to younger prospective tenants. *Id.* ¶¶ 41–45.

Plaintiff further asserts that Defendants' advertisements included discriminatory "age-based statements" intended to discourage older individuals from applying for the advertised housing—namely, the information that Facebook generally provides to viewers of targeted advertisements, who are able to click on a three-dot symbol for a menu of options in one corner of the post and then click on the words "Why am I seeing this?" to read that they were targeted on the basis of, for example, age, location, or pet ownership. *Id.* ¶¶ 46–49. Plaintiff alleges that Defendants had the ability to, but chose not to, remove those statements from their advertisements, instead authorizing Facebook, as their agent, to make such statements, purportedly to appeal to the preferred age group. *Id.* ¶¶ 50–51.

Plaintiff lists specific properties allegedly advertised to an age-restricted audience on Facebook by all nine Defendants over a three-year period from 2018 to 2020. *Id.* ¶¶ 56–60; *see id.* ¶¶ 63–71; Ex. A, ECF No. 1-1. She alleges that, in violation of D.C. and Montgomery County laws, these advertising campaigns have been central features of Defendants' discriminatory marketing practices. Am. Compl. ¶¶ 72–73.

Plaintiff claims that four Defendants (Bozzuto, JBG Smith, Kettler, and Tower) violated the Montgomery County Code and the DCHRA. The relevant Montgomery County Code provision states that "[a] person must not publish or circulate, or cause to be published or circulated, any housing notice, statement, listing, or advertisement . . . indicating that age could influence or affect [a covered real estate transaction]." Montgomery Cty. Code § 27-12(d). As to the DCHRA, Plaintiff accuses the same four Defendants of (1) making advertisements that unlawfully state a preference based on a protected class, D.C. Code § 2-1402.21(a)(5); (2) unlawfully refusing or

3

failing to initiate or conduct a transaction for real estate or falsely representing that a property is not available "wholly or partially for a discriminatory reason based on the [age] of any individual," *id.* § 2-1402.21(a)(1); (3) unlawfully aiding and abetting Facebook's violation of the DCHRA, *id.* § 2-1402.62; and (4) denying older individuals advertising and thereby unlawfully "steering" them, *id.* § 21-1402.22. Further, Plaintiff alleges that all nine Defendants have violated a D.C. Consumer Protections and Procedures Act provision that prohibits violating D.C. laws, such as the DCHRA, in a consumer context. D.C. Code § 28-3904.

Plaintiff filed this suit, joined by former plaintiff Housing Rights Initiative, on July 1, 2020, which Defendants thereafter moved to dismiss. On November 23, 2020, Plaintiffs filed an amended complaint, which superseded the original complaint, and on January 7, 2021, Defendants filed the present motion to dismiss the amended complaint. Defendants argue lack of subject matter jurisdiction and failure to state a claim. On June 17, 2021, the Court held oral argument on Defendants' motion and took the matter under advisement. It now addresses the pending motion to dismiss.

## II. Legal Standard

Federal courts are "courts of limited subject matter jurisdiction," possessing "only the jurisdiction authorized them by the United States Constitution and by federal statute." *United States ex rel. Vuyyuru v. Jadhav*, 555 F.3d 337, 347 (4th Cir. 2009). As the party asserting jurisdiction, the plaintiff bears the burden of proving that the district court has subject matter jurisdiction, requiring clear allegations of fact "demonstrating that he is a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers." *Warth v. Seldin*, 422 U.S. 490, 518 (1975). "In determining whether jurisdiction exists, the district court is to regard the pleadings' allegations as mere evidence on the issue, and may consider evidence outside the

pleadings without converting the proceeding to one for summary judgment." *Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991).

Dismissal for lack of subject matter jurisdiction is required where no named plaintiff has constitutional standing to pursue a claim. *See White Tail Park, Inc. v. Stroube*, 413 F.3d 451, 458 (4th Cir. 2005). To demonstrate standing, a plaintiff must clearly allege facts showing that she has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). An injury in fact must be "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000); *see also Sierra Club v. Morton*, 405 U.S. 727, 740 (1972) (explaining that the injury-in-fact requirement is intended to limit the power to litigate a claim to those "who have a direct stake in the outcome" thereof). In other words, an injury of fact must be one that "actually exist[s]" and is not a generalized grievance but "affect[s] the plaintiff in a personal and individual way." *Spokeo*, 136 S. Ct. at 1548.

The district court assumes for the purposes of determining standing that a plaintiff's claim is meritorious and, "at the pleading stage, 'presumes that general allegations embrace those specific facts that are necessary to support the claim.'" *Equity in Athletics, Inc. v. Dep't of Educ.*, 639 F.3d 91, 99 (4th Cir. 2011) (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990)).

### III. Discussion

Plaintiff asserts she has sustained four distinct injuries in fact. The Court finds that none of those alleged injuries suffice to confer constitutional standing.

**1.** Plaintiff first alleges that she was deprived of information about housing opportunities when Defendants excluded her from the targeted audiences of their Facebook advertisements. She

5

compares her allegations to the facts in *Havens Realty Corp. v. Coleman*, where the Supreme Court held that "tester" plaintiffs who sought information about the defendant's housing units, even without an intention to rent, suffered a cognizable injury in fact when the defendant failed to provide the Black applicant the same information regarding housing availability as it provided to the White applicant. 455 U.S. 363, 373–74 (1982). In fact, Plaintiff argues, her injury is more cognizable than the *Havens* "tester" plaintiff because she was actively and genuinely looking for rental housing and allegedly would have used the information from the Facebook advertisements to better understand the local housing availability and pricing. She contends that it is irrelevant whether she could have learned about Defendants' properties through channels other than Facebook.

The Court is not persuaded. As an initial matter, this case is quite dissimilar from *Havens*: there, the "tester" plaintiffs had made specific inquiries and were given affirmative misinformation about the availability of the rental housing. Here, in contrast, Plaintiff did not seek any information, much less receive false information, from Defendants. Indeed, she fails to state what specific information she was *prevented* from receiving, such as the availability of or rental price of units in a particular building. Moreover, on their face the challenged Facebook advertisements contain little more than conventional marketing language; they merely seek to draw Facebook users' attention in an attempt to entice them to click a link that would lead them to the advertiser's website on which the relevant information, open to anyone, is actually provided. *See, e.g.*, Ex. A at 1 (image of Facebook advertisement for Bozzuto building called The Banks, stating only "Boutique, modern style residences perfectly placed where Southwest meets the Wharf. #thebanksdc" with a link to "banksdc.com" labeled "Learn More"). Plaintiff was in no way prevented from obtaining the very same information on the same linked apartment website. To be sure, she might have preferred to

6

passively scroll Facebook and await advertisements suitable to her taste to appear on her screen rather than running her own apartment search on one of the many websites on which Defendants advertise or by engaging in a simple Google search for apartments in the D.C. area. But it cannot be said that, when the identical information sought was readily available through other sources, her preference to use Facebook amounted to a deprivation of information that might be construed as constitutional injury in fact.

**2.** Plaintiff next alleges economic harm because the denial of housing opportunities by Bozzuto, JBG Smith, Kettler, and Tower caused her greater expense, delay, and hardship in her quest for housing. She asserts that she did not learn of the opportunities for units at certain of Defendants' properties in that the abovementioned four Defendants ensured she would not see their Facebook advertisements. While Plaintiff concedes that it is not certain whether she ultimately would have been approved for such units had she applied, she insists that this does not undermine her standing because when a defendant "erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group . . . need not allege that he would have obtained the benefit but for the barrier in order to establish standing." *Ne. Fla. Chapter of Assoc. Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993) (involving claim under the Equal Protection Clause against a city government defendant). Plaintiffs asserts that, at bottom, her injury stems from an "inability to compete on an equal footing," *id.*, even "when the probability that the harm will actually occur is small," *In re C.P. Hall Co.*, 750 F.3d 659, 660 (7th Cir. 2014) (addressing insurance company's claim of "probabilistic harm").

The Court finds Plaintiff's alleged economic harm highly conjectural, undermining her claim of the requisite injury in fact. For the reasons just discussed, Plaintiff's exclusion from

Defendants' housing advertisements on Facebook was not tantamount to being "denied [a] housing opportunity." Her arguments might have been more compelling if this case involved allegations of denied opportunities to apply for housing despite frustrated affirmative efforts on Plaintiff's part to do so, as in *Havens*, but the allegations here are much less solid than that. No specific information—much less, for example, a rental application—was contained in the Facebook advertisements that Plaintiff was not privy to. Again, the fact remains that the advertisements she challenges merely led the targeted audience to websites that Plaintiff could just as easily have reached in other ways. The Court can only assume that most prospective tenants go directly to a rental company's website or otherwise contact the rental company directly to obtain specific information about the availability and pricing of units and, of course, to eventually apply for units. No more expense and no more inconvenience are required to access a rental company's website directly through simple searches on apartment-search websites or Google than to scroll through Facebook in the hope of lighting upon just the right housing advertisement, which may in fact never appear. When there are ten roughly equal paths to the same destination and an individual has access to nine them, that individual is hardly denied the ability "to compete on an equal footing." *City of Jacksonville*, 508 U.S. at 666.

**3.** Plaintiff further alleges that she suffered stigmatic harm when she learned that she had been excluded from the targeted audience for Defendants' housing advertisements by reason of her age. She contends that this exclusion constituted "unequal treatment" based on a protected trait (i.e., age), *see Heckler v. Mathews*, 465 U.S. 728, 739–40 (1984), leading to "embarrassment and humiliation," *McCrary v. Runyon*, 515 F.2d 1082, 1089 (4th Cir. 1975), *aff'd*, 427 U.S. 160 (1976). Notably, Plaintiff does not allege any facts regarding how she ultimately became aware of her exclusion from the targeted advertisements, nor does she allege that any Facebook users who

8

actually saw the advertisements were aware that older users were excluded therefrom. In fact, to learn that there was a targeted audience for a particular advertisement, Facebook users would have had to click on the small three-dot symbol in the corner of the post and click on "Why am I seeing this?"; only then would the users have been able to see why they personally received the advertisement. *See, e.g.*, Ex. A at 1 (showing that the advertisement for The Banks was targeted to "people interested in Pets" and "people ages 28 to 45 who live near Silver Spring, Maryland"). But there is no reason to suppose that any Facebook users who received the advertisement would necessarily have clicked that link to find out why they received the advertisement. It is far from a concrete and particularized injury to suggest that an otherwise facially neutral advertisement can "cause serious non-economic injuries" by "stigmatizing members of [a] disfavored group as 'innately inferior,'" *Heckler*, 465 U.S. at 739, when there is no suggestion that the recipients of the advertisement, nor indeed anyone excluded from receiving it (other than Plaintiff), were even aware of the targeting.

      Plaintiff compares her situation to that of a landlord placing "a 'whites only' advertisement in a community newsletter targeted at white families." But—to the extent that Facebook advertisements can fairly be compared to traditional media—this case seems more akin to a landlord placing a facially neutral advertisement in a community newsletter aimed primarily at White community members—while, at the same time, placing facially neutral advertisements directed at the community as a whole in all the more widely distributed papers in town. Whatever theoretical distress that hypothetical scenario might engender, it cannot be said to cause "embarrassment and humiliation" sufficient to produce the injury in fact required for standing.

      **4.** Finally, Plaintiff asserts she was deprived of the benefits of age-integrated associations by allegedly being steered away from Defendants' properties. This claim is simply without

9

foundation. To emphasize once again, when there exist ten paths to the same destination, an individual is not "steered away" from that destination just because one of those paths—and certainly, here, not the most direct path—is obscured from her view.

In sum, Plaintiff has failed to allege any concrete and particularized injury in fact.

## IV. Conclusion

The Court wishes to make clear that it does not reach the merits of Plaintiff's claim, viz., whether Defendants' advertising practices were or may have been contrary to D.C. and Montgomery County civil rights law intended to protect against housing advertisements that discriminate based on age, among other protected traits. However, this particular Plaintiff, in the Court's view, has not demonstrated "the irreducible constitutional minimum of standing" to sue with respect to the housing advertisements at issue.

The Court therefore **GRANTS** Defendants' Motion to Dismiss. A separate order will issue.

July 20, 2021

PETER J. MESSITTE
UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

NEUHTAH OPIOTENNIONE,
*on behalf of herself and all others similarly situated,*

Plaintiff,

v.

BOZZUTO MANAGEMENT COMPANY *et al.*,

Defendant.

\* \* \* \* \* \* \* \* \*

Civil No. **20-1956 PJM**

## ORDER OF DISMISSAL

Upon consideration of Defendants' Motion to Dismiss (ECF No. 65) and Plaintiff's opposition thereto, oral argument having been held, it is, for the reasons stated in the accompanying Memorandum Opinion, this 20th day of July 2021,

**ORDERED**

1. Defendants' Motion to Dismiss is **GRANTED**.

2. The Complaint is **DISMISSED**.

3. The Clerk of the Court is directed to **CLOSE** this case.

PETER J. MESSITTE
UNITED STATES DISTRICT JUDGE